**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

AMANDA KONDRAT'YEV, et al.,

      Plaintiffs,

      v.                                Case No.: 3:16cv195-RV/CJK

CITY OF PENSACOLA, FLORIDA, et al.,

      Defendants.

_____/

## **ORDER**

    This case involves the alleged unconstitutionality of a cross in a remote corner of a public city park. Discovery is now closed, and the parties have filed motions for summary judgment (docs. 30, 31). I held a hearing in this matter on June 14, 2017.

## I. Background

    The relevant facts are undisputed and can be stated briefly.

    Bayview Park is a 28-acre city park in the East Hill neighborhood of Pensacola, Florida. It overlooks Bayou Texar, a large body of water that empties into Pensacola Bay. In 1941, the National Youth Administration (a New Deal agency) erected a wood cross in the eastern corner of the park to be dedicated at the first annual Easter Sunrise Service held there. Several years later, a small amphitheatre was built right in front of the cross to serve as a permanent home for the church service. Two decades thereafter, in 1969, the Pensacola Jaycees (a civic group) replaced the wood cross with a concrete one for dedication at the 29th annual Easter Sunrise Service. The concrete cross, which still stands and is the subject of this dispute, is a 34-foot white "Latin cross." A Latin cross consists of a vertical bar and a shorter, horizontal one. It is a widely recognized symbol of Christianity.

The Bayview Cross is part of the rich history of Pensacola and of Bayview Park in particular. Thousands upon thousands of people have attended services in the park over the years. It has also been the site of remembrance services on Veteran's Day and Memorial Day, during which flowers were placed at the foot of the cross in honor of loved ones overseas and in memory of those who sacrificed their lives for our country. The cross is currently being maintained by the City, which for the past eight years has spent an average of $233 per year (out of a $772,206 annual maintenance budget, or about .03%) to keep it clean, painted, and illuminated at night.

Even though the cross costs very little to maintain, has hosted tens of thousands of people, and has stood on public property in one form or another for approximately 75 years (apparently without incident), four people—Amanda Kondrat'yev; Andreiy Kondrat'yev; David Suhor; and Andre Ryland—contend they are "offended" by it and want it removed. They have brought this lawsuit against the City of Pensacola, Mayor Ashton Hayward, and Director of Parks and Recreation Brian Cooper (together, "the City"), alleging that it violates the First Amendment.[1]

---

[1]

Three of the four plaintiffs arguably lack standing to continue this lawsuit. The Kondrat'yevs have relocated to Canada, which necessarily means their "use and enjoyment" of Bayview Park (and the "peace and tranquility" that it provided them) are no longer being "overshadowed by a religious symbol that signifies torture and violence" (doc. 1 at ¶¶ 9, 12). And although Mr. Suhor still resides in Pensacola and claims to feel "personally offended" and "excluded" by the Bayview Cross (*id.* at ¶ 16), that claim is highly attenuated in light of the fact that just last year he booked the amphitheatre for Easter Sunday—which required a church that had planned to use the site to move to another area of the park—so that he could use the space for his self-described "satanic purposes." Nevertheless, it is undisputed that the fourth plaintiff, Mr. Ryland, has standing in this action, and that is sufficient. *See Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain this suit."); *accord Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (stating that if standing is shown for at least one plaintiff with respect to each claim, "we need not consider the standing of the other plaintiffs to raise that claim").

As previously indicated, both sides have filed motions for summary judgment. Summary judgment is a pre-trial vehicle through which a party in a civil action must prevail if the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). Resolution by summary judgment is proper, in other words, when the facts are not in dispute and all that remains are questions of law. The parties agree that the pertinent facts are not disputed and that this case should be decided as a matter of law.

## II. Discussion

This case requires an interpretation and application of the First Amendment to the United States Constitution. The First Amendment contains two "religion clauses:" the Free Exercise Clause and the Establishment Clause. The Establishment Clause, the one at issue in this lawsuit, provides that "Congress shall make no law respecting an establishment of religion. . . ." From these ten words has sprung a body of law that is historically unmoored, confusing, inconsistent, and almost universally criticized by both scholars and judges alike. But I will begin at the beginning.

The available evidence strongly suggests—if not conclusively shows—that the Establishment Clause was intended to prevent Congress from establishing a *national* religion, that is, from officially preferring one rival sect over another. *See Wallace v. Jaffree*, 472 U.S. 38, 91-107 (1985) (Rehnquist, J., dissenting) (extensively reviewing the historical record). It obviously did not preclude the establishment of religions per se. We know this because several states maintained "established" religions at the time the First Amendment was ratified, and they continued to do so many years thereafter. *Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 621 & n.3 (9th Cir. 1996) (O'Scannlain, J., concurring in judgment) (noting same and identifying six states that maintained state religions: Connecticut, Georgia, Maryland, Massachusetts, New Hampshire, and South Carolina). Thus, as one scholar has stated: "What united

the representatives of all the states, both in Congress and in the ratifying legislatures, was a much more narrow purpose: to make it plain that *Congress* was not to legislate on the subject of religion, thereby leaving the matter of church-state relations to the individual states." Daniel O. Conkle, *Toward a General Theory of the Establishment Clause*, 82 Nw. U. L. Rev. 1113, 1133 (1988). In other words, it was concerns about federalism, and not about governmental endorsement of religion, that motivated the ratification of the Establishment Clause. *City of Eugene*, 93 F.3d at 621 (O'Scannlain, J., concurring in judgment); *accord, e.g.,* Zachary N. Somers, Note, *The Mythical Wall of Separation: How the Supreme Court has Amended the Constitution*, 2 Geo. J. L. & Pub. Pol'y 265, 271 (2004) (the ratifiers understood it to have two functions: "First, [it] forbade the national government from installing a national religion or giving a preferred status to one religious sect over another. Second, the carefully chosen word 'respecting' was used to ensure that not only would the national government not set up a national religion, but it would also be prohibited from interfering with the several states' decisions regarding church-state relations.").

