UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


**AMANDA KONDRAT'YEV, et al.,**

　　　　Plaintiffs,

　　　　　　　　　　　　　　　　　　Case No. 3:16cv195-RV/CJK

vs.　　　　　　　　　　　　　　　　Pensacola, Florida
　　　　　　　　　　　　　　　　　　June 14, 2017
　　　　　　　　　　　　　　　　　　1:04 p.m.

**CITY OF PENSACOLA, FLORIDA, et al.,**

　　　　Defendant.

_____


TRANSCRIPT OF **MOTION FOR SUMMARY JUDGMENT** PROCEEDINGS
BEFORE THE HONORABLE ROGER VINSON
SENIOR UNITED STATES DISTRICT JUDGE
(Pages 1-57)


**APPEARANCES**


FOR THE PLAINTIFF:　　　***MONICA L. MILLER, ESQUIRE***
　　　　　　　　　　　　American Humanist Association
　　　　　　　　　　　　1821 Jefferson Place, NW
　　　　　　　　　　　　Washington, DC  20036

　　　　　　　　　　　　***MADELINE ZIEGLER, ESQUIRE***
　　　　　　　　　　　　Freedom From Religion Foundation
　　　　　　　　　　　　P.O. Box 750
　　　　　　　　　　　　Madison, Wisconsin  53701


FOR THE DEFENDANT:　　　***JAMES NIXON DANIEL, III, ESQUIRE***
　　　　　　　　　　　　***TERRIE DIDIER, ESQUIRE***
　　　　　　　　　　　　BEGGS & LANE
　　　　　　　　　　　　501 Commendencia Street
　　　　　　　　　　　　Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

|       |                                                                      |
|-------|----------------------------------------------------------------------|
| 1     | *P R O C E E D I N G S*                                              |
| 2     | *(Court called to order at 1:04 p.m.)*                              |
| 01:04:18   3 | **THE COURT:**  Pursuant to notice, we have a hearing on |
| 01:04:20   4 | the Motion for Summary Judgment in Case 3:16cv0195. |
| 01:04:30   5 | The Plaintiff ready? |
| 01:04:32   6 | **MS. MILLER:**  Yes, Your Honor.  Do you want us to come |
| 01:04:34   7 | up to the podium? |
| 01:04:36   8 | **THE COURT:**  No, not yet, just I want to know if you're |
| 01:04:36   9 | ready. |
| 01:04:38  10 | Is this Ms. Miller? |
| 01:04:39  11 | **MS. MILLER:**  Yes. |
| 01:04:40  12 | **THE COURT:**  And Ms. Ziegler; is that right? |
| 01:04:44  13 | **MS. ZIEGLER:**  Yes. |
| 01:04:44  14 | **THE COURT:**  And the Defendant, Mr. Daniel and |
| 01:04:47  15 | Ms. Didier? |
| 01:04:48  16 | **MR. DANIEL:**  We're ready, Your Honor. |
| 01:04:48  17 | **THE COURT:**  All right.  Well, we're in this courtroom |
| 01:04:49  18 | because Judge Rodgers has a criminal jury trial still going on |
| 01:04:53  19 | upstairs in the big courtroom.  And if I've got my real time |
| 01:05:02  20 | court reporter working down here, we'll see if it works. |
| 01:05:06  21 | Preliminarily, I'm contemplating dividing the time up, |
| 01:05:11  22 | counsel.  Since we're talking about the same thing, giving each |
| 01:05:18  23 | side half an hour, 30 minutes for direct and 15 minutes for |
| 01:05:22  24 | rebuttal.  So we'll go Plaintiff 30 minutes, Defendant 30 |
| 01:05:28  25 | minutes, and then Plaintiff 15 minutes for rebuttal, and |

| | | |
|---|---|---|
| 01:05:31 | 1 | Defendant 15 minutes for rebuttal.  I think that's enough time |
| 01:05:35 | 2 | in this case.  The facts are not in dispute, so we're really |
| 01:05:39 | 3 | talking about the law.  And the Supreme Court gives you a total |
| 01:05:42 | 4 | of 30 minutes, so this ought to be enough for you to do this. |
| 01:05:46 | 5 | Anything you need to take up preliminarily before we |
| 01:05:53 | 6 | get started, either side? |
| 01:05:54 | 7 | **MR. DANIEL:**  No, sir. |
| 01:05:56 | 8 | **MS. MILLER:**  No, sir. |
| 01:05:56 | 9 | **THE COURT:**  Let me say I'm familiar with the site.  I |
| 01:06:00 | 10 | walk by it usually several times early in the morning every |
| 01:06:03 | 11 | week.  As a matter of full disclosure, let me say that I was |
| 01:06:08 | 12 | also an active member of the Pensacola Jaycees back in the |
| 01:06:12 | 13 | early '70s and actually served as the president I think for one |
| 01:06:16 | 14 | of those years, '74, '75.  So, again, I'm familiar with the |
| 01:06:22 | 15 | cross, I'm familiar with the location, and I'm pretty familiar |
| 01:06:25 | 16 | with most of the facts. |
| 01:06:27 | 17 | With that, let me begin.  And we'll recognize the |
| 01:06:30 | 18 | Plaintiff for purposes of your Motion for Summary Judgment. |
| 01:06:36 | 19 | Ms. Miller, you may use the podium for that, please. |
| 01:06:40 | 20 | **MS. MILLER:**  Good morning, Your Honor. |
| 01:06:42 | 21 | **THE COURT:**  Good morning -- afternoon. |
| 01:06:45 | 22 | **MS. MILLER:**  That's right, it is the afternoon now. |
| 01:06:47 | 23 | This cross is unconstitutional under decades of |
| 01:06:51 | 24 | established jurisprudence established by both the Supreme |
| 01:06:55 | 25 | Court, as well as the Eleventh Circuit, as well as sister |

01:06:58   1   circuit courts.

01:06:59   2          Almost every court that has evaluated a cross case has

01:07:02   3   found it unconstitutional, but I want to focus specifically on

01:07:07   4   the *Rabun Chamber of Commerce* case where the Eleventh Circuit

01:07:12   5   held a virtually identical cross unconstitutional under

01:07:17   6   virtually identical circumstances.

01:07:21   7          That case is not overruled, as the Defendants have

01:07:25   8   argued.  It remains good law.  And the Defendants have not

01:07:26   9   shown how that cross is distinguishable from the case here.

01:07:29  10          Both of the crosses were installed for the purposes of

01:07:31  11   Easter Sunrise Services, which the Eleventh Circuit recognized

01:07:34  12   is a distinctly religious service and, because it was installed

01:07:38  13   for this reason, reflects an unambiguous religious purpose,

01:07:41  14   thus failing the first prong of the three-prong *Lemon* test.

01:07:41  15          Second, the cross cannot withstand the second prong of

01:07:47  16   the *Lemon* test, which is that it must have a secular effect.

01:07:49  17   The effect cannot be to endorse or promote religion.  So

01:07:55  18   clearly a religious symbol that's placed on city property so

01:07:59  19   prominently as this has the effect of endorsing the message

01:08:01  20   that it's --

01:08:01  21          **THE COURT:**  Well, now, *Rabun County* was 1983.  That's

01:08:05  22   a long time ago in terms of First Amendment law and

01:08:10  23   particularly Establishment Clause law, right?

01:08:14  24          **MS. MILLER:**  That's correct.  But subsequent courts

01:08:16  25   have cited *Rabun County* as authoritative since then, and

| | | |
|---|---|---|
| 01:08:20 | 1 | there's no indication that it's been overruled.  In fact, the |
| 01:08:22 | 2 | District Court of Florida has relied on it in two cross cases: |
| 01:08:25 | 3 | one in 1989 -- that was in *Mendelson* case -- as well as the |
| 01:08:30 | 4 | *Starke* case, which was in 2007.  Both of those cases -- or, |
| 01:08:32 | 5 | sorry.  The *Starke* case actually came after the *Van Orden* |
| 01:08:35 | 6 | decision, which is the case that the Defendants are relying |
| 01:08:38 | 7 | upon. |
| 01:08:38 | 8 | **THE COURT:**  But those were both watertank cases, which |
| 01:08:40 | 9 | are different in some respects, right? |
| 01:08:43 | 10 | **MS. MILLER:**  They're different in terms of one is on a |
| 01:08:46 | 11 | watertank and one is in a public park, one is an |
| 01:08:48 | 12 | installation -- |
| 01:08:48 | 13 | **THE COURT:**  And the watertank had the city's name on |
| 01:08:51 | 14 | it, I believe, right? |
| 01:08:51 | 15 | **MS. MILLER:**  That's correct.  But this is also clearly |
| 01:08:52 | 16 | a city park.  Everyone knows it is the City's park, and the |
| 01:08:56 | 17 | City is using this symbol in its park, and it's the only |
| 01:08:57 | 18 | religious symbol. |
| 01:08:57 | 19 | **THE COURT:**  But this is in the far corner of the park. |
| 01:09:00 | 20 | It's not anywhere close to any of the buildings. |
| 01:09:02 | 21 | **MS. MILLER:**  The prominence of the cross or the |
| 01:09:07 | 22 | location of the cross hasn't been a huge factor in the various |
| 01:09:10 | 23 | court cases.  In fact, in the *Rabun* case it was a very remote |
| 01:09:15 | 24 | location up on a mountaintop, and the Eleventh Circuit pointed |
| 01:09:18 | 25 | out that you would have to go out of your way to go see it.  If |

01:09:21    1    you were at the park you would see it, but it wasn't, you know,

01:09:24    2    near a highway or anywhere that was in a constant flow of

01:09:24    3    traffic.

01:09:25    4            Other cases that has involved crosses have also been

01:09:28    5    in sort of remote areas.  The Ninth Circuit decided one where

01:09:31    6    the cross was also up on a hilltop but one couldn't see it from

01:09:35    7    the city of San Francisco, they'd have to go take a hike to see

01:09:40    8    it.

01:09:40    9            So the distance -- or the amount of people that see

01:09:42   10    this cross doesn't really have any bearing on whether it's

01:09:42   11    religious and whether it's City-endorsed, and that's what the

01:09:44   12    Establishment Clause --

01:09:45   13            **THE COURT:**  In one of the Supreme Court cases I think

01:09:46   14    the cross was out in the desert.

01:09:50   15            **MS. MILLER:**  There was the Mojave Desert case.  And to

01:09:50   16    be clear, the Ninth Circuit had found that cross

01:09:52   17    unconstitutional:  one, it was located on government property,

01:09:54   18    and that decision was not appealed by the defendants in that

01:09:56   19    case, and that case, *Buono*, remains good law, and again, has

01:10:01   20    also been cited by subsequent circuit court cases affirming its

01:10:06   21    validity.

01:10:06   22            When it came up to the Supreme Court, the only issue

01:10:08   23    was the validity of an injunction that had not considered the

01:10:13   24    changed circumstances, which was the land transfer putting it

01:10:16   25    now in private property.  And so it was actually a very

01:10:19   1    unremarkable case, and I think some of the jurists on the case

01:10:22   2    had commented on how it was not very -- you know, maybe they

01:10:24   3    shouldn't have even granted cert because it was a standard, you

01:10:27   4    know -- or should a hearing have been regranted for the changed

01:10:30   5    circumstances.

01:10:30   6         So the Defendants' reliance on that as a cross case

01:10:35   7    is, I think, misplaced, because it's not a cross case, and any

01:10:39   8    of the dicta regarding the constitutionality of the cross

01:10:44   9    pertained to its placement on private property.

01:10:46   10        Other facts distinguish that case as well.  Not only

01:10:49   11    was it in a remote location, far more remote than here, but

01:10:54   12    also it was commemorative of World War -- I think it was a

01:10:58   13    World War I memorial, but ether way it was unequivocally a war

01:11:02   14    memorial, whereas this one has no memorializing function

01:11:04   15    whatsoever.  It's --

01:11:04   16        **THE COURT:**  The war memorial was, what, the *City of*

01:11:08   17    *Eugene*?