Consistent with this reading and understanding of the Establishment Clause's "narrow purpose," it was generally accepted in the early period of this nation that the First Amendment did not require the government to be indifferent or neutral (let alone hostile) to religion, particularly Christianity. Indeed, prayer was a "prominent part of governmental ceremonies and proclamations." *Lee v. Weisman*, 505 U.S. 577, 633-36 (1992) (Scalia, J., dissenting) (citing multiple examples, including, *inter alia*, George Washington including prayer as his first official act as President; the First Congress opening with a chaplain's prayer; and benedictions at public school graduations dating back to the first high school graduation ceremony in 1868). In addition, the words "In God We Trust" were impressed on our coins starting in 1865, and "[c]ountless similar examples could be listed, but there is no need to belabor the obvious." *Engel v. Vitale*,

370 U.S. 421, 449-50 (1962) (Stewart, J., dissenting).

As Supreme Court Justice, Harvard Law Professor, and preeminent nineteenth century legal scholar Joseph Story observed in his treatise on the Constitution in 1851:

> Probably at the time of the adoption of the Constitution, and of the Amendment to it now under consideration [i.e., the First Amendment], *the general if not the universal sentiment in America was, that Christianity ought to receive encouragement from the State* so far as was not incompatible with the private rights of conscience and the freedom of religious worship. *An attempt to level all religions, and to make it a matter of state policy to hold all in utter indifference, would have created universal disapprobation, if not universal indignation.*
>
>                \* \* \*
>
> The real object of the [Establishment Clause] was not to countenance, much less to advance, Mahometanism, or Judaism, or infidelity, by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment which should give to a hierarchy the exclusive patronage of the national government. It thus cut off the means of religious persecution (the vice and pest of former ages), and of the subversion of the rights of conscience in matters of religion, which had been trampled upon almost from the days of the Apostles to the present age. . . .

2 Joseph Story, *Commentaries on the Constitution of the United States* §§ 1874, 1877 (2d ed. 1851) (emphasis added); *accord* Thomas Cooley, *Principles of Constitutional Law* at 224-225 (3d. ed. 1898) ("it was never intended by the [First Amendment] that the Government should be prohibited from recognizing religion"); *see also Wallace*, 472 U.S. at 98 (surveying the evidence and referring to as "indisputable" that James Madison, principal author of the Bill of Rights, "did not see it as requiring neutrality on the part of government between religion and irreligion") (Rehnquist, J., dissenting).

All this to say, the historical record indicates that the Founding Fathers did not intend for the Establishment Clause to ban crosses and religious symbols from public property. Indeed, "the enlightened patriots who framed our constitution" [*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 188 (1824)] would have most likely found this lawsuit absurd. And if I were deciding this case on a blank slate, I would agree and grant the plaintiffs no relief. But, alas, that is not what we have here.

Starting in 1947, the Supreme Court began to retreat from the well-established original understanding of the Establishment Clause. In *Everson v. Board of Ed. of Ewing Tp.*, 330 U.S. 1 (1947), a five-member majority of the Court for the very first time (in an opinion authored by Justice Black) adopted the now oft-quoted "wall of separation" metaphor in analyzing First Amendment claims:

> Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa. In the words of [Thomas] Jefferson, the clause against establishment of religion by law was intended to erect "a wall of separation between Church and State."

*Id.* at 16. The foregoing quote comes from a letter that Jefferson wrote to the Danbury Baptist Association in 1802, wherein he said: "I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' thus building a wall of separation between church and State." 8 Writings of Thomas Jefferson 113 (H. Washington ed. 1861). But, as Justice Rehnquist has noted:

> Thomas Jefferson was of course in France at the time the . . . Bill of Rights [was] passed by Congress and ratified by the States. His letter to the Danbury Baptist Association was a short note of courtesy, written 14 years after the Amendments were passed by Congress. He would seem to any detached observer as a less than ideal source of contemporary history as to the meaning of the Religion Clauses of the First Amendment.

*Wallace*, 472 U.S. at 92. Nevertheless, Jefferson's metaphor became "the focus for subsequent Establishment Clause analysis and set a philosophical tone that resonated through all post-World War II decisions regarding church and state. Operating under the assumption that the 'wall of separation' represented the Establishment Clause's correct meaning, the Court gradually developed a series of tests designed to determine if a particular governmental practice or statute impermissibly breached that wall." *City of Eugene*, 93 F.3d at 622 (O'Scannlain, J., concurring in judgment). There have been several Establishment Clause tests. Chief among them is the *Lemon* test, derived from *Lemon v. Kurtzman*, 403 U.S. 602 (1971).