01:11:08   18        **MS. MILLER:**  *City of Eugene* also was a war memorial

01:11:11   19    case, and so was *Trunk*, so was -- again, the *Salazar* case also

01:11:14   20    involved a war memorial.  And even in these war memorial cases

01:11:16   21    the courts have recognized that, even if it served some secular

01:11:21   22    commemorative function, it still doesn't negate its otherwise

01:11:24   23    religious effect.

01:11:24   24        Here we have both a religious purpose to commemorate

01:11:29   25    Easter Sunrise Services as well as an unambiguous religious

01:11:32   1   effect of the cross, thus failing both prongs of the *Lemon*

01:11:36   2   test.

01:11:36   3          The third prong is also violated.  Even though only

01:11:39   4   one prong actually needs to be violated for the cross to be

01:11:43   5   unconstitutional, in this case all three prongs are violated,

01:11:47   6   the first with the purpose prong, the effect prong, and the

01:11:52   7   entanglement prong.

01:11:53   8          **THE COURT:**  Well, you're assuming the *Lemon* test still

01:11:56   9   applies, though.

01:11:57   10         **MS. MILLER:**  I am, indeed, and that is established in

01:11:58   11   our brief as to why that is.

01:12:00   12         **THE COURT:**  It's been severely criticized.

01:12:03   13         **MS. MILLER:**  Yes, it has been criticized, and the

01:12:06   14   courts have recognized that, and they still --

01:12:07   15         **THE COURT:**  By both sides of the argument, in fact.

01:12:11   16         **MS. MILLER:**  Yeah, that is true.  But ultimately this

01:12:14   17   Court is bound by it because it hasn't been overruled yet, and

01:12:14   18   until it is, lower courts are bound to apply the three-part

01:12:17   19   *Lemon* test.  Unless, of course, it's a case that involves

01:12:19   20   coercion in the public school context, then the coercion test

01:12:24   21   might apply, or something that's even more rigorous than *Lemon*.

01:12:28   22   *Lemon* is sort of the baseline test or, of course, if it's a

01:12:30   23   legislative prayer case, which this decidedly is not.

01:12:32   24         So, once we've accepted that *Lemon* applies, the

01:12:34   25   Defendants really can't get around the *Rabun* case, they can't

01:12:37   1    get around --

01:12:38   2         **THE COURT:**  I think in Georgia they call that

01:12:42   3    [ray-bun].

01:12:42   4         **MS. MILLER:**  [Ray-bun], okay.  I apologize.  We were

01:12:45   5    actually discussing how to pronounce that earlier today.  Rabun

01:12:45   6    County, all right, thank you.

01:12:47   7         The *Rabun* case the Defendants simply can't distinguish

01:12:51   8    because the facts are so similar.  And so if this Court accepts

01:12:55   9    that *Lemon* applies, then I think it has to accept that it's

01:12:55  10    unconstitutional under *Rabun* and under the three-prong *Lemon*

01:12:55  11    test.

01:12:58  12         Even if this Court were to consider *Van Orden* as

01:13:01  13    controlling, the facts in *Van Orden* are so different than the

01:13:05  14    facts here that you couldn't find that this cross satisfies

01:13:08  15    whatever Justice Breyer calls his legal judgment test.

01:13:12  16         **THE COURT:**  Well, what is the holding of *Van Orden*?

01:13:16  17    Is it the four votes or is it Justice Breyer's concurrence?

01:13:23  18         **MS. MILLER:**  I think the appellate courts that have

01:13:25  19    looked at it have considered it to be Breyer's concurrence as

01:13:29  20    the fifth vote as what the holding is, but I can't -- it's not

01:13:36  21    certainly clear.  But what is clear is that Breyer ended up

01:13:40  22    going a different way on the very same day in the *McCreary*

01:13:44  23    *County* case, indicating that he wasn't intending to overrule

01:13:48  24    *Lemon* in subsequent cases, but was simply saying in this

01:13:50  25    particular case -- and he kept reiterating, "This Texas

01:13:54   1   monument that's on Texas Capitol grounds, we don't need to look

01:13:58   2   to *Lemon* for this case."

01:13:59   3           But other courts of appeal, including the Ninth

01:14:02   4   Circuit and the Tenth Circuit, as well as this court in the

01:14:04   5   *Dixie County* case, have all recognized that, even though

01:14:06   6   Justice Breyer and the --

01:14:07   7           **THE COURT:**  Tell me what Justice Breyer's standard is.

01:14:14   8   Because it's -- "good legal judgment," I think is what he

01:14:14   9   called it.

01:14:15   10          **MS. MILLER:**  It is, it's the legal judgment test.  And

01:14:18   11  to be honest, Your Honor, I don't know what he means by that.

01:14:21   12  I think that's why it poses an unworkable standard in future

01:14:25   13  cases.  Because what is legal judgment?

01:14:26   14          The whole point of the *Lemon* test is to give the Court

01:14:31   15  guidance on how to apply the Establishment Clause.  And if it

01:14:32   16  were to just exercise legal judgment in every case, you'd

01:14:33   17  probably come up with -- you know, it would just -- it's an

01:14:37   18  unworkable standard, and commentators have recognized that.

01:14:40   19          But more importantly, lower courts have recognized --

01:14:44   20  the Tenth Circuit has recognized, Ninth Circuit has recognized

01:14:47   21  that lower courts can't be bound by Justice Breyer's disregard

01:14:52   22  for the *Lemon* test in that case, because the *Lemon* test hasn't

01:14:55   23  been overruled and has consistently been applied in other cross

01:14:58   24  cases as well as -- again, in *McCreary County* the very same day

01:15:04   25  the court said we're not overruling *Lemon*, in fact, the purpose

01:15:05   1   test is very applicable when a religious monument is

01:15:08   2   challenged.

01:15:09   3          And as in *McCreary*, this case also involves a

01:15:13   4   standalone religious display, not one that's part of a

01:15:17   5   multifaceted array in a museum-like context, which was the case

01:15:19   6   in *Van Orden* where the small Ten Commandments was situated

01:15:23   7   among 21 other markers and --

01:15:23   8          **THE COURT:**  The three prongs of the *Lemon* test are:

01:15:28   9   Whether it has a secular purpose;

01:15:30   10          **MS. MILLER:**  That's right.

01:15:31   11          **THE COURT:**  whether the principal or primary effect is

01:15:34   12   one that neither advances nor inhibits religion; and whether

01:15:38   13   the challenged action fosters excessive government entanglement

01:15:38   14   with religion.

01:15:38   15          **MS. MILLER:**  That's correct.

01:15:47   16          **THE COURT:**  And you're saying this one violates which

01:15:49   17   of those?

01:15:49   18          **MS. MILLER:**  Well, Your Honor, we're submitting that

01:15:51   19   it actually violates all three, although one is sufficient.

01:15:54   20   For instance, in the *Rabun* case one was sufficient.  It was the

01:15:56   21   secular purpose prong was violated because of the inherently

01:16:00   22   religious symbolism conveyed by the cross as well as the

01:16:04   23   selection of the Easter Sunrise Service as the date for it to

01:16:07   24   be dedicated.

01:16:09   25          Those two factors ultimately caused the Eleventh

| 01:16:12 | 1 | Circuit to hold that it failed the purpose prong.  Even though |

Circuit to hold that it failed the purpose prong.  Even though
it was donated by, I think it was, the chamber of commerce in
that case, it still found that there was no secular purpose for
the cross.

And the exact same is true here except to a much
greater degree.  Because in that case the Department of Natural
Resources at least asked that the cross be removed, and they
had evidence of that, whereas here the City didn't even make
any attempt to have it removed, but in fact stood strong for
the cross and said they would defend it in court, and so that's
why we're here.

The Plaintiffs don't object to the Easter Sunrise
Services, they don't object to private citizens coming and
using the property for those purposes.  The problem is that the
City has provided them with the cross, an enormous religious
symbol to use for these annual religious holidays, and has also
provided them with a platform for these religious holidays
that, combined with the cross, make it very clear that this is
for Easter Sunrise Services.  And to non-Christian citizens
it's a very alienating --

**THE COURT:**  If the cross were on wheels and was
wheeled in for an Easter Sunrise Service, that would be okay?

**MS. MILLER:**  As long as the City wasn't paying for it
to be wheeled in or, you know, using its resources, absolutely.
And, in fact, one of the Plaintiffs in this case proposed that

01:17:21   1   solution to, I think it was, the mayor, and said, *Why can't*

01:17:24   2   *they bring in a temporary cross each year?*  I think they had

01:17:28   3   done that actually before this permanent one was the installed.

01:17:33   4          The Plaintiffs have absolutely no problem with that.

01:17:35   5   The problem is that this is a permanent Christian display

01:17:37   6   owned, maintained, and funded by the City, and everyone knows

01:17:41   7   this is the City's cross.  And to the non-Christians of the

01:17:41   8   city it sends a strong message, and to the county as well, that

01:17:45   9   this public park is not really for them or that this isn't --

01:17:47   10  you know, it's a constant reminder that they're not as favored

01:17:51   11  by the government as their Christian counterparts.

01:17:51   12         **THE COURT:**  Well, what if it's wheeled in several

01:17:54   13  times?  What if it's wheeled in during the Christmas season?

01:17:57   14         **MS. MILLER:**  You'd have to look at the public forum

01:18:00   15  requirements and if the government is treating everyone

01:18:02   16  equal-handedly.  If, you know, the atheists want to come in

01:18:04   17  with a similar symbol for their convictions and the City says

01:18:09   18  you can't come in, but you can come it, then we'd have a

01:18:12   19  problem.  But if it's an open forum and they're complying with

01:18:15   20  the permitting laws, absolutely that would be allowed.

01:18:19   21         It's just about the City's treatment of Christians

01:18:22   22  versus non-Christians and the Christian symbols versus other

01:18:22   23  symbols.  But absolutely that would be fine.  It's, again, the

01:18:27   24  permanency and the fact that it's City-sponsored that

01:18:31   25  Plaintiffs take issue with.

01:18:33    1          **THE COURT:**  And if the City didn't spend a penny on

01:18:35    2     it, would that make any difference, if the City didn't have a

01:18:39    3     light, if it didn't spend any maintenance money?

01:18:42    4          **MS. MILLER:**  No, Your Honor.  I mean, those facts

01:18:44    5     aggravate or compound this problem here, but it's still the

01:18:48    6     City's cross.  We know it owns it and it adopted the cross as

01:18:51    7     its on, it's on City property, and so those two factors are

01:18:51    8     beyond sufficient.

01:18:55    9          I mean, there's been other cases, again, where the

01:18:57   10     city hasn't paid for the symbol -- *Allegheny County* is a

01:19:02   11     perfect example where a private entity came in and donated a

01:19:07   12     nativity scene.  There was even a disclaimer on the base of the

01:19:09   13     nativity scene, and presumably no government funds were spent,

01:19:12   14     and the supreme court still said this is government endorsed

01:19:14   15     because it's -- and it was actually temporary, too, which makes

01:19:17   16     it, you know, more like that, but it was situated on the

01:19:18   17     government's property, it wasn't pursuant to an open forum

01:19:21   18     policy, and so it was endorsed by the government.

01:19:24   19          **THE COURT:**  What about the standing of two of the

01:19:26   20     Plaintiffs that have moved away, does that have any

01:19:30   21     consequence?

01:19:30   22          **MS. MILLER:**  No, Your Honor, because for standing for

01:19:33   23     these types of cases the courts have said that only one

01:19:35   24     plaintiff needs to have standing for the Court to go forward.

01:19:39   25     Those two Plaintiffs ostensibly have lost perhaps their ability

| 01:19:43 | 1 | to seek for injunctive relief should they not intend to come |

01:19:43   1   to seek for injunctive relief should they not intend to come

01:19:48   2   back, but they still have the nominal damage claim from the

01:19:50   3   past exposure to the cross.  And two Plaintiffs unequivocally

01:19:52   4   have standing, so it would be sort of futile to go through the

01:19:56   5   standing analysis for those two when we have the standing for

01:19:59   6   the others.  So there isn't a standing problem.