*Lemon* has been widely criticized (and sometimes savaged) by scholars, courts, and individual Supreme Court Justices. *See, e.g., Chabad-Lubavitch of Ga. v. Miller*, 5 F.3d 1383, 1388 & n.8 (11th Cir. 1993) (collecting sources); *Barnes v. Cavazos*, 966 F.2d 1056, 1063 (6th Cir. 1992) ("The *Lemon* test has received criticism from virtually every corner and we add our voices to those who profess confusion and frustration with *Lemon's* analytical framework."); *see also Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 399 (1993) (recognizing and agreeing with "the long list of constitutional scholars who have criticized *Lemon*") (Scalia, J., dissenting). The Eleventh Circuit has stated, however:

> We follow the tradition in this area by beginning with the almost obligatory observation that the *Lemon* test is often maligned. *But it is even more often applied.*
>
> What the Supreme Court said ten years ago remains true today: "*Lemon*, however frightening it might be to some, has not been overruled." *Lamb's Chapel*, 508 U.S. at 395 n.7.

*Glassroth v. Moore*, 335 F.3d 1282, 1295 (11th Cir. 2003) (internal citations omitted) (emphasis added); *accord Smith v. Governor for Alabama*, 562 F. App'x 806 (11th Cir. 2014) (applying *Lemon* as recently as three years ago).

To pass constitutional muster under *Lemon*, a government practice must have (1) a secular purpose; (2) it must neither advance nor inhibit religion in its principal or primary effect; and (3) it must not foster an excessive entanglement with religion. 403 U.S. at 612-13. "If [the challenged government action] violates any of these three principles, it must be struck down under the Establishment Clause." *Stone v. Graham*, 449 U.S. 39, 40-41 (1981). As for the first prong—and as particularly relevant for this case—it has been recognized that "the Latin cross is unmistakably a universal symbol of Christianity . . . and it has never had any secular purpose. In fact, *no federal case has ever found the display of a Latin cross on public land . . . to be constitutional.*" *Mendelson v. City of St. Cloud*, 719 F. Supp. 1065, 1069 (M.D. Fla. 1989) (citations omitted) (emphasis added). Thus, if *Lemon* applies, the Bayview Cross is in trouble, as the City acknowledged during the June 14th hearing in this case.

But *Lemon* is not consistently used, and, as noted, there are several other tests as well. For example, there is: (1) the "endorsement test" from *Lynch v. Donnelly*, 465 U.S. 668, 687-94 (1984) (O'Connor, J., concurring); (2) the "*Marsh* test" from *Marsh v. Chambers*, 463 U.S. 783 (1983); (3) a "narrow coercion test" from *Lee v. Weisman*, 505 U.S. at 642 (Scalia, J., dissenting); and *County of Allegheny v. ACLU*, 492 U.S. 573, 660 (1989) (Kennedy, J., concurring in part and dissenting in part); (4) a "broad coercion test" from *Lee*, 505 U.S. at 586-99; and (5) a "nonpreferentialist test" from *Wallace*, 472 U.S. at 91-114 (Rehnquist, J., dissenting). *See generally* Steven G. Gey, *"Under God," The Pledge of Allegiance, and Other Constitutional Trivia*, 81 N.C. L. Rev. 1865, 1883, 1891-92, 1919 & ns. 67, 106-108, 226 (2003) (noting each of these tests). Some members of the Court have suggested that still other tests should govern. *See Van Orden v. Perry*, 545 U.S. 677, 692-94 (2005) (where Justice Thomas argued that even if the Establishment Clause is incorporated and applies to the states, which he believes it should not, the Court should return to "the original meaning of the word

'establishment,'" as the Framers understood that term). Sometimes the Justices have advocated no discernible formal test at all (but rather a standardless ad hoc approach), or they have embraced "different analyses at different times, without ever abandoning their earlier approaches, or recognizing the incompatibility of the various tests." Gey, *supra*, 81 N.C. L. Rev. at 1883 n.67.

Unsurprisingly, this hodgepodge has caused significant confusion in the lower courts. *Utah Highway Patrol Ass'n v. American Atheists, Inc.*, 565 U.S. 994 (2011) (Thomas, J., dissenting from denial of certiorari) ("Lower courts have understandably expressed confusion. This confusion has caused the Circuits to apply different tests to displays of religious imagery challenged under the Establishment Clause.") (citing, *inter alia*, *Green v. Haskell Cty. Bd. of Comm'rs*, 574 F.3d 1235, 1235 n.1 (10th Cir. 2009) (Kelly, J., dissenting from denial of rehearing) (noting that "whether *Lemon* and its progeny actually create discernable 'tests,' rather than a mere ad hoc patchwork, is debatable," and describing the "judicial morass resulting from the Supreme Court's opinions"); *Card v. City of Everett*, 520 F.3d 1009, 1016 (9th Cir. 2008) (recognizing that current Establishment Clause jurisprudence has been described as "'Limbo'"); *id.* at 1023-1024 (Fernandez, J., concurring) (applauding the majority's "heroic attempt to create a new world of useful principle out of the Supreme Court's dark materials," but noting that the "*Lemon* test and other tests and factors, which have floated to the top of this chaotic ocean from time to time," remain "so indefinite and unhelpful that Establishment Clause jurisprudence has not become more fathomable"); *Skoros v. New York*, 437 F.3d 1, 13 (2d Cir. 2006) ("[W]e confront the challenge of frequently splintered Supreme Court decisions" and Justices who "have rarely agreed—in either analysis or outcome—in distinguishing the permissible from the impermissible public display of symbols having some religious significance."); *ACLU v. Mercer Cty., Ky.*, 432 F.3d 624, 636 (6th Cir. 2005) ("we remain in Establishment Clause purgatory")).