01:20:02   7          Really the Defendants' case hinges on the *Van Orden*

01:20:05   8   test.  They haven't made any argument as to how this would

01:20:08   9   satisfy *Lemon*, effectively conceding, I would argue, that *Lemon*

01:20:12  10   -- it wouldn't satisfy *Lemon*, and of course, that's the case

01:20:15  11   under the *Rabun* case so, you know --

01:20:17  12          **THE COURT:**  So your position is basically this:  The

01:20:21  13   *Lemon* test is still good, valid Supreme Court precedent?

01:20:25  14          **MS. MILLER:**  Yes.

01:20:26  15          **THE COURT:**  *Rabun County* is still good law in the

01:20:30  16   Eleventh Circuit and I'm bound by that?

01:20:32  17          **MS. MILLER:**  Yes, Your Honor.

01:20:33  18          **THE COURT:**  And the *Van Orden* case is inapplicable or

01:20:38  19   doesn't change anything with respect to the cross at least?

01:20:41  20          **MS. MILLER:**  Yes, Your Honor.

01:20:42  21          **THE COURT:**  Okay.

01:20:43  22          **MS. MILLER:**  I actually have no further points to

01:20:46  23   make.  I think everything has been set forth in our brief.  So

01:20:49  24   if you have further questions for me, I'm happy to answer them.

01:20:52  25   But otherwise, I won't take up more of the Court's time.  Thank

01:20:56   1   you.

01:20:56   2            **THE COURT:**  Defendant, Mr. Daniel?

01:21:01   3            **MR. DANIEL:**  Please the Court.  My name is Nixon

01:21:06   4   Daniel.  I represent the Defendants in this case.  I'd like to

01:21:09   5   start a little differently than we did in our brief to put some

01:21:13   6   of this in perspective.  Because, as Your Honor has pointed

01:21:16   7   out, the real issue in this case is, first, what is the law.

01:21:21   8   And I'd like to take just a minute and go through a bit of

01:21:25   9   history both with respect to what the law is and what precedent

01:21:29  10   is in this Court versus other courts.

01:21:32  11            The issue that we're about here is the Establishment

01:21:37  12   Clause, which is very succinct.  It says that Congress shall

01:21:41  13   make no law respecting an establishment of religion.

01:21:47  14            In the *Lynch v. Donnelly* case, which is a Supreme

01:21:52  15   Court case in 1984 involving a nativity scene, this is what the

01:21:54  16   Court said about the religion clauses.

01:21:59  17            It said:  "The court has sometimes described the

01:22:01  18   religion clauses as erecting a wall between church and state.

01:22:07  19   The concept of a wall of separation is a useful figure of

01:22:11  20   speech probably deriving from the views of Thomas Jefferson.

01:22:14  21   The metaphor is served as a reminder that the Establishment

01:22:20  22   Clause forbids an established church or anything approaching

01:22:21  23   it.  But the metaphor itself is not a wholly accurate

01:22:25  24   description of the practical aspects of the relationship that

01:22:28  25   in fact exists between church and state.  No significant

01:22:31    1    segment of our society and no institution within it can exist

01:22:35    2    in a vacuum or in a total or absolute isolation from all other

01:22:40    3    parts, much less from government.  It's never been thought

01:22:45    4    either possible or desirable to enforce a regimen of total

01:22:49    5    separation, nor does the Constitution require complete

01:22:52    6    separation of church and state.  It affirmatively mandates

01:22:58    7    accommodation, not merely tolerance of all religions, and

01:23:02    8    forbids hostility towards any.  Anything less would require the

01:23:06    9    callous indifference we've said was never intended by the

01:23:11    10   Establishment Clause.  Indeed, we've observed such hostility

01:23:14    11   would bring us into war with our national tradition as embodied

01:23:19    12   in the First Amendment's guarantee of the free exercise of

01:23:23    13   religion."

01:23:23    14          And then the Court said this:  "The purpose of the

01:23:26    15   Establishment Clause was to state an objective, not to write a

01:23:31    16   statute."

01:23:31    17          Now, as Your Honor has alluded to, there is great

01:23:35    18   ambiguity in the interpretation of the Establishment Clause.

01:23:39    19          THE COURT:  Well, I think we can agree that the wall

01:23:45    20   of separation is attributable to a letter from Thomas Jefferson

01:23:52    21   many years after the adoption of the Bill of Rights to the

01:24:00    22   Danbury Baptists.

01:24:04    23          MR. DANIEL:  Correct.

01:24:05    24          THE COURT:  And the fact is that it was never called

01:24:08    25   wall of separation until Justice Black decided to do that in

01:24:13    1    1947.

01:24:15    2              **MR. DANIEL:**  Yes, sir.

01:24:16    3              **THE COURT:**  Up until that time, it had never occurred.

01:24:18    4              **MR. DANIEL:**  Correct.

01:24:19    5              **THE COURT:**  But the fact is that he did say it, and

01:24:22    6    that's what we've got.

01:24:23    7              **MR. DANIEL:**  Well, it is, except for the fact that on

01:24:26    8    a number of occasions since then -- and Justice Rehnquist

01:24:32    9    particularly has been critical of that language and has called

01:24:36   10    it foreign to our Constitution.  But apart from that particular

01:24:40   11    descriptor, a number of justices, including Justice Alito,

01:24:45   12    Justice Thomas, Justice Scalia, Justice Rehnquist and Justice

01:24:52   13    White have on a number of occasions, both in concurring

01:24:56   14    opinions with the court and also in dissenting opinions,

01:25:01   15    expressed the fact that the Establishment Clause, as Justice

01:25:05   16    Alito said in the *Mount Soledad* case, is undoubtedly in need of

01:25:10   17    clarity.  Others have been much more vociferous in their

01:25:15   18    description of the -- "shambles" is a word that others have

01:25:17   19    used to describe the law with respect to the Establishment

01:25:20   20    Clause.

01:25:20   21              And so, we come to this case with no fewer than five

01:25:27   22    tests that have been enunciated and articulated by the court

01:25:33   23    since the *Lemon* case in 1971.

01:25:37   24              **THE COURT:**  I think Justice Scalia characterizes the

01:25:41   25    *Lemon* test as some character from a B grade haunted movie.

01:25:49    1        **MR. DANIEL:**  He said this specifically:  He said -- he

01:25:52    2    compares *Lemon* to "some ghoul in a late night horror movie that

01:25:57    3    repeatedly sits up in its grave and shuffles abroad, after

01:26:02    4    being repeatedly killed and buried, *Lemon* stalks our

01:26:05    5    Establishment Clause jurisdiction."

01:26:08    6        And then he said this:  "I agree with the long list of

01:26:09    7    constitutional scholars who have criticized *Lemon* and bemoaned

01:26:15    8    the strange establishment clause geometry of crooked lines and

01:26:16    9    wavering shapes its intermittent use has produced."  That's

01:26:21   10    Justice Scalia.

01:26:24   11        **THE COURT:**  His typical understated fashion, right?

01:26:28   12        **MR. DANIEL:**  Yes, sir.  And so I think what that says

01:26:31   13    to us is, the Establishment Clause is not nearly so clear as

01:26:36   14    the Plaintiffs would suggest.  And in fact, we have in 1971 the

01:26:42   15    *Lemon* test in a legislative action case that we'll talk about

01:26:48   16    more in a minute.

01:26:49   17        In 1983, you've got *Marsh v. Chambers*.  That dealt

01:26:55   18    with prayer, which has been dealt with in a separate kind of

01:26:58   19    way by the court traditionally.  In 1984, you've got *Lynch v.*

01:27:03   20    *Donnelly*, which was a nativity case that enunciated an

01:27:08   21    endorsement case, as it was then called.

01:27:13   22        In 1992, you've got *Lee v. Weisman*, which describe a

01:27:16   23    coercion test in a prayer at graduation where the Court said

01:27:21   24    that there was the possibility of indirect coercion where in

01:27:26   25    public school forums prayer was permitted even at a graduation

01:27:31   1   where it was a student led prayer.

01:27:35   2         And then, finally you've got *Van Orden* in 2005, a Ten

01:27:40   3   Commandments monument case in Texas.

01:27:44   4         And what's interesting about all of those cases is,

01:27:47   5   none of them, as they make the findings of the court, overrule

01:27:52   6   any earlier precedent.  They talk about it and in some cases

01:27:58   7   don't talk about it.  And in fact, in some of the cases which

01:28:02   8   I'll describe in a minute *Lemon* is ignored, it's not even

01:28:05   9   mentioned in the case.  In one case it was mentioned simply by

01:28:09   10  way of history to say this is the standard that was used by the

01:28:12   11  District Court but it was not the standard that was adopted by

01:28:16   12  the Supreme Court.

01:28:16   13        One thing that is interesting about *Lemon* is that, in

01:28:24   14  its opinion the court found that there was no basis for the

01:28:28   15  conclusion that the legislative intent in that case was to

01:28:32   16  advance religion.

01:28:36   17        The court did not decide whether the particular

01:28:39   18  legislative precautions restricted the principal or primary

01:28:42   19  effect of the programs to the point where they did not offend

01:28:46   20  the Establishment Clause.  And these were programs where the

01:28:49   21  state was purchasing from parochial schools educational

01:28:55   22  services pursuant to legislative action.

01:28:57   23        And the court concluded -- and this is a quote from

01:29:00   24  the court -- "that the cumulative impact of the entire

01:29:04   25  relationship arising under the statutes in each state

01:29:08   1    involves," quote, "excessive entanglement between government

01:29:13   2    and religion."

01:29:16   3         And if you look at *Lemon* -- and you can talk about the

01:29:19   4    formulaic approach as other courts have described it --

01:29:24   5         **THE COURT:** *Lemon* was '71, right?

01:29:27   6         **MR. DANIEL:**  That's correct.

01:29:27   7         **THE COURT:**  Who wrote that majority opinion?

01:29:32   8         **MR. DANIEL:**  Your Honor, I'm not sure of the answer to

01:29:32   9    that, but I can tell you in one second, but I'm not sure who

01:29:34   10   wrote the opinion.

01:29:34   11        **THE COURT:**  We'll find it.

01:29:35   12        **MR. DANIEL:**  But what the Court said in that case was

01:29:37   13   that there was entanglement, and it went through a number of

01:29:42   14   factors describing the fact that only Roman Catholic elementary

01:29:46   15   schools had participated in the program, there were 30 minutes

01:29:49   16   of religious teaching each day at those schools, there were

01:29:53   17   religious symbols throughout the schools, the ideological

01:29:56   18   character of the teachers, and the Court said, not to cast any

01:30:00   19   dispersion on those nuns and others that taught there, but to

01:30:04   20   say that there's no way that they could divorce from their

01:30:08   21   teaching their background.

01:30:09   22        And in that case, it was the entanglement that the

01:30:13   23   Court made its decision on.

01:30:14   24        **THE COURT:**  Does that mean the other factors are

01:30:19   25   dicta?

01:30:19  1       **MR. DANIEL:**  It may mean that, frankly, Your Honor,

01:30:22  2    because they didn't consider those other factors.  The court

01:30:27  3    looked to entanglement and did not consider the other factors.

01:30:31  4          Now, candidly, the argument could be made, as counsel

01:30:34  5    has made, that the failure of one of the prongs is the failure

01:30:38  6    of the test, and therefore that was the basis.  But when one

01:30:43  7    looks at the Establishment Clause and its intent -- and we'll

01:30:49  8    see as these cases progress this becomes more clear -- the

01:30:53  9    issue is entanglement.  The issue is not some, as the court has

01:30:58  10   said, formulaic approach to the evaluation of the Establishment

01:31:03  11   Clause.

01:31:03  12         *Marsh v. Chambers* came along, a prayer case, a

01:31:08  13   different kind of case.  But one of the quotes in that case is

01:31:12  14   from Justice Goldberg in the *Abington* case, which was in 1963.