In light of the foregoing, how is the Bayview Cross supposed to be analyzed? By applying *Lemon*; one of the other tests; or no formal test at all? May I look to what the Founding Fathers intended (in which case the cross is certainly constitutional), or must I look to how the "wall of separation" metaphor has been applied (in which case it is probably unconstitutional)? Ultimately, these are not difficult questions—legally speaking—because there is controlling precedent directly on point.

In *ACLU of Georgia v. Rabun County Chamber of Commerce*, 698 F.2d 1098 (11th Cir. 1983), the Eleventh Circuit considered this exact issue on virtually identical facts. In *Rabun County*, a private organization (there, the Chamber of Commerce; here the Jaycees) put up a tall illuminated Latin cross (there, a 35-foot cross; here a 34-foot cross) to replace an existing one. The cross was on government property (there, a state park in Black Rock Mountain; here, a city park in Pensacola), and its dedication was specifically scheduled to coincide with the annual Easter Sunrise Service (there, the 21st annual service; here, the 29th annual service), which had been held at the site of the cross for a number of years. As the plaintiffs have pointed out, however, *Rabun County* differs from this action in at least one notable respect: when the government received objections to the cross in *Rabun County*, it asked the Chamber of Commerce to remove it, but the organization refused (and the government did not push the issue). Here, by contrast, when the plaintiffs complained about the cross (and threatened suit), the City did not try to have it removed. To the contrary, Mayor Hayward told the press that he did not want it removed because "I hope there is always a place for religion in the public square."

Thus, in *Rabun County*, the ACLU and five individuals (here, four individuals) filed an action against the city and the Chamber of Commerce, seeking to permanently enjoin the maintenance of the cross as a violation of the First Amendment. The district court ruled for the plaintiffs and ordered the cross removed. The defendants appealed.

The Eleventh Circuit began its analysis by expressly stating that the *Lemon* test was the "correct" and "controlling" legal standard to apply. *Rabun County*, 698 F.2d at 1109 & n.20. Applying that test, the court wasted very little time—barely one page of its thirteen page opinion—concluding that the cross failed the first prong of *Lemon*. The court noted that there was "ample evidence" that the cross was not erected for a secular purpose, specifically: (1) "the Latin cross is universally regarded as a symbol of Christianity;" and (2) the city chose "an Easter deadline for completion of the cross [and decided] to dedicate [it] at Easter Sunrise Services . . . ." *See id.* at 1110-111. The Court of Appeals agreed with the district court that these facts clearly "point[ed] to the existence of a religious purpose." *Id.* at 1111. The opinion concluded as follows:

> For many years, a cross on Black Rock Mountain State Park has shone over the North Georgia mountains. Yet "historical acceptance without more" does not provide a rational basis for ignoring the command of the Establishment Clause that a state "pursue a course of 'neutrality' toward religion." Moreover, we cannot close our eyes to the light of the cross on the ground that it represents only a minor encroachment of this constitutional command, for the "breach of neutrality that is today a trickling stream may all too soon become a raging torrent." Accordingly, the cross must be removed.

*Id.* (internal citations omitted).

If the cross under review in *Rabun County* violated the First Amendment and had to be removed, the cross here must suffer the same fate. Indeed, not only are both of the above facts also present here (i.e., it is a Latin cross that was completed by, and dedicated at, an Easter Sunrise Service), but the mayor has said that he does not want the cross taken down specifically because he hopes there will "always [be] a place for religion in the public square," which is essentially an admission that the cross has been sustained for a religious purpose.

Thus, if *Rabun County* is still good law, it is binding on me and the resolution of this case is clear. *See, e.g., Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991) (noting that district courts within the Eleventh Circuit are "bound by this court's decisions"); *Litman v. Mass. Mut. Life Ins. Co.*, 825 F.2d 1506, 1508 (11th Cir. 1987) (cautioning that "[a]bsent a Supreme Court decision to the contrary, district courts are *compelled* to follow mandates of appellate courts") (emphasis added).[2] To get around *Rabun County*, the City argues that *Lemon* (which *Rabun County* relied on) no longer applies to cases like this one. The City's argument is based principally on the Supreme Court's intervening decision in *Van Orden v. Perry*, 545 U.S. 677 (2005).

The question in *Van Orden* was whether the Establishment Clause permitted the display of a 6-foot monolith inscribed with the Ten Commandments on state capitol grounds in Texas. The monument was among 16 other *non-religious* monuments and 21 historical markers in the 22 acres surrounding the capitol, each of which was meant to commemorate the "'people, ideals, and events that compose Texan identity.'" 545 U.S. at 681. The monolith (one of more than a hundred around the country, along with

---

[2]

In their responsive memorandum, the City suggested that *Rabun County* (decided almost 35 years ago) is an old case. "Judicial decisions, however, are not spoilable like milk. They do not have an expiration date and go bad merely with passage of time." *ComTran Group, Inc. v. U.S. Dep't of Labor*, 722 F.3d 1304, 1314 (11th Cir. 2013) (Vinson, J.).