01:31:19  15   And Justice Goldberg said that "The measure of constitutional

01:31:23  16   adjudication is the ability and willingness to distinguish

01:31:28  17   between real threat and mere shadow."

01:31:30  18         And those are words that will come back later on in

01:31:33  19   others of these cases, and particularly with Justice Breyer in

01:31:38  20   the *Van Orden* case, to say we've got to be able to look at the

01:31:42  21   facts and distinguish between a real threat, what is an

01:31:47  22   Establishment Clause threat and what is simply a shadow.

01:31:50  23         *Lynch v. Donnelly* we've talked about briefly, but in

01:31:55  24   that case the court begins to move away -- and by the way, two

01:31:59  25   years after --

01:32:00    1          **THE COURT:**  I asked Ms. Miller, and let me ask you:

01:32:03    2     What is the test to be applied under Justice Breyer's

01:32:08    3     controlling concurrence?

01:32:11    4          **MR. DANIEL:**  I think the test is fairly clear, and

01:32:13    5     I'll move to that.  Justice Breyer in his decision said that

01:32:22    6     there's no -- and I'm quoting from his opinion -- "There's no

01:32:27    7     single mechanical formula that can accurately draw the

01:32:31    8     constitutional line in every case."

01:32:34    9          He says, "Where the Establishment Clause is at issue,

01:32:40   10     tests designed to measure neutrality alone are insufficient

01:32:43   11     both because it is sometimes difficult to determine when a

01:32:46   12     legal rule is neutral and because untutored devotion to the

01:32:52   13     concept of neutrality can lead to the invocation or approval of

01:32:56   14     results which partake not simply of that noninterference and

01:33:01   15     noninvolvement with the religions which the Constitution

01:33:04   16     commands."

01:33:04   17          **THE COURT:**  Well, I think the other four in that

01:33:06   18     plurality would agree with that statement.

01:33:10   19          **MR. DANIEL:**  Correct.  And if you look at precedent --

01:33:11   20     and the Plaintiffs have suggested that other circuits, for

01:33:14   21     instance, are precedent to you, which they clearly are not in

01:33:17   22     the Eleventh Circuit.  Your Honor can certainly look at those

01:33:20   23     as persuasive; they are not precedent.

01:33:23   24          You then look at what the court has said is precedent,

01:33:27   25     that is the Supreme Court has said is precedent where there are

01:33:32    1    plurality and concurring opinions.  And in those cases the

01:33:37    2    court has said you look to the narrowest interpretation that a

01:33:41    3    majority of the justices would agree to.  And what we just --

01:33:47    4    what I just read to you I think is a part of that in Justice

01:33:54    5    Breyer's opinion.

01:33:54    6           Then Justice Breyer makes one thing clear, *Lemon* is

01:34:00    7    not the test, and here is what he said.  He said, "As in all

01:34:04    8    Constitutional cases, judgment must reflect and remain faithful

01:34:07    9    to the underlying purposes of the clauses, and it must take

01:34:11   10    account of context and consequences measured in light of those

01:34:15   11    purposes.  While the court's prior tests provide useful

01:34:21   12    guideposts and might well lead to the same result the court

01:34:25   13    reaches today," referring to *Lemon*, "no exact formula can

01:34:29   14    dictate a resolution to such fact intensive cases."

01:34:33   15           Now, it's interesting --

01:34:35   16           **THE COURT:**  Well, the problem you have, though, is

01:34:36   17    that *Van Orden* involved a determination that the monument in

01:34:44   18    question of the Ten Commandments was one of, what, 27 on the

01:34:48   19    whole grounds?

01:34:49   20           **MR. DANIEL:**  Yes, sir.

01:34:49   21           **THE COURT:**  And represented different things,

01:34:51   22    including -- but it was donated by the Eagles as one of about

01:34:58   23    100 or 120 that they had made and donated all around the

01:35:03   24    country pursuant to a plan by one of the state judges, I think,

01:35:10   25    in Minnesota assisted by Cecil B. DeMille because "The Ten

01:35:16   1   Commandments" was at that time the big movie and he wanted to

01:35:19   2   assist it.  So there was a lot of secular associated with it,

01:35:22   3   including the development of the law, which the Ten

01:35:25   4   Commandments are routinely.

01:35:27   5          **MR. DANIEL:**  Yes, sir.

01:35:28   6          **THE COURT:**   In fact, Justice Rehnquist pointed out

01:35:31   7   that right in the Supreme Court building they have the Ten

01:35:35   8   Commandments in at least four, maybe five different locations

01:35:38   9   within the building itself as part of the decorative --

01:35:42   10         **MR. DANIEL:**  Yes, sir.

01:35:43   11         **THE COURT:**   So how do you distinguish that which has a

01:35:46   12   finding of a secular purpose as well as a religious purpose?

01:35:50   13         **MR. DANIEL:**   Well, in that case, in the *Van Orden*

01:35:53   14   case, the point that Justice Breyer ultimately made -- and he

01:35:57   15   said that this is the determinative factor for him, was the

01:36:03   16   fact that it had been there for 40 years.  And let me quickly

01:36:07   17   say, time alone is not enough, and I understand that.

01:36:10   18         **THE COURT:**  Numerous cases have held that.

01:36:13   19         **MR. DANIEL:**   Exactly.  On the other hand, to say that

01:36:16   20   this is purely a religious symbol, this cross, is not itself

01:36:23   21   true as far as this case is concerned.

01:36:25   22               And here is what the court in *Salazar* --

01:36:28   23         **THE COURT:**   Well, one of our writers in the local

01:36:30   24   newspapers has said that maybe it's a small "t" and stands for

01:36:38   25   "Texar."

01:36:39   1              MR. DANIEL:  I doubt that that is true.

01:36:41   2              THE COURT:  You're not arguing that?

01:36:43   3              MR. DANIEL:  No, I'm not, Your Honor.  And I'll

01:36:46   4    readily concede it is a Christian symbol.  It is.

01:36:51   5              But here is what the *Salazar* court said about that.

01:36:53   6    It said the District Court concentrated solely on the religious

01:36:58   7    aspect of the cross divorced from its background and context.

01:37:02   8              The court said this:  "But a Latin cross is not merely

01:37:04   9    a reaffirmation of Christian beliefs.  It's a symbol often used

01:37:09   10   to honor and respect those whose heroic acts, noble

01:37:14   11   contributions, and patient striving help secure an honored

01:37:17   12   place in history for this nation and its people.  Here one

01:37:21   13   Latin cross in the desert evokes far more than religion; it

01:37:28   14   evokes thousands of small crosses in foreign fields marking the

01:37:31   15   graves of Americans who fell in battles whose tragedies are

01:37:36   16   compounded if the fallen are forgotten."

01:37:37   17             And in the affidavit of Stephen Sutherland that was

01:37:41   18   submitted with our papers in this case, Mr. Sutherland, who was

01:37:46   19   a president of the Jaycees back in the '70s time frame, as I

01:37:51   20   recall, he --

01:37:51   21             THE COURT:  He was a couple of years after I served.

01:37:54   22             MR. DANIEL:  I think it was the mid to late '70s

01:37:57   23   sometime.  He said that, not only was this cross and the

01:38:01   24   amphitheater there, by the way, which was dedicated in the

01:38:05   25   honor of Frazier Phelps, not only were those used for sunrise

01:38:09    1    services, which they were, but he said they were used for

01:38:13    2    gatherings on Veterans Day and Memorial Day and other secular

01:38:19    3    holidays in which veterans were honored, the fallen were

01:38:24    4    remembered, et cetera.  That's Mr. Sutherland's -- that's a

01:38:28    5    fact in this record, undisputed insofar as the use of that

01:38:33    6    cross.

01:38:33    7         But if we go back -- and I want to go back and answer

01:38:36    8    Your Honor's question about the test of *Van Orden*.  Because in

01:38:40    9    *Van Orden* Justice Breyer talks about purpose, and he talks

01:38:44   10    about the purpose not only of the Establishment Clause, but the

01:38:48   11    purpose of the object that's being analyzed.

01:38:52   12         And then he talks about what he calls the

01:38:56   13    determinative factor.  He says that, "Forty years passed in

01:39:01   14    which the presence of this monument, legally speaking, went

01:39:06   15    unchallenged until the single legal objection raised by

01:39:10   16    petitioner."

01:39:10   17         In this case it was more like 75 years.  The first

01:39:13   18    cross at Bayview was in 1941.  There was another one placed in

01:39:19   19    1949.  There was a hiatus in there where there's no historical

01:39:25   20    information that anyone can glean until the current cross was

01:39:27   21    placed in 1969.  But if you look at just the current cross,

01:39:33   22    it's 46, 47 years since the current cross was there.

01:39:37   23         And he says, "I'm not aware of any evidence suggesting

01:39:40   24    that this was due to a climate of intimidation."  There's no

01:39:45   25    evidence in this case of any climate of intimidation.

01:39:50   1           "Hence," he says, "those forty years suggest more

01:39:52   2   strongly than any set of formulaic test what" -- and here is

01:39:57   3   where the test comes, he says, "they suggest that few

01:40:01   4   individuals, whatever their system of beliefs, are likely to

01:40:05   5   have understood the monument as amounting, in any significantly

01:40:10   6   detrimental way, to a government effort to favor a particular

01:40:14   7   religious sect, primarily to promote religion over nonreligion,

01:40:21   8   to engage in any religious practice, to compel any religious

01:40:25   9   practice, or to work deterrence of any religious belief."

01:40:27   10          The legal judgment test of Justice Breyer, the legal

01:40:31   11   judgment test of *Van Orden* is that.  If Your Honor --

01:40:36   12          **THE COURT:**  Well, what that boils down to, though, is

01:40:39   13   a test of what is the philosophy of the judge hearing the case.

01:40:44   14   And that's not what the law is supposed to be.

01:40:47   15          **MR. DANIEL:**  Your Honor, I think what it --

01:40:49   16          **THE COURT:**  It depends on the panel you get on your

01:40:52   17   court of appeals.

01:40:52   18          **MR. DANIEL:**  It may.  But if you look at, number one,

01:40:55   19   what is precedent, this is the narrowest interpretation of *Van*

01:41:00   20   *Orden* that five justices would agree to.

01:41:03   21          **THE COURT:**  Has any court ever analyzed a cross case

01:41:06   22   under *Van Orden*, any reported case you can cite to me?

01:41:10   23          **MR. DANIEL:**  No, sir, not that I know of, which is

01:41:13   24   itself probably instructive that -- other than -- well, no

01:41:21   25   case, to answer your question, is ever under *Van Orden*, no.

01:41:24   1           **THE COURT:**  That's what I mean.

01:41:26   2           **MR. DANIEL:**  No.

01:41:26   3           **THE COURT:**  Has there ever been a court that has

01:41:29   4   upheld a Latin cross under either *Lemon* or *Van Orden* if it's on

01:41:41   5   public property?  And let me exclude one case.

01:41:46   6           **MR. DANIEL:**  *Salazar*.

01:41:48   7           **THE COURT:**  Well, no, I'm not excluding *Salazar*.

01:41:51   8   You're saying *Salazar* was a cross case --

01:41:53   9           **MR. DANIEL:**  Yes, sir.

01:41:55  10           **THE COURT:**  -- that was upheld under *Lemon*.

01:41:59  11           **MR. DANIEL:**  Well, *Salazar* was a cross case that was

01:42:01  12   upheld.

01:42:02  13           **THE COURT:**  Yes.

01:42:03  14           **MR. DANIEL:**  And it was a case that was decided by the

01:42:05  15   District Court in 2002 before *Van Orden*, and it went up and

01:42:11  16   back a couple of times.  It was -- the Supreme Court case was

01:42:14  17   actually *Buono*, they call it, but *Salazar* 3 was the case that

01:42:23  18   went up.