At the hearing, the City also tried to distinguish *Rabun County* by noting that the cross in that case (which had replaced an earlier, longer-standing one) had only been in place for a few years. The cross here, by contrast, has been standing for about 75 years. (When the original Bayview Cross was erected in 1941, the Establishment Clause was not construed as an obstacle). But there is no reason to believe the relative age of the cross in *Rabun County* had any bearing on the Eleventh Circuit's ruling. Quite to the contrary, as stated in the text, the panel concluded its opinion by intimating that regardless of how "many years" the cross had been standing, "'historical acceptance without more' does not provide a rational basis for ignoring the command of the Establishment Clause that a state 'pursue a course of 'neutrality' toward religion.'" Insofar as the City argues that later Supreme Court case law authorizes courts to consider passage of time and historical acceptance, that argument will be considered immediately above.

thousands of paper replicas) had been donated forty years prior by the Fraternal Order of Eagles of Texas—a national social, civic, and patriotic organization—as part of its national program to combat juvenile delinquency. The bottom of the monument bore an inscription that read: "PRESENTED TO THE PEOPLE AND YOUTH OF TEXAS BY THE FRATERNAL ORDER OF EAGLES OF TEXAS, 1961." *Id.* After someone complained and sued to have the monolith removed, the district court held that it *did not* violate the Establishment Clause inasmuch as the state had a valid secular purpose in recognizing and commending the Eagles group for their efforts to reduce juvenile delinquency. *Id.* at 682. The district court held "that a reasonable observer, mindful of the history, purpose, and context, would not conclude that this passive monument conveyed the message that the State was seeking to endorse religion." *Id.* The Fifth Circuit agreed with the district court and affirmed.

The case was appealed to the Supreme Court, which also affirmed. A plurality of Justices (Rehnquist, Scalia, Kennedy, and Thomas) stated as follows:

> Over the last 25 years, we have sometimes pointed to [*Lemon*] as providing the governing test in Establishment Clause challenges. *Compare Wallace v. Jaffree*, 472 U.S. 38 (1985) (applying *Lemon*), *with Marsh v. Chambers*, 463 U.S. 783 (1983) (not applying *Lemon*) . . . . Many of our recent cases simply have not applied the *Lemon* test. Others have applied it only after concluding that the challenged practice was invalid under a different Establishment Clause test.
>
> Whatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence, *we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds.* Instead, our analysis is driven both by the nature of the monument and by our Nation's history.

*Id.* at 685-86 (some internal citations omitted) (emphasis added).

The plurality opinion then went on to discuss the significant role that the Ten Commandments have played "in our Nation's heritage," as evidenced by the fact that they are widely displayed in courtrooms (including, notably, the Supreme Court itself) and throughout the Nation's capital. *Id.* at 688-89. In addition, the historical role of the Ten Commandments has also been recognized in Supreme Court case law and by the Executive and Legislative branches as well. *Id.* at 689-90 (citations omitted). The plurality continued:

> Of course, the Ten Commandments are religious—they were so viewed at their inception and so remain. The monument, therefore, has religious significance. According to Judeo-Christian belief, the Ten Commandments were given to Moses by God on Mt. Sinai. But Moses was a lawgiver as well as a religious leader. And the Ten Commandments have an undeniable historical meaning, as the foregoing examples demonstrate. Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause.
>
> * * *
>
> . . . Texas has treated its Capitol grounds monuments as representing the several strands in the State's political and legal history. The inclusion of the Ten Commandments monument in this group has a *dual significance*, partaking of both religion and government. We cannot say that Texas' display of this monument violates the Establishment Clause of the First Amendment.

*Id.* at 690-91 (emphasis added). Notably, the plurality specifically stated in a footnote that: "we need not decide in this case the extent to which a *primarily religious purpose* would affect our analysis because it is clear from the record that there is no evidence of such a purpose in this case." *Id.* at 691 n.11 (emphasis added).

The City highlights the portion in *Van Orden* where the plurality said that it did not find *Lemon* "useful." *See id.* at 686. Seizing on this language, the City argues that the *Lemon* test is no longer appropriate to evaluate passive monuments. And thus, to the extent *Rabun County* relied on and applied *Lemon*, the City contends that it is no longer controlling precedent. I disagree for three reasons.

First, on the same day that *Van Orden* was issued, the Supreme Court decided *McCreary County, Kentucky v. ACLU of Kentucky*, 545 U.S. 844 (2005). Just like *Van Orden*, that action involved a First Amendment challenge to the Ten Commandments being posted on public property. A five-member majority in *McCreary County* applied *Lemon*—specifically, the purpose prong—to *strike down* the display, whereas the *Van Orden* plurality opined that *Lemon* was not "useful" and *upheld* the display. Whatever else may be said (and much has been said) about the apparent inconsistency between these two decisions and the confusion generated by the ten(!) separate opinions in the cases,[3] one thing is reasonably clear: *Van Orden's* plurality opinion did not overrule or otherwise nullify the *Lemon* test in religious monument cases (nor could it), or else *McCreary County's* majority would not have applied it that very same day.

Second, the *Van Orden* plurality did not say that the *Lemon* test was not useful in evaluating *all* religious monuments. Rather, it merely said the test was "not useful in dealing with the sort of passive monument" that Texas erected in *that* case. *See Van Orden,* 545 U.S. at 686. And the "sort" of monument in that case (positioned among almost 40 other non-religious monuments and historical markers) was a monolith of the Ten Commandments, which the plurality noted has played both a historical/legal

---

[3]

Edith Brown Clement, *Public Displays of Affection . . . for God: Religious Monuments After McCreary & Van Orden*, 32 Harv. J. L. & Pub. Pol'y 231 (2009); *see also, e.g., Card v. Everett*, 520 F.3d 1009, 1016 (9th Cir. 2008) (observing that courts have been "[c]onfounded by the ten individual opinions in the two cases"); *accord* Linda Greenhouse, *Justices Allow a Commandments Display, Bar Others*, N.Y. Times, June 28, 2005 (reporting that when the Supreme Court announced the ten separate opinions, Justice Rehnquist joked: "I didn't know we had that many people on our Court").