01:42:24  19           And in that case the Court said this:  "Although, for

01:42:27  20   purposes of the opinion, the propriety of the 2002 injunction

01:42:32  21   may be assumed" -- that is the injunction that was issued prior

01:42:35  22   to *Van Orden* by the District Court that was not before the

01:42:38  23   Supreme Court in *Salazar* -- "the following discussion, though,

01:42:44  24   should not be read to suggest this court's agreement with that

01:42:47  25   judgment, some aspects of which may be questionable."

*Defense Argument*                                                      30

01:42:50  1          So that was an analysis of a cross case by a District

01:42:57  2   Court post-*Lemon* but pre-*Van Orden*.  And when it got to the

01:43:02  3   Supreme Court of the United States in 2010, the plurality

01:43:08  4   opinion in that case said, *Don't take our judgment in this case*

01:43:11  5   *finding that the statute authorizing the transfer of the land*

01:43:14  6   *was constitutional, don't take that to mean that we agree with*

01:43:18  7   *the injunction that was issued by the District Court.*

01:43:21  8          **THE COURT:**  Well, that was really the issue, though,

01:43:25  9   whether they could effectively transfer it, right?

01:43:28  10         **MR. DANIEL:**  That was the issue in that case, yes,

01:43:30  11  sir.  But in dicta -- and this is dicta, no doubt, but in dicta

01:43:35  12  the court said and went out of its way really to say, *Don't*

01:43:40  13  *read this to say that we agree with the propriety of the*

01:43:43  14  *injunction.  We're only deciding one issue, and that is whether*

01:43:46  15  *the transfer of the land was constitutional or not, and we're*

01:43:49  16  *finding that it was, in fact, we're finding that's exactly what*

01:43:52  17  *the government ought to do in these kinds of situations.*

01:43:55  18         **THE COURT:**  Well, in this case, for example, if *Lemon*

01:43:59  19  still controls and if *Rabun County* still controls, then can the

01:44:06  20  City lease this site -- fence it off and lease it to somebody

01:44:11  21  else?

01:44:12  22         **MR. DANIEL:**  Well, that's a very good question, and

01:44:15  23  the answer is, that's not clear.  It certainly would be -- it

01:44:20  24  would certainly suggest in *Salazar*, yes, because that's what

01:44:24  25  happened in *Salazar*.  The federal government said, *We'll sell*

01:44:27  1   *this property off to a private entity and therefore maintain*

01:44:32  2   *the cross,* and the court described that as an accommodation

01:44:35  3   that was appropriate under the law.  And so I think the answer

01:44:38  4   to your question is, yes, that is a possibility.

01:44:40  5          **THE COURT:**  Well, they did that in my colleague Judge

01:44:44  6   Sharp's case, *City of Starke*, I guess it is -- no, the other

01:44:56  7   Florida case.  But in that case, Judge Sharp decided that it

01:45:03  8   was an invalid lease, that --

01:45:05  9          **MR. DANIEL:**  Subterfuge.

01:45:08  10         **THE COURT:**  Yes, it was a subterfuge and really it

01:45:11  11  wasn't effective.

01:45:11  12         **MR. DANIEL:**  Yes, sir.

01:45:12  13         **THE COURT:**  But underlying that apparently is an

01:45:14  14  assumption that *Salazar* would authorize it if they did it

01:45:17  15  right.

01:45:17  16         **MR. DANIEL:**  Yes, sir.  And I think that's precisely

01:45:20  17  the issue.  There is, no doubt, a challenge that would come --

01:45:22  18  if one were to lease it to some entity so that that cross could

01:45:27  19  stay there, the challenge would come that this is a subterfuge

01:45:31  20  as opposed to a *Salazar*-compliant act.

01:45:34  21         **THE COURT:**  Let me ask you this:  If *Lemon* is still

01:45:37  22  good law as far as the Supreme Court is concerned -- and

01:45:39  23  there's been no Supreme Court decision that overrules it, at

01:45:44  24  least even comes close to expressly doing it -- and if *Rabun*

01:45:48  25  *County* is still the law in the Eleventh Circuit, which we are,

01:45:52  1    how do you distinguish *Rabun County*?

01:45:57  2         **MR. DANIEL:**  Well, the *Rabun County* case, first of

01:45:59  3    all, was decided in 1983, which was, you know, obviously 22

01:46:04  4    years before *Van Orden*.

01:46:05  5         Secondly, the -- and this goes back to the comments

01:46:09  6    that a number of justices have made about Establishment Clause

01:46:13  7    jurisprudence, that there simply is no way to explain

01:46:23  8    Establishment Clause jurisprudence by looking to a particular

01:46:26  9    standard.  And in fact, you can look at a number of cases that

01:46:31  10   have ruled on Establishment Clause cases but have not applied

01:46:35  11   *Lemon*, have not even referred to *Lemon*.

01:46:38  12        And so it's one thing to say --

01:46:40  13        **THE COURT:**  I may not agree with the law but I still

01:46:42  14   have to apply it.

01:46:43  15        **MR. DANIEL:**  Well, but there is where the precedent

01:46:45  16   issue comes in.  Because if you go -- if you look at what --

01:46:49  17   and I'll give you the cites to the cases.  But the issue of

01:47:01  18   precedent is an important issue.  And what does it mean?

01:47:04  19        In the *Marks* case, if my memory serves me, yeah, *Marks*

01:47:11  20   *v. United States*, the Supreme Court in 1977 said this:  "When a

01:47:14  21   fragmented court decides a case and no single rationale

01:47:18  22   explaining the results enjoys the assent of five justices, the

01:47:22  23   holding of the court may be viewed as the position taken by

01:47:26  24   those members who concurred in the judgments on the narrowest

01:47:30  25   grounds."  And the Eleventh Circuit in the *United States v.*

| | |
|---|---|
| 01:47:32 | 1 |

*Hughes* in 2017 -- recently -- quoted the *Marks* case.

So, then you say, if it doesn't expressly overrule *Lemon* -- and you're correct, there's no case that expressly overrules *Lemon* -- but yet there are cases that don't apply it in certain factual situations, and there is the law of the Supreme Court that says that the precedent of a case is the narrowest ground that five of the justices would agree to, those who have commented on *Lemon* -- and again, two years after *Lemon* it began to be referred to as "a guideline" -- but those who have commented on it said the narrowest is to look at Justice Breyer's opinion, that is the one that the plurality plus Justice Breyer agreed to, and then you ask yourself what is that.  If he didn't apply the *Lemon* test, which he didn't do, then what did he do?

And what he did, I think, is suggest to us what the proper standard is in a case like this where *Lemon* is not the standard.

**THE COURT:**  Well, *Rabun County* specifically says that the *Lemon* factors apply in analysis of that case, which was a cross case, it said it applies, and that's the law of the circuit.

My colleague, Judge Moore, in the *City of Starke* case, which was decided in 2007, belies the *Rabun County* and *Lemon* factors.  And, as you say, there's been no court that's tried to analyze a cross case under *Van Orden* since *Van Orden* was

01:49:23    1     decided, and there have been a number of cases.

01:49:26    2         **MR. DANIEL:**  Well, here is another distinguishing

01:49:29    3     factor about *Rabun*.  *Rabun* involved a cross that was placed in

01:49:34    4     1979.  There was an immediate objection.  The case went to the

01:49:38    5     Supreme Court in 1983.  In the space of four years there was an

01:49:44    6     objection and action that ultimately ended up in the Supreme

01:49:48    7     Court.

01:49:48    8         Now, what does that say?  What that says is -- and we

01:49:53    9     would readily concede the City of Pensacola cannot go out today

01:49:57   10     and put a cross in Bayview Park.  They could not do that today.

01:50:01   11     But what it does say is, if you look at *Van Orden*, the

01:50:04   12     determinative factor for Justice Breyer was, this has been

01:50:09   13     there for 40 years and no one has objected.

01:50:12   14         Look at the cases -- and there are other cases that

01:50:21   15     have described time as a factor in this analysis, and other

01:50:26   16     cases have looked at time and said that's something we look at

01:50:29   17     in terms of trying to determine the effect, that is, is this

01:50:36   18     something that is going to be seen as promoting religion,

01:50:42   19     establishing some sort of position of the government in terms

01:50:45   20     of religion.  But *Rabun* can be distinguished because it all

01:50:50   21     happened immediately, I mean, there was an immediate

01:50:53   22     objection --

01:50:53   23         **THE COURT:**  Well, actually, the cross originally was

01:50:58   24     finalized with lights in 1957, and then they built the cross in

01:51:03   25     1979.  And the litigation didn't arise until -- what? -- this

| 01:51:08 | 1 |
| 01:51:12 | 2 |
| 01:51:19 | 3 |
| 01:51:19 | 4 |
| 01:51:21 | 5 |
| 01:51:24 | 6 |
| 01:51:28 | 7 |
| 01:51:34 | 8 |
| 01:51:37 | 9 |
| 01:51:43 | 10 |
| 01:51:46 | 11 |
| 01:51:59 | 12 |
| 01:52:05 | 13 |
| 01:52:08 | 14 |
| 01:52:12 | 15 |
| 01:52:16 | 16 |
| 01:52:19 | 17 |
| 01:52:23 | 18 |
| 01:52:27 | 19 |
| 01:52:34 | 20 |
| 01:52:39 | 21 |
| 01:52:39 | 22 |
| 01:52:44 | 23 |
| 01:52:47 | 24 |
| 01:52:52 | 25 |

was decided in '83, so several years.  But it actually went back -- the cross itself had been there since '57, so twenty-something years.

MR. DANIEL:  The cross that was the subject of the lawsuit was the 1979 cross.  That was the one that is the subject of the lawsuit in *Rabun*.  That is the one that was objected to.  And again, it was -- once that replacement cross with the lights and all went up, that's when the objection was made and the case went forward, and in 1983 the Supreme Court had heard the case and written an opinion.

There are -- and I want to find these to suggest them to Your Honor.  When you look at the *Van Orden* analysis, in the *Town of Greece*, which admittedly is a prayer case, but the court in that case looked at time, that is, how long the institutions of our government had opened with prayer, et cetera, that was a factor in those cases.

And in the *Salazar* case the court -- and this is dicta in the opinion, but the court said this:  "Time also has played its role.  The cross had stood on Sunrise Rock for nearly seven decades before the statute was enacted.  By then, the cross and the cause it commemorated had become entwined in the public consciousness."

So time is a factor that the *Town of Greece* has looked at, *Salazar* has looked at, certainly *Marsh vs. Chambers*, which, again, is a prayer case, looked at time.  But if the issue is

01:52:55  1    not hostility toward religion but accommodation, which is what

01:53:02  2    the Supreme Court has said is the perspective in which these

01:53:07  3    Establishment Clauses should be viewed, you have to --

01:53:09  4         **THE COURT:**  Well, isn't that just a factor, at the

01:53:11  5    most, though, right?  I mean, it certainly cannot be

01:53:15  6    controlling because there's so many cases that have decided

01:53:18  7    otherwise.

01:53:18  8         **MR. DANIEL:**  Absolutely, and it is a factor.  And in

01:53:21  9    the -- again, in the *Van Orden* case Justice Breyer said it was

01:53:24  10   the determinative factor for him, but a factor.

01:53:28  11        But you asked what is the distinction between *Rabun*

01:53:33  12   and this case.  Time is certainly a factor.  The immediacy of

01:53:39  13   the action in *Rabun*, the 40, 50, 60 years, depending on how you

01:53:44  14   measure the time, which cross you want to look at as far as

01:53:46  15   Bayview is concerned, but time is certainly a factor, which

01:53:50  16   indicates that there's no Establishment Clause violation here.

01:53:54  17        And Your Honor brought up the standing issue, and we

01:54:03  18   raised the standing issue with respect to the two Plaintiffs

01:54:06  19   that have moved to Canada.

01:54:09  20        But maybe as importantly in looking at this case, what

01:54:12  21   these Plaintiffs tell us about themselves in their own

01:54:16  22   affidavits belies the issue of whether there has really been

01:54:27  23   some divisive, as the Court has used, effort to establish

01:54:31  24   religion, because both of these Plaintiffs have said they

01:54:35  25   continued to go to the park, they continued to use the park.