role in this nation as well as a religious one. That is not the situation here as a solitary Latin cross ("a universally recognized symbol of Christianity," *see Rabun County*, 698 F.2d at 1103) would not appear to have such dual significance. *King v. Richmond Cty., Ga.*, 331 F.3d 1271, 1285 (11th Cir. 2003) (referring to the cross as an "exclusively religious symbol"). Indeed, the plurality in *Van Orden* declined to speculate how its analysis would be affected if the monument there—as in this case—had a "*primarily religious purpose*." 545 U.S. at 691 n.11 (emphasis added).[4]

Third and lastly, the plurality decision and its disregard of the *Lemon* test is not the "controlling" opinion in *Van Orden*. Justice Breyer's separate concurrence is. *See, e.g., Card,* 520 F.3d at 1017 n.10 ("the controlling opinion in *Van Orden* is, of course, that of Justice Breyer"); *Staley v. Harris County, Texas*, 485 F.3d 305, 308 n.1 (5th Cir. 2007) ("Justice Breyer's concurrence is the controlling opinion in *Van Orden*") (both cases quoting *Marks v. United States*, 430 U.S. 188, 193 (1977) ("When a fragmented

---

[4]

The City concedes (as it must) that the Bayview Cross is obviously a symbol of Christianity. However, it suggests that it is not *merely* a religious symbol. Rather, it is "intertwined in Pensacola history" and has been a place where "many thousands of Pensacolians" have gathered over the years to support our country and honor fallen soldiers. I don't disagree. Despite briefly implying that the Bayview Cross is a war memorial in its motion, however, the City did not actually make that claim at the hearing or tender any evidence to suggest that the cross was dedicated as a war memorial or intended to be one. Nor, apparently, would it have made a difference if it had (*see* doc. 31 at 14-15 (citing numerous appellate and district court cases ordering the removal of war memorial crosses)); *see also Separation of Church & State Comm. v. City of Eugene*, 93 F.3d 617, 626 (9th Cir. 1996) ("Though the cross has a secular purpose as a war memorial, observers might reasonably perceive the City's display of such a religious symbol on public property as government endorsement of the Christian faith. Further, the City's use of a cross to memorialize the war dead may lead observers to believe that the City has chosen to honor only Christian veterans.") (O'Scannlain, J., concurring in judgment).

The City also points out that the Bayview Cross is one of two displays in the park, the second one being a memorial to Tim Bonifay, a Pensacola resident who died in a skiiing accident on Bayou Texar. But the presence of that second monument in the park does not alter the fact that the Bayview Cross obviously had—and still has—a primarily religious purpose, as evidenced, *inter alia*, by the mayor's own words to that effect.

Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'")). And Justice Breyer did not express hostility toward the *Lemon* test, say that it was inapplicable in all passive religious monument cases, or suggest that it should be overruled. In fact, perhaps in response to the plurality's suggestion to the contrary, he stated that *Lemon would* continue to be "useful" in Establishment Clause cases. *Van Orden,* 545 U.S. at 700.[5]

However, Justice Breyer went on to say that in "difficult borderline cases," it would be better to use legal judgment—instead of the *Lemon* test—which would allow courts to "reflect and remain faithful to the underlying purposes of the [Establishment Clause and] . . . take account of context and consequences measured in light of those purposes." *See id.* Justice Breyer determined that the monument under review in *Van Orden* presented a "borderline case" because (as the plurality had already recognized) the Ten Commandments carried not only a religious message, but "secular moral" and "historical" messages as well. *See id.* at 700-01. Consequently, he employed his "legal judgment test" and found that the monolith passed that test based on: (1) the "physical setting" where it was placed (i.e., it was situated in a large park with *dozens* of non-religious monuments and historical markers, which "suggests little or nothing of the sacred"); (2) the length of time it stood there (about 40 years); and (3) the fact that the group that donated it sought to "highlight the Commandments' role in shaping civil

---

[5]

Indeed, Justice Breyer was part of the majority bloc in *McCreary County, Kentucky v. ACLU of Kentucky*, 545 U.S. 844 (2005), which, as previously discussed, was decided the same day as *Van Orden* and applied *Lemon* in a different Ten Commandments display case. And furthermore, Justice Breyer made a point to specifically say in *Van Orden* that he disagreed with Justice Scalia's dissent in *McCreary County*, where he (Justice Scalia) had argued that the *Lemon* test was "bad;" criticized its "brain-spun" logic; and asserted that its purpose prong—incidentally, the prong that was applied in *Rabun County*—should be "abandoned."

morality as part of that organization's efforts to combat juvenile delinquency." *Id.* at 700-03. He also noted that the monolith "prominently acknowledge[d] that the Eagles donated the display, a factor which, though not sufficient, . . . further distances the State itself from the religious aspect of the Commandments' message." *Id.* at 701-02.[6]