01:54:38   1          In fact, Mr. Suhor, one of the Plaintiffs, actually

01:54:42   2   reserved the cross in 2016 on Easter Sunday, and McIlwain

01:54:49   3   Presbyterian, which had used it before, made no objection.

01:54:55   4   Mr. Suhor used it.

01:54:55   5          Now, the question is:  Can one really say that that

01:54:59   6   cross is the kind of thing that Justice Breyer described in *Van*

01:55:04   7   *Orden* that causes one to look at it and say that this is an

01:55:13   8   establishment of religion, the kind of thing that the

01:55:18   9   Establishment Clause is designed to forbid?  Can anyone look at

01:55:23   10  this and likely understand the monument to be a government

01:55:29   11  effort to favor a particular religious sect or anything like

01:55:33   12  that?  There's none of that.

01:55:34   13         **THE COURT:**  Your time is up, Paula says.

01:55:38   14         **MR. DANIEL:**  Thank you, Your Honor.

01:55:42   15         **THE COURT:**  All right, 15 minutes, Ms. Miller.

01:55:44   16         **MS. MILLER:**  A few things.  One is the Defendants can

01:55:47   17  only point to one distinction from this case in *Rabun*, and that

01:55:51   18  is the time factor.  But in the *Rabun County* case which you

01:55:54   19  pointed out, it wasn't an immediate cross at all but one that

01:55:57   20  had succeeded or had followed several other series of crosses,

01:56:00   21  just like here.

01:56:01   22         The Eleventh Circuit went out of its way to say that

01:56:04   23  historical acceptance of a religious display, especially one as

01:56:08   24  sectarian as a Christian cross, cannot eliminate the aura of

01:56:15   25  religion that it conveys.  And that's exactly true in this

01:56:18    1    case.

01:56:18    2             The fact that Justice Breyer in *Van Orden* focused on

01:56:21    3    the 40-year history of unobjection, tied directly to his other

01:56:27    4    point that he made that was also determinative, that those 40

01:56:31    5    years went by where there was no religious use of those Ten

01:56:35    6    Commandments.   It was portrayed in this very secular setting, a

01:56:39    7    museum-like setting where there was nothing like an Easter

01:56:43    8    Sunrise Service that would occur there.

01:56:45    9             And so to Justice Breyer it was the fact that there

01:56:47   10    wasn't any religious use or objection for those 40 years that

01:56:51   11    made it clear that a reasonable observer didn't see it as a

01:56:52   12    religious --

01:56:52   13             THE COURT:   Well, the court accepted the fact that it

01:56:54   14    was religious.   I mean, that was a fundamental part of the

01:56:57   15    decision, right?

01:56:58   16             MS. MILLER:   It was religious, but it also conveyed a

01:57:00   17    secular message.   So what I read the court as saying is, is the

01:57:04   18    message that we're seeing from this more secular or more

01:57:07   19    religious, at least the plurality, and Justice Breyer

01:57:10   20    specifically, and he's saying this is more secular than

01:57:13   21    religious because it has this historical ties to our nation's

01:57:17   22    foundation of lawmaking, it's portrayed in a secular setting,

01:57:21   23    there's no evidence of any religious usage, no evidence of any

01:57:25   24    people coming forward and objecting, you know, seeing this as

01:57:27   25    religious, it's not the type of place where people come to

| | |
|---|---|
| 01:57:30 | 1 |
| 01:57:32 | 2 |
| 01:57:34 | 3 |
| 01:57:36 | 4 |
| 01:57:39 | 5 |
| 01:57:42 | 6 |
| 01:57:42 | 7 |
| 01:57:47 | 8 |
| 01:57:50 | 9 |
| 01:57:54 | 10 |
| 01:57:55 | 11 |
| 01:58:00 | 12 |
| 01:58:04 | 13 |
| 01:58:04 | 14 |
| 01:58:07 | 15 |
| 01:58:10 | 16 |
| 01:58:13 | 17 |
| 01:58:16 | 18 |
| 01:58:18 | 19 |
| 01:58:23 | 20 |
| 01:58:26 | 21 |
| 01:58:27 | 22 |
| 01:58:30 | 23 |
| 01:58:32 | 24 |
| 01:58:35 | 25 |

1  meditate or pray.

2        And so there was a bunch of factors that went into the

3  court's ultimate analysis, and that's why Justice Breyer said

4  that the outcome would probably be the same under *Lemon* because

5  we're seeing a predominantly secular purpose and secular

6  effect.

7        **THE COURT:**  What's the meaning of *McCreary County*,

8  which was decided the same day as *Van Orden*, involving the Ten

9  Commandments in the courthouses, I think, in Kentucky?  It was

10  decided on *Lemon*, right?

11        **MS. MILLER:**  Exactly, it was decided on *Lemon*.  And

12  *McCreary* is so much more clearer than *Van Orden* because the

13  court explicitly -- five justices explicitly apply *Lemon*.  They

14  say the *Lemon* purpose prong is completely good law, that we

15  still should use it.  And that was over the objection of the

16  counties that had argued that the court should abandon the

17  *Lemon* test, and abandon the purpose test specifically.

18        **THE COURT:**  So you've got two Supreme Court decisions

19  decided the same day, both involving the Ten Commandments, and

20  they reached different results.

21        **MS. MILLER:**  Yes.  And one of the key distinguishing

22  factors between the two is that the displays in the *McCreary*

23  would be standalone displays, and the Supreme Court said in the

24  decision that when a government places a religious item on its

25  property as a standalone display, the religious purpose is

01:58:38   1   clear, or the religious effect is clear.

01:58:39   2          And that's exactly what we have here, a standalone,

01:58:42   3   enormous religious display for Christianity.  It's not a

01:58:47   4   nondenominational symbol.  It's a very sectarian display, and

01:58:53   5   it stands alone on government property, not among numerous

01:58:57   6   other objects.  And so that was a main factor in *McCreary*.

01:59:00   7          The other factor that *McCreary* looked to was the

01:59:03   8   religious history leading up to the display.  There had been

01:59:04   9   statements by the supporters of the Ten Commandments in

01:59:07  10   *McCreary* that were not found in *Van Orden* indicating that the

01:59:09  11   purpose of the display was to be religious.  And that's exactly

01:59:12  12   what we have here as well.

01:59:13  13          So if the Court were to look to any Ten Commandments

01:59:15  14   case, *McCreary* would be far more telling or instructive to this

01:59:23  15   Court than the *Van Orden* case would be.  And even if we looked

01:59:25  16   to *Van Orden* and this Court were to exercise its legal

01:59:28  17   judgment, I think it's good to sort of think of this as --

01:59:28  18          **THE COURT:**  And specifically Justice Breyer agreed

01:59:31  19   with *McCreary*.

01:59:34  20          **MS. MILLER:**  Absolutely, yes, he was on the majority

01:59:37  21   in *McCreary* finding that a standalone Christian or religious

01:59:41  22   display is unconstitutional, especially when it has a religious

01:59:43  23   history, and that *Lemon* is still good law and is binding,

01:59:45  24   especially as to the purpose test, which is what we recall the

01:59:49  25   *Rabun* case fell under.

| | | |
|---|---|---|
| 01:59:51 | 1 | If this Court were to consider this monument, say it |
| 01:59:54 | 2 | was a star and crescent, an Islamic star and crescent, and that |
| 02:00:02 | 3 | was some -- you know, it's been up for 40 years and maybe |
| 02:00:03 | 4 | there's no objection because everyone in the community is |
| 02:00:06 | 5 | Islamic.  If a Christian came forward, you know, today, now |
| 02:00:06 | 6 | that there are organizations dedicated to separation of church |
| 02:00:08 | 7 | and state, and objected, I think you have to look at it in the |
| 02:00:11 | 8 | context of it's still a giant religious symbol, and to an |
| 02:00:16 | 9 | outsider -- in this case would be a Christian in that community |
| 02:00:19 | 10 | -- would see it as alienating to them.  Because it's the |
| 02:00:24 | 11 | government's symbol, it's the government's property, and to an |
| 02:00:27 | 12 | outsider it can be alienating and it can be marginalizing, and |
| 02:00:32 | 13 | that's what we have in this case. |
| 02:00:32 | 14 | I wanted to go back to something Your Honor had |
| 02:00:36 | 15 | mentioned about whether there was any case that had analyzed a |
| 02:00:39 | 16 | cross under *Van Orden*.  And the answer is yes.  In fact, the |
| 02:00:41 | 17 | Ninth Circuit did in the *Trunk* case.  The Ninth Circuit had |
| 02:00:46 | 18 | considered the constitutionality of a very longstanding war -- |
| 02:00:46 | 19 | **THE COURT:**  Which case was this? |
| 02:00:47 | 20 | **MS. MILLER:**  It was the *Trunk* case, and that was the |
| 02:00:51 | 21 | Mount Soledad cross. |
| 02:00:52 | 22 | **THE COURT:**  Okay, *Mount Soledad* case, okay, yeah. |
| 02:00:54 | 23 | **MS. MILLER:**  I think it was Jewish war veterans were |
| 02:00:58 | 24 | the plaintiffs.  It was a longstanding war memorial cross |
| 02:01:03 | 25 | surrounded by thousands of secular symbols all commemorating |

| | |
|---|---|
| 02:01:11 | 1 |
| 02:01:12 | 2 |
| 02:01:13 | 3 |
| 02:01:16 | 4 |
| 02:01:16 | 5 |
| 02:01:19 | 6 |
| 02:01:23 | 7 |
| 02:01:26 | 8 |
| 02:01:29 | 9 |
| 02:01:31 | 10 |
| 02:01:35 | 11 |
| 02:01:40 | 12 |
| 02:01:43 | 13 |
| 02:01:45 | 14 |
| 02:01:50 | 15 |
| 02:01:50 | 16 |
| 02:01:55 | 17 |
| 02:01:57 | 18 |
| 02:02:01 | 19 |
| 02:02:06 | 20 |
| 02:02:09 | 21 |
| 02:02:13 | 22 |
| 02:02:15 | 23 |
| 02:02:16 | 24 |
| 02:02:19 | 25 |

World War I and I believe World War II, and there's no dispute is was a war memorial.  And I should also add that this case also came after *Salazar*, so this is a post-*Salazar*, post-*Van Orden* case.

        And the defendants argued, just as in this case, that *Van Orden* applied and not *Lemon*, and the plaintiffs argued that *Lemon* applied and not *Van Orden*.  And the Ninth Circuit said, *Look, we think that Lemon probably applies here because it's never been overruled, this is not a Ten Commandments case, we had decided a previous Ten Commandments case where we did apply Van Orden but this is not that.  But let's just assume that Van Orden applies and apply both Van Orden and Lemon.*

        And it reached the exact same outcome that the cross remained unconstitutional under both standards because of the distinguishing factors between an enormous Christian cross and a Ten Commandments in the multifaceted display.

        So, yes, one court had.  And that court was an anomaly, too, because the Tenth Circuit had subsequently evaluated a cross after *Van Orden* as well as after *Salazar* and did not find *Van Orden* relevant at all, even though the crosses -- there were, I want to say, 10 to 12 roadside memorial crosses that had also been longstanding, I want to say, 20 years or so.