After considering all the foregoing, I have to conclude that *Van Orden* did not overrule or nullify *Lemon/Rabun County*. At most, the plurality said that *Lemon* was not "useful" in considering passive monuments of the "sort" at issue in that case (i.e., a longstanding Ten Commandments display with "*dual significance*"), and, in such "borderline cases," Justice Breyer would apply his "legal judgment test" to consider context, history, and the overall purpose of the Establishment Clause. Or as the Ninth Circuit has described it: "*Van Orden* expressly establishes an 'exception' to the *Lemon* test in certain 'borderline cases' regarding the constitutionality of some longstanding plainly religious displays that convey a historical or secular message in a non-religious context." *See Trunk v. City of San Diego*, 629 F.3d 1099, 1107 (9th Cir. 2011) (citation omitted). If I were to apply that test here (and look to context, history, passage of time, placement of the cross, and overall purpose of the Establishment Clause), the Bayview Cross might well pass constitutional muster. However, Justice Breyer's "test"—which

---

6

One writer has opined that Justice Breyer's *Van Orden* concurrence, which "insulated from constitutional challenge the thousands of Ten Commandment markers that were erected in the 1950s and 1960s by the Fraternal Order of Eagles," is "a laudable act of judicial statesmanship" in that it "defends an important principle of liberal constitutionalism—a firm separation of church and state. Yet at the same time, it acknowledges political reality and makes a wise concession to the force of public opinion." Michael J. Klarman, *Judicial Statesmanship: Justice Breyer's Concurring Opinion in Van Orden v. Perry*, 128 Harv. L. Rev. 452 (2014). But not all the reviews have been so positive. *See, e.g.,* John E. Nowak and Ronald D. Rotunda, *Constitutional Law* 1570 (8th ed. 2010) ("To say that Justice Breyer's opinion concurring in the judgment in *Van Orden* will provide little guidance to lower court judges when they consider establishment clause challenges to government displays would be an understatement."); *see also id.* (further opining that "it is difficult to understand how anyone other than Justice Breyer could apply his analysis, which contains neither any formal tests nor any clear guideposts for how lower courts could anticipate [his] judgment").

is not really a test at all—is inappropriate here because this is not a "borderline case." Indeed, based on the undisputed facts (i.e., the nature of the Latin cross, its dedication at the Easter Sunrise Service, and the mayor's statements), the Bayview Cross clearly has a primarily—*if not exclusively*—religious purpose. Thus, the *Lemon* test controls, and not *Van Orden's* "legal judgment test."

The City contends, however, that it is "reasonable to assume [that the Eleventh Circuit] would apply *Van Orden*" to this case instead of *Lemon*. But as Circuit Judge Edith Brown Clement has observed: "Most courts of appeals have concluded that the *Lemon* tripartite test of purpose, effect, and entanglement still stands after *Van Orden* . . . . Out of the ten-plus religious monuments cases actually decided by the courts of appeals since *Van Orden*, only two have expressly declined to apply *Lemon*, and both did so on extremely narrow grounds." *See* Edith Brown Clement, *Public Displays of Affection . . . for God: Religious Monuments After McCreary & Van Orden*, 32 Harv. J. L. & Pub. Pol'y 231, 246-47 & n.100 (2009) (collecting cases). It thus seems more likely that the Eleventh Circuit would continue to apply the *Lemon* test to cross cases, as several post-*Van Orden* courts have done, including at least one district court in this circuit. *American Atheists, Inc. v. City of Starke*, 2007 WL 842673, at *5-7 (M.D. Fla. 2007). Notably, the City conceded during the June 14th hearing that in the twelve years since *Van Orden* was decided, there is apparently no case by any court—in this circuit or beyond—holding that it overruled *Lemon* or supplanted its analysis in a cross case like this one.[7] It is not "reasonable to assume" that the Eleventh Circuit would be the first to do so.

---

[7] However, it was noted at the hearing that in *Trunk v. City of San Diego*, 629 F.3d 1099 (9th Cir. 2011), the Ninth Circuit analyzed a "cross case" under both *Lemon* and *Van Orden* because the court concluded that on the facts of that particular case the result would be the same regardless. *See id.* at 1107 ("Ultimately, we need not resolve the issue of whether *Lemon* or *Van Orden* controls our analysis of the Memorial . . . [because] both cases guide us to the same result.").

Indeed, such an assumption would be particularly untenable in light of *Rabun County*, which is not only binding precedent on me *but on the Court of Appeals as well*. To apply the legal judgment test from *Van Orden* to this case instead of *Lemon* would relegate *Rabun County* to the dustbin of history, which the Eleventh Circuit could only do en banc. Indeed, in this circuit, "'it is the firmly established rule . . . that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.'" *Breslow v. Wells Fargo Bank,* 755 F.3d 1265, 1267 (11th Cir. 2014) (citation omitted). Unless the subsequent Supreme Court decision and the previous circuit precedent are "clearly inconsistent," the Court of Appeals is "bound to follow" its existing precedent until it is overruled en banc. *See Garrett v. University of Alabama at Birmingham Bd. of Trustees,* 344 F.3d 1288, 1292 (11th Cir. 2003) (citations omitted). As I have said, *Van Orden* and *Rabun County* can be reconciled: the latter applies to single purpose religious symbol cases, whereas the former applies to "borderline" dual purpose (and arguably only Ten Commandment) cases. They are not clearly inconsistent. I believe the Eleventh Circuit Court of Appeals would have to continue to follow *Rabun County* in cross cases unless and until the *full court* decided to take a different path and follow *Van Orden*, and I think that unlikely.[8]