        **THE COURT:**  The Tenth Circuit, is that the one where there was a dissent by our new justice?

| | | |
|---|---|---|
| 02:02:23 | 1 | **MS. MILLER:**  That is true, yes. |
| 02:02:24 | 2 | **THE COURT:**  What was the name of that case? |
| 02:02:27 | 3 | **MS. MILLER:**  That is called *Davenport v. Utah Highway* |
| 02:02:27 | 4 | *Patrol.* |
| 02:02:27 | 5 | **THE COURT:**  *Davenport*, okay. |
| 02:02:33 | 6 | **MS. MILLER:**  It also has another name, *Duncan*, and I |
| 02:02:34 | 7 | can't really figure out why, but, yes, *Davenport* is how we |
| 02:02:36 | 8 | cited it. |
| 02:02:37 | 9 | **THE COURT:**  I want to ask you about something that |
| 02:02:39 | 10 | Mr. Daniel brought up.  Mr. Suhor apparently leased or reserved |
| 02:02:44 | 11 | the cross of Easter.  Is that a fact? |
| 02:02:44 | 12 | **MS. MILLER:**  Yes, he did.  He wanted to use it for |
| 02:02:50 | 13 | satanic purposes. |
| 02:02:50 | 14 | **THE COURT:**  Okay.  So he's actually used the cross. |
| 02:02:53 | 15 | What does that do to his objecting to the cross?  Does that |
| 02:02:57 | 16 | create an estoppel situation? |
| 02:03:00 | 17 | **MS. MILLER:**  It doesn't, Your Honor.  There's plenty |
| 02:03:03 | 18 | of cases, for instance, the legislative prayer cases that the |
| 02:03:07 | 19 | Defendants rely so heavily upon, where plaintiffs continue to |
| 02:03:10 | 20 | go to county meetings where they hear objectionable prayers, |
| 02:03:12 | 21 | they listen to the meetings at home and don't fast-forward, and |
| 02:03:15 | 22 | the courts have said explicitly -- actually, in the *Pelphrey* |
| 02:03:17 | 23 | case, the Eleventh Circuit *Pelphrey* case that the plaintiffs |
| 02:03:18 | 24 | had standing even though they could have avoided the prayers. |
| 02:03:22 | 25 | The Plaintiffs don't want to avoid the park, and they |

02:03:25   1   actually want to use it, they want to use the space.  He wished

02:03:27   2   to use the amphitheater and the area around it for satanic

02:03:33   3   purposes, and he actually had some issues with the County as

02:03:35   4   far as they said that -- or the City said that the church

02:03:37   5   actually had a first-come, first-serve use for the cross for

02:03:41   6   Easter services.  So that's that issue.

02:03:43   7          But at the end of the day, we still have another

02:03:46   8   Plaintiff who has not used the cross for any purpose.  So even

02:03:50   9   if the Court were to have some issue with that, which, again,

02:03:52   10  under the case law there shouldn't be any, there is at least

02:03:56   11  one Plaintiff that has not used the cross for such purposes

02:04:00   12  that has objected to the cross, that lives near the cross, and

02:04:04   13  has standing.

02:04:04   14         **THE COURT:**  I want to ask you about another case.  Are

02:04:05   15  you familiar with *Capital Square Review vs Pinette*?

02:04:11   16         **MS. MILLER:**  I am.

02:04:12   17         **THE COURT:**  And we had a cross there that was approved

02:04:15   18  by the Supreme Court in the Ohio State Capitol.

02:04:19   19         **MS. MILLER:**  And that was the KKK case?

02:04:21   20         **THE COURT:**  The Ku Klux Klan, yes.

02:04:21   21         **MS. MILLER:**  Yes, the Ku Klux Klan, so that was --

02:04:24   22         **THE COURT:**  They were allowed to put a cross during

02:04:26   23  the Christmas season at the state capitol.

02:04:26   24         **MS. MILLER:**  Yes, I think it was for about 16 days.

02:04:28   25  And so that was pursuant to an open forum policy where the

| 02:04:31 | 1 | evidence was shown that the government had already allowed |

evidence was shown that the government had already allowed

numerous displays, somewhere in the ballpark of 20.  And so to

exclude the Ku Klux Klan would actually be to discriminate on

the basis of viewpoint under the free speech analysis, so it

was not an Establishment Clause analysis.

**THE COURT:**  The lower court analyzed it -- the lower

courts, I guess I should say, including the Sixth Circuit,

analyzed it as an Establishment Clause and affirmed it.

**MS. MILLER:**  I mean, yes, I will admit that I am not

familiar with the --

**THE COURT:**  I'm not sure if the Sixth Circuit affirmed

on that basis, but the justification by the state was under the

Establishment Clause for denying.  And it was analyzed under

the Establishment Clause, right, I mean, initially?

**MS. MILLER:**  You know, I'm not familiar with the lower

court decisions.  I'm just familiar with the Supreme Court one.

I would say that was probably -- if the defense was -- my guess

is that it was on the defense side.  So if the city said or the

government said that if we accept this monument it will violate

the Establishment Clause, so it was probably under the defense

versus the plaintiff saying that, I guess, obviously with the

posture, so I guess I could see how that would fit in.

But if they upheld the cross as being not violative of

the Establishment Clause -- is that what you're saying that

happened?

02:05:44   1          **THE COURT:**  Well, that's the effect of it, anyway,

02:05:46   2   right?

02:05:46   3          **MS. MILLER:**  Yes, yes.  And that's consistent with

02:05:48   4   what we're saying, I mean, and again, it's consistent with the

02:05:50   5   position that, if they were to make this a public forum and

02:05:53   6   allow private citizens to bring in a cross annually for the

02:05:58   7   holiday display, you know, for their service and then remove

02:06:00   8   it, you know, the next day or pursuant to some open forum

02:06:04   9   policy, that would be completely allowed.

02:06:05  10          **THE COURT:**  So we have the Supreme Court affirming the

02:06:07  11   placement of a cross by the Ku Klux Klan on the state capitol

02:06:12  12   but denying the use of a cross as a war memorial or a monument

02:06:17  13   to veterans or anything else.  Is that where we are?

02:06:19  14          **MS. MILLER:**  Your Honor, I don't find it inconsistent

02:06:21  15   only because it was an open forum.  So the presumption is that

02:06:21  16   citizens are aware that an atheist can come in and bring in

02:06:26  17   their symbol.  You know, if Plaintiff Suhor wishes to bring in

02:06:28  18   a satanic symbol, he could.  That was the underlying principle

02:06:33  19   of the *Pinette* case.

02:06:35  20          This is a permanent religious monument on government

02:06:40  21   property.  There's no question that this is not a private

02:06:41  22   symbol, you know, this is not the Ku Klux Klan's cross.  This

02:06:43  23   the City of Pensacola's cross, and that's where the

02:06:49  24   Establishment Clause kicks in and not the free speech clause.

02:06:51  25          The other point that I wanted to make was that the

02:06:53  1    *Lynch* case was cited by the Defendants as being one of the

02:06:57  2    cases that did not employ *Lemon*, but that's actually incorrect.

02:06:57  3    The *Lynch* case did look to *Lemon* and then just said that the

02:07:00  4    display in that case satisfied *Lemon* because it was one

02:07:04  5    religious part of an otherwise secular display.  That was

02:07:07  6    actually also on private property, it wasn't actually city

02:07:10  7    property.

02:07:11  8         So the facts in that case are distinguishable, but

02:07:13  9    ultimately the court did apply and look to *Lemon* as it did in

02:07:16  10   the other case that it looked to a nativity scene, which was

02:07:20  11   the *Allegheny County* case.

02:07:24  12        **THE COURT:**  Well, *Allegheny County* just sort of

02:07:27  13   amplified the second *Lemon* factor, right?

02:07:31  14        **MS. MILLER:**  Yes.

02:07:32  15        **THE COURT:**  I mean, it didn't change *Lemon* at all?

02:07:35  16        **MS. MILLER:**  No, not at all, Your Honor, no.  It did

02:07:37  17   amplify the second prong of *Lemon*, and it also emphasized that

02:07:41  18   even a donated display or one that's temporary is

02:07:44  19   unconstitutional when it has the government's stamp of approval

02:07:47  20   on it.

02:07:49  21        Your Honor, I don't have any other points to make.

02:07:51  22        **THE COURT:**  Thank you.

02:07:52  23        Mr. Daniel, 15 minutes.

02:08:00  24        **MR. DANIEL:**  Thank you, Your Honor.  Just a few

02:08:03  25   comments.  Number one, as far as the use of this cross is

| | |
|---|---|
| 02:08:06 | 1 |
| 02:08:12 | 2 |
| 02:08:16 | 3 |
| 02:08:18 | 4 |
| 02:08:22 | 5 |
| 02:08:26 | 6 |
| 02:08:26 | 7 |
| 02:08:29 | 8 |
| 02:08:31 | 9 |
| 02:08:33 | 10 |
| 02:08:35 | 11 |
| 02:08:38 | 12 |
| 02:08:43 | 13 |
| 02:08:48 | 14 |
| 02:08:52 | 15 |
| 02:08:57 | 16 |
| 02:09:04 | 17 |
| 02:09:06 | 18 |
| 02:09:09 | 19 |
| 02:09:14 | 20 |
| 02:09:18 | 21 |
| 02:09:21 | 22 |
| 02:09:26 | 23 |
| 02:09:29 | 24 |
| 02:09:32 | 25 |

concerned, the City has no position whatsoever.  If Mr. Suhor wants to use it, whoever wants to use it can use it for whatever purpose.  In fact, it would probably be unconstitutional if the City forbade a church from coming in there and having Easter Sunrise Services or whatever.  So the use of it --

**THE COURT:**  I was trying to figure out how you reserve a cross, but actually what you reserve is the little amphitheater that's right there with it, I guess.

**MR. DANIEL:**  Exactly, you reserve the space.  And in the affidavits that we submitted, the practice of the City was that, if you had a recurring event -- and there are Bayou runs and various events -- if you had a recurring event where you used the Bayview Park on a particular day for a particular event, you had first dibs, so to speak, on it again.

In 2016 McIlwain Presbyterian intended to use the cross for its Easter service.  Mr. Suhor was told that -- and this is in the affidavit of Mr. Cooper that we submitted to the Court.  Mr. Suhor wanted it.  McIlwain said, *Well, that's fine, we'll go down to the dock*, and I think they went down to the dock, and he reserved it.  Whether he used it or not, we don't know.  We don't keep up with who uses it and what they do.  We simply allow anyone who wants to use it to use it.

**THE COURT:**  And there's no fee for that?

**MR. DANIEL:**  No fee, no fee.  Now, you can be charged

02:09:34  1   a fee if you're going to have a crowd, and there's some limit

02:09:37  2   and I don't recall what the limit is.  But say it's a hundred

02:09:40  3   people or more and that requires security or something like

02:09:43  4   that, there could be a fee associated with that.

02:09:45  5            But the truth of the matter is that anybody could go

02:09:49  6   down there anytime and do whatever they want to at the cross or

02:09:52  7   on the dock or on the swing set or wherever they want to do it

02:09:57  8   at the park.  There is no limitation on it.

02:10:01  9            If you want to reserve it, you can reserve it, if you

02:10:05  10  anticipate, again, a particular event and that sort of thing.

02:10:08  11  But there's no discrimination at all in who gets to reserve the

02:10:12  12  cross.

02:10:12  13           Let me talk about the *McCreary* case for just a minute

02:10:18  14  because I think that it is very distinguishable from *Van Orden*.

02:10:21  15  And in that case, there were two Kentucky counties who wanted

02:10:27  16  to post large readily visible copies of the Ten Commandments in

02:10:33  17  their courthouses, and they adopted identical resolutions that

02:10:40  18  basically said that the commandments -- the Ten Commandments

02:10:45  19  were Kentucky's, quote, "precedent legal code."  That was what

02:10:49  20  the resolution said.

02:10:51  21           The resolution went on to say that the state

02:10:53  22  legislature -- that not only the resolutions but the state

02:10:59  23  legislature acknowledged Christ as the, quote, "Prince of

02:11:04  24  Ethics."

02:11:04  25           Now, when you look at *Van Orden* and you say Justice

02:11:08  1    Breyer's analysis was '*What's the purpose and effect of this*

02:11:11  2    *cross*,' *Van Orden* says the Ten Commandments in that case had

02:11:15  3    been there for 40 years, and I read to you a minute ago what he

02:11:19  4    said the determinative factor was and why.