---

[8]     In its memoranda, the City quotes several concurring, dissenting, and plurality opinions from some more recent First Amendment cases decided by the Supreme Court in other contexts. Together, these quotes arguably suggest that *Lemon/Rabun County* (and certain parts of Establishment Clause jurisprudence as a whole) have been weakened and may be poised to be reconsidered. However, it is well established that "we are not at liberty to disregard binding case law that is so closely on point and has only been weakened, rather than directly overruled, by the Supreme Court." *Florida League of Prof'l Lobbyists, Inc. v. Meggs,* 87 F.3d 457, 462 (11th Cir. 1996). Notably, "this is so even if we are convinced that the Supreme Court will overturn its previous decision the next time it addresses the issue. Though wounded, [binding precedent] still marches on and we are ordered to follow. We will join the funeral procession only after the Supreme Court has decided to bury it." *United States v. Gibson*, 434 F.3d 1234, 1247 (11th Cir. 2006) (citations omitted). Here, the Eleventh Circuit may be "following" for a long time as it is unclear if *Lemon* will ever be truly buried. *See Lamb's Chapel*

*Lemon* is routinely criticized, but it is still the law of the land and I am not free to ignore it.[9] Nor am I free to ignore *Rabun County*, which expressly states that *Lemon* provides the "correct" analytical framework in cases such as this. Accordingly, *Rabun County* controls. And consistent with that directly-on-point and binding case law, the Bayview Cross fails the first prong of the *Lemon* test and, thus, runs afoul of the First Amendment as currently interpreted by the Supreme Court.[10]

To be clear: None of this is to say that the cross would have to come down if the City sold or leased the area surrounding it to a private party or non-governmental entity (so long as the transfer was bona fide and not a subterfuge). Nor would there be a constitutional problem with worshipers using a temporary cross for their services in the park (counsel for plaintiffs conceded that point during the hearing). However, after about 75 years, the Bayview Cross can no longer stand as a permanent fixture on city-owned property. I am aware that there is a lot of support in Pensacola to keep the cross as is, and I understand and respect that point of view. But, the law is the law.

---

*v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 398 (1993) (comparing *Lemon* to "some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried;" stating that "no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart . . . and a sixth has joined an opinion doing so," but it still "stalks our Establishment Clause jurisprudence") (Scalia, J., dissenting).

[9]

*Lemon* has not only been criticized by several Justices, but, as noted, it has occasionally been bypassed or ignored by the Supreme Court. *See Lynch v. Donnelly*, 465 U.S. 668, 679 (1984) (noting multiple times where the Court did not apply it); *Lamb's Chapel*, 508 U.S. at 399 ("When we wish to strike down a practice it forbids, we invoke it; when we wish to uphold a practice it forbids, we ignore it entirely.") (Scalia, J., dissenting). The Supreme Court can do that, as it did in *Van Orden*. But as the Tenth Circuit has said: "While the Supreme Court may be free to ignore *Lemon*, this court is not. Therefore, we cannot . . . be guided in our analysis by the *Van Orden* plurality's disregard of the *Lemon* test." *Green v. Haskell Cty. Bd. of Comm'rs*, 568 F.3d 784, 797 n.8 (10th Cir. 2009).

[10]

The plaintiffs contend that the Bayview Cross fails all three prongs of the *Lemon* test. I need not address that argument or analyze the other two prongs of the test as *Rabun County* is dispositive on the first prong.

## III. Conclusion

As one author has noted, "[i]n a rare and remarkable way, the Supreme Court's establishment clause jurisprudence has unified critical opinion: people who disagree about nearly everything else in the law agree that establishment doctrine is seriously, perhaps distinctively, defective." *See* Steven D. Smith, *Separation and the "Secular:" Reconstructing the Disestablishment Decision*, 67 Tex. L. Rev. 955, 956 & ns.1 & 2 (1989) (citing multiple "scathing" judicial and scholarly criticisms, including: Leonard W. Levy, *The Establishment Clause: Religion and the First Amendment* 163 (1986) ("the Supreme Court would not recognize an establishment of religion if it took life and bit the Justices"); Rex Lee, *The Religion Clauses: Problems and Prospects*, 1986 B.Y.U. L. Rev. 337 (1986) ("A decent argument can be made that the net contribution of the Court's precedents toward a cohesive body of law . . . has been zero. Indeed, some would say that it has been less than zero.")); *Edwards v. Aguillard*, 482 U.S. 578, 639 (1987) ("our embarrassing Establishment Clause jurisprudence") (Scalia, J., dissenting); *see also, e.g., Wallace*, 472 U.S. at 110 (criticizing *Lemon* as having "no more grounding in the history of the First Amendment" than the view that the framers intended to build a "wall of separation" between the church and state) (Rehnquist, J., dissenting).

Count me among those who hope the Supreme Court will one day revisit and reconsider its Establishment Clause jurisprudence, but my duty is to enforce the law as it now stands.

Accordingly, it is hereby ORDERED AND ADJUDGED that:

    (1) The plaintiffs' motion for summary judgment (doc. 31) is GRANTED;

    (2) The defendants' motion for summary judgment (doc. 30) is DENIED;

(3) The Bayview Cross violates the Establishment Clause of the First Amendment to the United States Constitution, as interpreted by the Supreme Court and circuit precedent, and it must be removed within thirty (30) days;

(4) The City is ordered to pay damages to the plaintiffs in the amount of $1.00; and

(5) The parties are directed to follow the local rules of this court with regard to attorney fees to which plaintiffs may be entitled.


DONE and ORDERED this 19th day of June, 2017.

/s/ Roger Vinson
ROGER VINSON
Senior United States District Judge