02:11:21  5           It's very easy to see that, if you have a county

02:11:26  6    adopting an ordinance talking about the commandments as

02:11:30  7    Kentucky's precedent legal code and Christ as the Prince of

02:11:34  8    Ethics, the purpose as advocated by the government entity

02:11:38  9    itself is not anything but a religious purpose.  That's what

02:11:42  10   they're doing.

02:11:42  11          And so it's very easy to see how the justices could

02:11:47  12   decide *Van Orden* where there's no evidence of any coercion or

02:11:54  13   advocacy of any religion in *Van Orden* for 40 years versus

02:12:04  14   contemporary resolutions where the Kentucky counties are trying

02:12:09  15   to establish these kinds of things that are clearly --

02:12:12  16          **THE COURT:**  Well, when they first did it they said it

02:12:14  17   was for religious purposes.  But then after the District Court

02:12:18  18   questioned it, they went back and they changed it and added

02:12:22  19   nine framed documents of equal size including a copy of the

02:12:26  20   Star-Spangled Banner's lyrics, the Declaration of Independence,

02:12:33  21   and other things like that.

02:12:35  22          **MR. DANIEL:**  And the court said, *You can't fool me on*

02:12:38  23   *stuff like that, We know what you're doing, You showed us what*

02:12:41  24   *you're doing, And to go back and try to work your way around*

02:12:45  25   *something like this is not appropriate*.  That's what the court

said in its --

**THE COURT:**  Well, this is, again, a finding of a subterfuge.

**MR. DANIEL:**  Yes, sir, exactly, that's exactly the point, the court said, *We're not going to look at that kind of thing, which is a subterfuge, as opposed to looking at the act itself to see what its purpose is.*

And in *Van Orden* the court says, *Forty years tells us this purpose is not to establish religion*.  But in *McCreary* the court said, *It's real obvious what your purpose is regardless of what you say*.

**THE COURT:**  But it then went on to apply the *Lemon* three-part analysis and said it prohibited the use of those Ten Commandments --

**MR. DANIEL:**  It did.

**THE COURT:**  -- on the very same day that *Van Orden* was decided.

**MR. DANIEL:**  It did.  And let me talk about *Lemon* just a minute.  Because, in all candor, when I first started looking at this case and looked at the *Lemon* test, I thought, you know, if *Lemon* is the law, this is a problem as far as the City is concerned.

But then I started looking at *Lemon*, and I said, well, let's look at those factors.  And *Lemon* was a legislative action case.  And the first prong says the statute must have a

02:14:02   1   secular legislative purpose.  We're looking at the purpose of

02:14:05   2   the enactment of the legislature, what was the purpose of that.

02:14:11   3          From the City's point of view we look at the placement

02:14:14   4   of the cross by the Jaycees, not the City, but by the Jaycees

02:14:24   5   in the park, and we say what is the City's purpose in that.

02:14:27   6          Well, the City is accommodating religion, certainly.

02:14:28   7   But can it be said that the City is advocating religion or

02:14:34   8   attempting to establish a religion in some way?

02:14:37   9          And we know that the Jaycees, as we pointed out in our

02:14:42   10  papers, and as Your Honor is well aware what the Jaycees is,

02:14:42   11  what kind of organization it is.  It's a civic organization.

02:14:47   12  It's not to say that it has no faith element to it at all, but

02:14:51   13  it's primarily a civic organization.

02:14:52   14         We know from the record in this case that that

02:14:54   15  organization -- at that site there's a plaque that says that

02:14:58   16  this amphitheater is dedicated to Frazier Phelps, and this

02:15:03   17  cross stands right next to it.  We know that that site was used

02:15:07   18  for Veterans Day and Memorial Day celebrations honoring the

02:15:13   19  dead.  The quote that we gave you from *Salazar* related to what

02:15:17   20  crosses mean, we know that that's what they did.

02:15:19   21         The *Lemon* test does not require that its total purpose

02:15:24   22  be secular.  It has to have "a" secular purpose.  There is --

02:15:29   23  from the City's perspective there is some secular purpose of

02:15:33   24  this.  And I'm not going to stand here and say that there's no

02:15:37   25  religious purpose, but there is a secular purpose.

| | |
|---|---|
| 02:15:39 | 1 |
| 02:15:44 | 2 |
| 02:15:50 | 3 |
| 02:15:54 | 4 |
| 02:15:59 | 5 |
| 02:16:04 | 6 |
| 02:16:04 | 7 |
| 02:16:08 | 8 |
| 02:16:09 | 9 |
| 02:16:11 | 10 |
| 02:16:12 | 11 |
| 02:16:14 | 12 |
| 02:16:18 | 13 |
| 02:16:22 | 14 |
| 02:16:24 | 15 |
| 02:16:30 | 16 |
| 02:16:34 | 17 |
| 02:16:38 | 18 |
| 02:16:41 | 19 |
| 02:16:46 | 20 |
| 02:16:50 | 21 |
| 02:16:51 | 22 |
| 02:16:56 | 23 |
| 02:16:58 | 24 |
| 02:17:02 | 25 |

And then its principal or primary effect must be one that neither advances nor inhibits religion.  No one can stand before you and say the principal effect of this cross is to advance or inhibit religion.  That's not what's happening at all.  It hadn't happened for 70 years.

**THE COURT:**  Well, you have religious services there.

**MR. DANIEL:**  Yes, sir.

**THE COURT:**  I mean, it's primarily associated with the Easter Sunrise Service.

**MR. DANIEL:**  It is.  But it's the City's -- you've got to look not -- if that's the test, then people can't come into the park and do anything that might be religious because they're using this public forum, this park as a place to have a religious service, which clearly is not what the law is.  It's the City's perspective.  It's not -- the principal effect of what it has done is not to promote a religion.

**THE COURT:**  But it isn't the City's perspective that counts.  It's sort of an objective onlooker.

**MR. DANIEL:**  Well, that's where you go back to what Justice Gorsuch said in the Tenth Circuit, the *Davenport* case, he says, you know, those objective reasonable observers are, in the vernacular, grossly overrated, is basically what he said.

**THE COURT:**  Well, I don't disagree with that, but that's different from the City's perspective.

**MR. DANIEL:**  Well, it is, but I'm talking about what

| | |
|---|---|
| 02:17:04 | 1 |
| 02:17:09 | 2 |
| 02:17:14 | 3 |
| 02:17:17 | 4 |
| 02:17:20 | 5 |
| 02:17:26 | 6 |
| 02:17:31 | 7 |
| 02:17:35 | 8 |
| 02:17:40 | 9 |
| 02:17:44 | 10 |
| 02:17:47 | 11 |
| 02:17:51 | 12 |
| 02:17:56 | 13 |
| 02:18:03 | 14 |
| 02:18:07 | 15 |
| 02:18:14 | 16 |
| 02:18:18 | 17 |
| 02:18:23 | 18 |
| 02:18:25 | 19 |
| 02:18:30 | 20 |
| 02:18:33 | 21 |
| 02:18:36 | 22 |
| 02:18:40 | 23 |
| 02:18:45 | 24 |
| 02:18:50 | 25 |

*Lemon* says.  *Lemon* says that the primary or principal effect must be one that neither advances nor inhibits.  And what we're looking at is the effect of the City's action.

And I understand Your Honor's point.  I understand that the effect of the cross may be one that is perceived by somebody.  But perception -- and we know this from other cases, the mere fact that someone perceives something does not make it a constitutional violation.  There has to be more objectivity to it than that.  And that's why Justice Breyer said in *Van Orden* the objectivity to him, the determinative factor was it's been there for 40 years and nobody has complained about it.

And now this contrived kind of lawsuit, frankly, is what we're now faced with and by people, two of whom have now moved to Canada, and it's not something that really is a statement of the City is trying to advance or inhibit religion. It's as the organizations that support them -- and we pointed it out in our briefs -- their purpose is to eliminate religion from society.  That's not the purpose of the Establishment Clause.  The Establishment Clause is to accommodate religion.

And then, if you look at the excessive government entanglement, which is where *Van Orden* -- where Justice Breyer came down, the entanglement issue, there's clearly no entanglement in this case.  The City does not in any way discriminate.  Contrary to what the Plaintiffs said in their filings with the Court, they don't sponsor anything.

| | | |
|---|---|---|
| 02:18:53 | 1 | There may be a quid pro quo that, if you have another |
| 02:18:56 | 2 | event that's going to raise some money for another function, |
| 02:19:00 | 3 | they may trade out with you, kind of thing, which they do with |
| 02:19:04 | 4 | all organizations, according to Mr. Cooper's affidavit. |
| 02:19:07 | 5 | So I'm not sure that if you look at *Lemon* and look at |
| 02:19:14 | 6 | it in the context of the Establishment Clause and the |
| 02:19:17 | 7 | purpose -- |
| 02:19:17 | 8 | THE COURT: Well, if the cross were just, what, 100 |
| 02:19:22 | 9 | feet farther north on the other side of the street it wouldn't |
| 02:19:24 | 10 | be a problem. It wouldn't be in the park, it wouldn't be part |
| 02:19:29 | 11 | of the City's. |
| 02:19:30 | 12 | MR. DANIEL: True. |
| 02:19:31 | 13 | THE COURT: But the City owns it, maintains it. |
| 02:19:33 | 14 | MR. DANIEL: Well, the City owns it and the -- |
| 02:19:35 | 15 | THE COURT: Well, it has been maintained, the evidence |
| 02:19:37 | 16 | in the record shows that. |
| 02:19:40 | 17 | MR. DANIEL: $2,000 out of about several million |
| 02:19:44 | 18 | dollars. I did the calculation, and I don't remember exactly, |
| 02:19:45 | 19 | but the calculation is like .001 percent of the City's budget. |
| 02:19:49 | 20 | It is so de minimus as to be nonexistent. |
| 02:19:53 | 21 | THE COURT: I think the evidence shows it was actually |
| 02:19:54 | 22 | refurbished a few years ago. |
| 02:19:59 | 23 | MR. DANIEL: That's included in that $2,000 figure, |
| 02:19:59 | 24 | and the refurbishment was paint, I think. So yes, there is |
| 02:20:08 | 25 | evidence that there was a dollar factor in the maintenance of |

02:20:10   1   it.   There's also evidence I think in Mr. Cooper's affidavit

02:20:15   2   that volunteers have come in and helped do some of that

02:20:18   3   maintenance.

02:20:19   4            But Your Honor is correct, there is an element of

02:20:22   5   public dollar -- just like there is in paying for a chaplain

02:20:26   6   for the Senate and that kind of thing, there's public money

02:20:30   7   involved in some of these things that are accommodations of

02:20:34   8   religion as opposed to the exclusion of religion.

02:20:38   9            Thank you, Your Honor.

02:20:39   10            **THE COURT:**   All right.   Well, this is clearly a case

02:20:43   11   that will be decided by summary judgment.   There are no issues

02:20:50   12   of disputed fact and it's purely a question of law.   So I will

02:20:56   13   get a decision to you as quickly as possible.

02:21:00   14            Unless there's something else, that will complete the

02:21:03   15   hearing.   Anything else?

02:21:05   16            **MR. DANIEL:**   No, Your Honor.

02:21:05   17            **THE COURT:**   If not, then we are adjourned.   Thank you.

           18                  *(Proceedings concluded at 2:21 p.m.)*

           19                  --------------------

           20   *I certify that the foregoing is a correct transcript from the*
                *record of proceedings in the above-entitled matter.   Any*
           21   *redaction of personal data identifiers pursuant to the Judicial*
                *Conference Policy on Privacy are noted within the transcript.*

           22

           23   *Donna L Boland*
                                                           7-18-2017
                *Donna L. Boland, RPR, FCRR*                *Date*
           24   *Official Court Reporter*

           25

1

**INDEX**

2
                                                                    **PAGE**
3

4      Argument by Ms. Miller                                      3

5      Argument by Mr. Daniel                                     16

6      Rebuttal by Ms. Miller                                     37

7      Rebuttal by Mr. Daniel                                     47

8
       **CERTIFICATE OF REPORTER**                                **56**
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25