[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
————————————————

No. 17-13025
————————————————

D.C. Docket No. 3:16-cv-00195-RV-CJK


AMANDA KONDRAT'YEV,
ANDREIY KONDRAT'YEV,
ANDRE RYLAND,
DAVID SUHOR,

                                        Plaintiffs - Appellees,

versus

CITY OF PENSACOLA, FLORIDA,
ASHTON HAYWARD,
Mayor,
BRIAN COOPER,

                                        Defendants - Appellants.

————————————————

Appeal from the United States District Court
for the Northern District of Florida
————————————————

(September 7, 2018)

Before NEWSOM and HULL, Circuit Judges, and ROYAL,[*] District Judge.

PER CURIAM:

The City of Pensacola, Florida appeals a district court decision ordering it to remove a 34-foot Latin cross from a public park on the ground that the City's maintenance of the cross violates the First Amendment's Establishment Clause. Having concluded that we are bound by existing Circuit precedent, we find ourselves constrained to affirm.

## I

The pertinent facts are undisputed.  In 1941, the National Youth Administration erected a wooden cross in the eastern corner of Pensacola's Bayview Park to be the "focal point" of what would become an annual Easter sunrise program.  The program itself was organized by the Pensacola Junior Chamber of Commerce (a/k/a the "Jaycees") and soon became a tradition, with people gathering for Easter services during World War II to pray, among other things, for "the divine guidance of our nation's leaders" and for faith to "see through the present dark days of war."  The services continued following the war, and in 1949 the Jaycees built a small stage—or "bandstand"—immediately in front of the cross to serve as a permanent home for the annual program.

---

[*] Honorable Charles Ashley Royal, United States District Judge for the Middle District of Georgia, sitting by designation.

In 1969, the Jaycees replaced the original wooden cross with the 34-foot concrete version at issue in this appeal.  The new cross was dedicated at the 29th annual Easter sunrise service.  The Jaycees donated the cross to the City, which continues to light and maintain it at a cost of around $233 per year.  Although the cross is only one of more than 170 monuments scattered throughout Pensacola's parks, it is one of only two—and the only religious display—located in Bayview Park.  Over the years, the cross has continued to serve as the location for an annual Easter sunrise program, but it has also been used as a site for remembrance services on Veteran's and Memorial Days, at which attendees place flowers near the cross in honor of loved ones overseas and in memory of those who died fighting in service of the country.

The Bayview Park cross stood in the same location for nearly 75 years, essentially without incident, before the plaintiffs in this case filed suit asserting that the cross's presence on city property violates the Establishment Clause.  The parties filed dueling summary judgment motions, and the district court granted the plaintiffs' motion and ordered the cross removed.  This is the City's appeal.[1]

## II

In relevant part, the First Amendment states that "Congress shall make no law respecting an establishment of religion …."  U.S. Const. amend. I.  Although

---

[1] As this appeal comes to us following a grant of summary judgment, our review is *de novo*.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

by its terms the Establishment Clause applies only to Congress, and although available historical evidence indicates that it was originally understood as a federalism-based provision designed to prevent the federal government from interfering with state and local decisions about church-state relations, the Supreme Court has since made clear that, as "incorporated" through the Fourteenth Amendment, the Clause protects individual rights against state and local interference. *See, e.g.*, *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947). The question here, therefore, is whether the City's maintenance of the Bayview Park cross constitutes a prohibited "establishment of religion."

The City contends (1) that none of the plaintiffs here has suffered sufficient injury to have standing to sue and (2) that, in any event, the Bayview Park cross does not violate the Establishment Clause under current Supreme Court precedent. If we were writing on a clean slate, we might well agree—on both counts. But we are not—and so we cannot. As we will explain, we have concluded that we are bound by this Court's decision in *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098 (11th Cir. 1983), which considered facts nearly indistinguishable from those here. There, with the approval of the Georgia Department of Natural Resources, the Rabun County Chamber of Commerce erected an illuminated 35-foot Latin cross in Black Rock Mountain State Park. *Id.* at 1101. Like the Bayview Park cross at issue here, the Black Rock

4

Mountain cross replaced a similar monument that had stood for a number of years but had fallen into disrepair, and like the Bayview Park cross, it was dedicated at an annual Easter sunrise service. *Id.* The ACLU of Georgia and five named individuals sued, claiming that the Establishment Clause forbade the Black Rock Mountain cross's presence on state-owned land. A panel of this Court agreed, holding both (1) that the plaintiffs there had standing to sue and (2) that the cross violated the Establishment Clause. *Id.* at 1108–09, 1111.

For the reasons that follow, absent en banc reconsideration or Supreme Court reversal of the holding in *Rabun*, we are bound by our "prior panel precedent" rule to follow it, and are thus constrained to affirm the district court's decision. *See, e.g.*, *Breslow v. Wells Fargo Bank*, 755 F.3d 1265, 1267 (11th Cir. 2014) ("It is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court.") (alteration and internal quotations omitted).

## A

We begin, as we must, with the question of the plaintiffs' standing to sue. *See, e.g.*, *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1330 (11th Cir. 2007) ("[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.") (internal quotations omitted).

As already indicated, we find that the Court's earlier decision in *Rabun* resolves the standing issue in the plaintiffs' favor.

In *Rabun*, the defendants contended that the plaintiffs lacked standing under the Supreme Court's then-recent decision in *Valley Forge Christian College v. Americans. United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982). In *Valley Forge*, a nonprofit organization and four of its employees had sued to prevent the transfer of federal land to a religious institution.  *Id*. at 469.  The Third Circuit held that the plaintiffs had standing based on the "shared individuated right to a government that 'shall make no law respecting the establishment of religion.'" *Americans United for Separation of Church & State, Inc. v. U.S. Dep't of Health, Ed. & Welfare*, 619 F.2d 252, 261 (3d Cir. 1980).  The Supreme Court rejected that theory, finding that such "generalized grievances" are insufficient to confer standing, and further stated that Establishment Clause plaintiffs who cannot identify a personal injury "other than the psychological consequence presumably produced by observation of conduct with which one disagrees" lack the injury necessary to establish Article III standing.  *Valley Forge*, 454 U.S. at 483, 485. Relying on *Valley Forge*, the defendants in *Rabun* insisted that none of the plaintiffs there had the necessary standing.  698 F.2d at 1103.

While the *Rabun* panel acknowledged that *Valley Forge* had "expressly held that the mere 'psychological consequence presumably produced by observation of

conduct with which one disagrees' is not a cognizable injury" for standing purposes, *id*. (quoting 454 U.S. at 486), it nonetheless concluded that the plaintiffs before it had "demonstrated an individualized injury, other than a mere psychological reaction," *id*. at 1108. Specifically, the panel held that the plaintiffs had sufficiently "allege[d] that they ha[d] been injured in fact because they ha[d] been deprived of their beneficial right of use and enjoyment of a state park." *Id*. at 1103. Two of the plaintiffs, in particular, "demonstrated the effect that the presence of the cross ha[d] on their right to the use of Black Rock Mountain State Park both by testifying as to their unwillingness to camp in the park because of the cross and by the evidence of the physical and metaphysical impact of the cross." *Id*. at 1108. More particularly still, the *Rabun* panel concluded, those two plaintiffs were "forced to locate other camping areas or to have their right to use Black Rock Mountain State Park conditioned upon the acceptance of unwanted religious symbolism." *Id*.

As we read *Rabun*, therefore, it is not strictly necessary for an Establishment Clause plaintiff to modify his behavior in order to avoid the alleged violation; rather, it is enough that he claim to have suffered "metaphysical"—or as the *Rabun* panel also called it, "spiritual"—injury and that his use of a public resource has been "conditioned upon the acceptance of unwanted religious symbolism." *Id*. Under *Rabun*'s expansive formulation, it seems to us that at least one of the

plaintiffs in this case has alleged sufficient injury to pass Article III muster.  Andre

Ryland testified that he uses Bayview Park "many times throughout the year" and

is "offended and feel[s] excluded by … the Bayview Cross."  Although it does not

appear that Ryland (or any other plaintiff for that matter) has taken any steps to

avoid encountering the cross, his "offen[se]" and "exclu[sion]" would seem to

qualify as the sort of "metaphysical" or "spiritual" injury that *Rabun* deems

adequate.  Because Ryland has standing under *Rabun*, we need not consider

whether the other plaintiffs do.  *See, e.g., Watt v. Energy Action Educ. Found.*, 454

U.S. 151, 160 (1981).

We turn then, as did the panel in *Rabun*, to the merits of the plaintiffs'

Establishment Clause claim.

## B

In considering the merits, we begin, once again, with *Rabun*.  The panel

there analyzed the Black Rock Mountain cross under the three-prong

Establishment Clause test announced in *Lemon v. Kurtzman*, 403 U.S. 602 (1971),

which both parties "agree[d]" supplied "the correct legal standard."  698 F.2d at

1109.  The *Lemon* test, the panel observed, asks "(1) [w]hether the [challenged]

action has a secular purpose; (2) [w]hether the 'principal or primary effect' is one

which neither 'advances nor inhibits religion;' and (3) [w]hether the action fosters

'an excessive entanglement with religion.'"  *Id*. (quoting *Lemon*, 403 U.S. at 612–

13).  "[I]f even one of these three principles is violated," the panel continued, "the challenged governmental action will be found to violate the Establishment Clause." *Id*.  The *Rabun* panel concluded that the defendants there had "failed to establish a secular purpose" for the Black Rock Mountain cross and, therefore, that "the maintenance of the cross in a state park violate[d] the Establishment Clause of the First Amendment."  *Id*. at 1111.  In closing, the panel acknowledged that the cross had stood in the park "[f]or many years," but held that "'historical acceptance without more' does not provide a rational basis for ignoring the command of the Establishment Clause that a state 'pursue a course of "neutrality" toward religion.'"  *Id*. (quoting *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 792–93 (1973)).

The similarities between the Bayview Park cross at issue here and the Black Rock Mountain cross at issue in *Rabun* are striking.  As the district court summarized:

> In *Rabun County*, a private organization (there, the Chamber of Commerce; here the Jaycees) put up a tall illuminated Latin cross (there, a 35-foot cross; here a 34-foot cross) to replace an existing one. The cross was on government property (there, a state park in Black Rock Mountain; here, a city park in Pensacola), and its dedication was specifically scheduled to coincide with the annual Easter Sunrise Service (there, the 21st annual service; here, the 29th annual service), which had been held at the site of the cross for a number of years.

9

Doc. 41 at 10.  Given the parallels between the two cases—and crosses—we think it clear that *Rabun* (with its *Lemon*-based purpose analysis) controls our analysis and requires that we affirm the district court's decision.

The City contends that the Supreme Court's more recent Establishment Clause decisions free us to disregard *Lemon*—and thus *Rabun*—in our analysis. And we cannot help but agree that the Court's contemporary jurisprudence seems to have substantially weakened *Lemon*—and thus, by extension, *Rabun*.  *See, e.g.*, *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811 (2014) (never mentioning *Lemon*); *Van Orden v. Perry*, 545 U.S. 677 (2005) (plurality) (declining to apply *Lemon*).  But our precedent—in particular, our precedent about precedent—is clear: "[W]e are not at liberty to disregard binding case law that is … closely on point and has been only weakened, rather than directly overruled, by the Supreme Court."  *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996).  And at least as matters now stand, neither *Lemon* nor *Rabun* has been "directly overruled."  Accordingly, our hands are tied.  Absent en banc reconsideration or Supreme Court reversal, we are constrained to affirm the district court's order requiring removal of the Bayview Park cross.

**AFFIRMED**.

NEWSOM, Circuit Judge, concurring in the judgment:

Reluctantly, I agree that our existing precedent—and in particular, *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098 (11th Cir. 1983)—requires us to affirm the district court's decision, which orders the removal of a Latin cross that has stood in a remote corner of Pensacola's Bayview Park, essentially unchallenged, for 75 years.  With respect to both of the key issues here—the plaintiffs' standing to contest the city's maintenance of the cross and the merits of their Establishment Clause challenge—*Rabun* is effectively on point.  And under our prior-panel-precedent rule, it seems clear enough to me that we—by which I mean the three of us—are stuck with it. *See, e.g.*, *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008).[1]

---

[1] "Under [the prior-panel-precedent] rule, a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting en banc.  While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point."  *Archer*, 531 F.3d at 1352.  We haven't been perfectly consistent in our articulation of the rule, and other formulations would seem to allow subsequent panels more wiggle room.  *See, e.g.*, *United States v. Madden*, 733 F.3d 1314, 1319 (11th Cir. 2013) ("[O]ur prior precedent is no longer binding once it has been substantially undermined or overruled by ... Supreme Court jurisprudence."); *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992) ("We may decline to follow a decision of a prior panel if necessary to give full effect to a United States Supreme Court decision."); *Leach v. Pan Am. World Airways*, 842 F.2d 285, 286 (11th Cir. 1988) ("[A]ccording to both Eleventh and Fifth Circuit precedent [a three-judge] panel may not overlook decisions by the Supreme Court which implicitly overrule a binding circuit decision, or undercut its rationale.").  As tempting as it may be to invoke one of the flabbier variants in order to "write around" *Rabun*, I'll resist the urge.  The way I see it, a healthy respect for the decisions of my colleagues—both past and present—counsels a fairly rigorous application of the prior-panel-precedent rule.

Having said that, it's equally clear to me that *Rabun* is wrong. On neither score—standing or the merits—can *Rabun* be squared with a faithful application of Supreme Court precedent, and I urge the full Court to rehear this case en banc so that we can correct the errors that *Rabun* perpetuates.

## I

First, standing. Plaintiffs Andre Ryland and David Suhor assert that they feel "offended," "affronted," and "excluded" by the Bayview Park cross. Neither, though, it seems, has been sufficiently affected to take any affirmative steps to avoid the cross. To the contrary, Ryland has explained that he continues to use Bayview Park "many times throughout the year" and that he "often" encounters the cross when "walk[ing] the trail around the park." So too, Suhor says that he "visit[ed] Bayview Park regularly" for years before filing suit and that he still encounters the cross on "regular bike rides" there. (Suhor also used the cross for his own purposes in 2016, just before filing suit—apparently for some kind of satanic ritual.)

Under the Supreme Court's pathmarking Establishment Clause standing case, *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982), the plaintiffs' allegations here— offense, affront, exclusion—are plainly inadequate. There, the Court held, in no uncertain terms, that "the psychological consequence presumably produced by

12

observation of [religious] conduct with which one disagrees" is "not an injury

sufficient to confer standing under Art[icle] III, even though the disagreement is

framed in constitutional terms." *Id*. at 485–86.

Just a year after *Valley Forge*, however, a panel of this Court upheld the

standing of the two plaintiffs in *Rabun*, who sued to remove a large Latin cross

from a state park in Georgia.  The panel acknowledged *Valley Forge*'s holding that

"psychological" injury doesn't give rise to Article III standing in an Establishment

Clause case.  698 F.2d at 1106.  Even so, the panel concluded that the *Rabun*

plaintiffs had sufficiently alleged an injury-in-fact *both* (1) by testifying that they

were unwilling to camp in the state park so long as the cross stood there *and*,

separately, (2) "by the evidence of the physical and metaphysical impact of the

cross." *Id*. at 1108.  Thus, we said, the plaintiffs there suffered injury because they

were required *either* (1) to relocate to other camping areas *or*—again, separately—

(2) "to have their right to use [the state park] conditioned upon the acceptance of

unwanted symbolism," the latter of which the panel described as a form of

"spiritual harm." *Id*.  *Rabun* makes clear, therefore, that at least in this Circuit, it is

enough for an Establishment Clause plaintiff to allege that he has suffered

13

"metaphysical" or "spiritual" harm as a result of observing religious conduct or imagery with which he disagrees.[2]

Can it really be that, as *Valley Forge* clearly holds, "psychological" harm is *not* sufficient to establish Article III injury in an Establishment Clause case, and yet somehow, as *Rabun* says, "metaphysical" and "spiritual" harm *are*?  And can it really be that I—as a judge trained in the law rather than, say, neurology, philosophy, or theology—am charged with distinguishing between "psychological" injury, on the one hand, and "metaphysical" and "spiritual" injury, on the other?  Come on.  It seems clear to me that *Rabun* was wrong the day it was decided— utterly irreconcilable with the Supreme Court's then-hot-off-the-presses decision in *Valley Forge*.

And to make matters worse, *Rabun* has only gotten more wrong as time has passed.  Since 1983, the Supreme Court has consistently tightened standing requirements—emphasizing, for instance, that the "irreducible constitutional minimum" comprises three distinct elements, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), that the "[f]irst and foremost" of those elements is injury-in-fact, *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998), and

---

[2] In *Glassroth v. Moore*, we held that two plaintiffs who "altered their behavior" to avoid a large Ten Commandments monument in the rotunda of the Alabama Supreme Court had suffered and continued to suffer "injuries in fact sufficient for standing purposes."  335 F.3d 1282, 1292 (11th Cir. 2003).  Having done so, we excused ourselves from deciding whether another plaintiff, "who ha[d] not altered his behavior as a result of the monument," had standing.  *Id*. at 1293.

perhaps most significantly for present purposes, that an actionable injury must be not only "particularized" in the sense that affects the plaintiff in an individual way, but also "concrete" in the sense that it "actually exist[s]" and is "real" rather than "abstract," *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1548 (2016).  Notably, along the way—and again, in cases since *Rabun* was decided—the Court has expressly rejected "stigma[]," *Allen v. Wright*, 468 U.S. 737, 754–55 (1984), "conscientious objection," *Diamond v. Charles*, 476 U.S. 54, 67 (1986), and "fear," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013), as judicially cognizable injuries.

To be clear, the question whether Article III's standing requirement is satisfied by the sort of squishy "psychological" injury that carried the day in *Rabun*—and via *Rabun*, here—is no mere academic issue.  Rather, it touches on fundamental constitutional postulates.  "The law of Article III standing," the Supreme Court recently reiterated, "is built on separation-of-powers principles [and] serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408.  In particular, the Court has emphasized that standing questions "must be answered by reference to the Art[icle] III notion that federal courts may exercise power only 'in the last resort, and as a necessity.'"  *Allen*, 468 U.S. at 752 (quoting *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345 (1892)).  In the same vein, with respect to concreteness—the aspect of the injury-in-fact requirement principally at issue

here—the Court has underscored that when, as in this case, "a court is asked to undertake constitutional adjudication, the most important and delicate of its responsibilities, the requirement of concrete injury … serves the function of insuring that such adjudication does not take place unnecessarily." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).  By contrast, "[t]o permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'"  *Id.* at 222.

In short, standing rules *matter*—and the sweeping standing rule that *Rabun* embodies threatens the structural principles that underlie Article III's case-or-controversy requirement.  We should take this case en banc in order to bring our own Establishment Clause standing precedent into line with the Supreme Court's and to clarify that "offen[se]," "affront[]," and "exclu[sion]" do not alone satisfy the injury-in-fact requirement.

## II

I agree with the Court that *Rabun* controls the merits here, as well.  The factual similarities between the two cases are indeed (as the Court says, *see* Maj. Op. at 9) "striking"—both involve 30-some-odd-foot illuminated Latin crosses that

reside in public parks, that were dedicated at Easter sunrise services, and that are (or were, as the case may be) maintained by the government. Applying the since-much-maligned three-part test minted in *Lemon v. Kurtzman*, 403 U.S. 602 (1971)—and indeed, doing so by agreement of the parties[3]—the panel in *Rabun* required removal of the cross in that case, and it seems to me that an honest reading of *Rabun* requires the same here.

But once again—this time for different reasons—*Rabun* is wrong. It simply can't be squared with the Supreme Court's intervening Establishment Clause precedent. The clearest evidence of that inconsistency is the concluding paragraph of the *Rabun* opinion. The panel there acknowledged that the cross at issue had stood "[f]or many years" but nonetheless held—quoting a now-nearly-50-year-old decision—that "'historical acceptance without more' does not provide a rational basis for ignoring the command of the Establishment Clause that a state 'pursue a course of "neutrality" toward religion.'" 698 F.2d at 1111 (quoting *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 792–93 (1973)).

Whereas the *Rabun* Court thereby effectively dismissed history as a reliable guide for Establishment Clause cases, the Supreme Court has since made clear that history plays a crucial—and in some cases decisive—role in Establishment Clause analysis. Initially, in *Van Orden v. Perry*, a four-justice plurality considering a

---

[3] *See Rabun*, 698 F.2d at 1109 ("[B]oth parties agree that the district court applied the correct legal standard ….").

challenge to a Ten Commandments monument on the Texas state capitol grounds concluded that "[w]hatever may be the fate of the *Lemon* test in the larger scheme of Establishment Clause jurisprudence"—again, a generation earlier the *Rabun* Court had applied *Lemon* essentially by default, as the only game in town—it was "not useful in dealing with the sort of passive monument that Texas ha[d] erected on its Capitol grounds." 545 U.S. 677, 686 (2005) (plurality). Instead, the plurality explained, the proper analysis should be "driven both by the nature of the monument *and by our Nation's history*." *Id.* (emphasis added). With respect to the latter half of that conjunction, the plurality emphasized the Court's earlier holding that "'[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789.'" *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984)). That "history," the plurality concluded, comfortably encompassed the Ten Commandments monument at issue. *See id.* at 691–92.

Even more pertinent for our purposes is the Supreme Court's recent decision in *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811 (2014). There, in an opinion by Justice Kennedy, the Court held that a city council's practice of beginning its meetings with a sectarian Christian prayer didn't violate the Establishment Clause. Notably, in so holding, the Court never so much as mentioned *Lemon*. Instead, the Court relied on its earlier decision in *Marsh v. Chambers*, 463 U.S. 783 (1983),

which had upheld a state legislature's practice of opening its sessions with a prayer delivered by a state-funded chaplain.  Given legislative prayer's unique historical pedigree—"the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment," 134 S. Ct. at 1819—the *Greece* Court found that the challenge to the city council's practice necessarily failed:  "*Marsh* stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted.  Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change."  *Id*.

Importantly for present purposes, the Court in *Greece* squarely rejected the suggestion—which nonetheless seems to persist in many quarters[4]—that *Marsh* "'carv[ed] out an exception'" to the usual Establishment Clause standards.  *Id*. at 1818 (quoting *Marsh*, 463 U.S. at 796 (Brennan, J., dissenting)).  *Marsh*, the *Greece* Court clarified, "must not be understood as permitting a practice that would amount to a constitutional violation if not for its historical foundation."  *Id*. at 1819.  Rather, the Court stressed—using broad terms that apply every bit as clearly here as they did there—*Marsh* stands for the proposition that "the Establishment Clause *must be interpreted 'by reference to historical practices and*

---

[4] *See* Oral Arg. Tr. at 14:13 *et seq*.

*understandings*.'" *Id*. (quoting *Cty. of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 670 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part)) (emphasis added).

As his self-citations indicate—and as all here seem to agree[5]—Justice Kennedy used as the blueprint for his majority opinion in *Greece* his earlier separate opinion in *Allegheny*.  Notably, that opinion—which had nothing to do with legislative prayer but rather, like this case, addressed the constitutionality of a religious display—similarly emphasized the centrality of history to any legitimate Establishment Clause analysis.  "*Marsh*," Justice Kennedy said there—previewing what he would later write for the full Court in *Greece*—"stands for the proposition, not that specific practices common in 1791 are an exception to the otherwise broad sweep of the Establishment Clause, but rather that the meaning of the Clause is to be determined by reference to historical practices and understandings." *Allegheny*, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part).  Any valid Establishment Clause standard, he emphasized, "must permit not only legitimate practices two centuries old but also any other practices with no greater potential for an establishment of religion." *Id*.  By contrast, he warned, any "test for implementing the protections of the Establishment Clause that, if applied

---

[5] *See* Oral Arg. Tr. at 15:12 *et seq*.

with consistency, would invalidate longstanding traditions cannot be a proper reading of the Clause." *Id*.

So in the light of the Supreme Court's most recent decisions, how exactly, should the Bayview Park cross's constitutionality be determined?  What Establishment Clause analysis applies?  Frankly, it's hard to say.  The Court's Establishment Clause jurisprudence is, to use a technical legal term of art, a hot mess.  *Lemon* came[6] and went,[7] and then came again[8]—and now seems, perhaps, to have gone again.[9]  The Court flirted with an "endorsement" standard for a while,[10] but it too appears to have fallen out of favor.  The "coercion" test may still be a going concern, although it's not quite clear when it applies, and there seem to be competing versions of it, in any event.[11]  And then, of course, *Van Orden* and *Greece* have clarified that history and tradition play central roles in Establishment Clause analysis.

---

[6] *See Lemon*, 403 U.S. 602.

[7] *See Van Orden*, 545 U.S. 677 (plurality opinion) (declining to apply *Lemon*).

[8] *See McCreary Cty., Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844 (2005) (applying *Lemon*).

[9] *See Greece*, 134 S. Ct. 1811 (never mentioning *Lemon*).

[10] *See Edwards v. Aguillard*, 482 U.S. 578, 593 (1987); *Wallace v. Jaffree*, 472 U.S. 38, 59–60 (1985); *Lynch v. Donnelly*, 465 U.S. 668, 687 (1984).

[11] *Compare, e.g.*, *Lee v. Weisman*, 505 U.S. 577, 587 (1992) (finding psychological coercion sufficient to demonstrate Establishment Clause violation), *with, e.g.*, *Greece*, 134 S. Ct. at 1838 (Thomas, J., concurring in part and concurring in the judgment) (requiring "actual legal coercion").

Given the inconsistency—er, uncertainty—in the Supreme Court's own Establishment Clause precedent, I would leave it to the en banc Court to chart the next move for this Circuit.  The one thing of which I'm pretty certain is that *Rabun*—which is what requires the three of us to affirm here—is wrong.  It's hard to imagine an Establishment Clause analysis more squarely at odds with *Rabun*'s than the one that Justice Kennedy inaugurated in *Allegheny* and then cemented in *Greece*.  *Rabun*'s concluding paragraph all but says that a practice's "historical acceptance" has no real bearing on its Establishment Clause footing.  698 F.2d at 1111.  In stark contrast, *Greece*—which uses the terms "history" and "tradition" more than 30 times—stresses that a practice's historical acceptance is paramount. Indeed, *Greece* states an unequivocal, exceptionless rule—which, it warrants repeating, has its roots in a case (like this one) about a religious display:  "[T]he Establishment Clause must be interpreted 'by reference to historical practices and understandings.'"  134 S. Ct. at 1819 (quoting *Allegheny*, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part)).

How and to what extent, then, do "historical practices and understandings" bear on this case?  Pretty clearly and strongly, it seems to me.  There is, put simply, lots of history underlying the practice of placing and maintaining crosses on public land—that practice, in *Greece*'s words, comfortably "fits within the tradition long followed" in this country.  *Id*.

Though not (exactly) first in time chronologically, an interesting place to begin what is necessarily an abbreviated historical survey is with the "Father Millet Cross," which currently stands in Fort Niagara State Park in upstate New York. The current cross was erected in the 1920s on what was originally federal land. Notably, though, it was put there to replace a wooden cross that had been placed in the same spot by a Jesuit priest—Father Pierre Millet—in 1688, when the territory was under French control.  Father Millet was part of a rescue party that had managed to save the remnant of a frontier detachment ravaged by cold, disease, and starvation.  On April 16, 1688—Good Friday—Father Millet celebrated Mass and built a wooden cross, which he dedicated to God's mercy for the survivors.

In 1925, President Calvin Coolidge set aside a 320-square-foot section of Fort Niagara Military Reservation "for the erection of another cross commemorative of the cross erected and blessed by Father Millet[]."  The following year, the New York State Knights of Columbus dedicated the commemorative cross "not only to Father Millet, but to those other priests whose heroism took Christianity into the wilderness …."  The cross bears the inscription "REGN. VINC. IMP. CHRS.," an abbreviation of *Regnat*, *Vincit*, *Imperat*, *Christus—i.e.*, Christ reigns, conquers, and commands.  The Father Millet Cross

was originally designated as a national monument and administered by the federal government; ownership was transferred to the State of New York in 1949.[12]

To be sure, the Father Millet Cross was originally constructed on land that the United States didn't control (at least definitively) until after the War of 1812. But its history shows that the erection of crosses as memorials is a practice that dates back centuries, and that for a long time now, we—we Americans, I mean—have been commemorating the role that religion has played in our history through the placement and maintenance of cross monuments.

In fact, President Coolidge's proclamation was part of a tradition—in this country specifically—that stretches back much farther.  Just a few examples:

- *San Buenaventura Mission Cross* (Grant Park, Ventura, California)—In 1782, Spanish missionary Father Junipero Serra placed a large wooden cross on a hilltop overlooking his recently established mission church.  The original cross was replaced in the 1860s and then again in 1912, and then once again in 1941.  The land on which the cross now stands was designated a city park in 1918.[13]

- *Cross Mountain Cross* (Cross Mountain Park, Fredericksburg, Texas)—In 1847, the first settlers of what is now Fredericksburg discovered a timber

---

[12] *See* Bob Janiskee, Pruning the Parks: Father Millet Cross National Monument, 1925-1949, Was the Smallest National Monument Ever Established, https://www.nationalparkstraveler.org/2009/09/pruning-parks-father-millet-cross-national-monument-1925-1949-was-smallest-national-monument-ever-es4482 (last updated Sept. 4, 2009); Thor Borresen, Father Millet Cross: America's Smallest National Monument, https://www.nps.gov/parkhistory/online_books/regional_review/vol3-1e.htm (last visited Sept. 3, 2018).

[13] *See* Serra Cross Park at Grant Park, Ventura, California: History of the Cross, http://www.serracrosspark.com/history.html (last visited Sept. 3, 2018).  Under threat of litigation, the plot of land surrounding the cross itself was transferred to a private entity in 2003. *Id*.

cross on a hilltop.  A cross has remained there ever since; the original was replaced with a permanent lighted version in 1946, and today resides in the city-maintained Cross Mountain Park.[14]

- *Chapel of the Centurion* (Fort Monroe, Hampton, Virginia)—Since 1858, a cross has perched atop the Chapel of the Centurion at Fort Monroe, which is named for Cornelius, the Roman centurion who was converted to Christianity by St. Peter—and which, until it was decommissioned in 2011, was the United States Army's oldest wooden structure in continuous use for religious services.[15]

- *Irish Brigade Monument* (Gettysburg National Military Park, Gettysburg, Pennsylvania)—Erected in 1888 to honor soldiers from three New York regiments who fought and died at Gettysburg, the monument is a 19-foot Celtic cross.  At the cross's dedication, Father William Corby held a Mass for the assembled veterans and blessed the monument.[16]

- *Jeannette Monument* (United States Naval Academy, Annapolis, Maryland)—Erected in 1890, the largest monument in the Naval Academy Cemetery, is a Latin cross dedicated to sailors who died while exploring the Arctic in 1881.[17]

- *Horse Fountain Cross* (Lancaster, Pennsylvania)—This six-foot marble cross was erected in 1898 and is maintained by the City of Lancaster.  It bears the inscription "Ho! Everyone That Thirsteth" and sits atop a granite base with a small fluted basin designed to allow horses to drink from it.[18]

---

[14] *See* The City of Fredericksburg, Texas: Cross Mountain Park, https://www.fbgtx.org/415/Cross-Mountain-Park (last visited Sept. 3, 2018).

[15] *See* Chapel of the Centurion: History of the Chapel of the Centurion, http://www.chapelofthecenturion.org/history.php (last visited Sept. 3, 2018).

[16] *See* The Battle of Gettysburg: Irish Brigade Monument at Gettysburg, http://gettysburg.stonesentinels.com/union-monuments/new-york/new-york-infantry/irish-brigade/ (last visited Sept. 3, 2018).

[17] *See* United States Naval Academy: Cemetery and Columbarium, https://www.usna.edu/Cemetery/History_and_Memory/First_Monuments.php (last visited Sept. 3, 2018).

[18] *See* Art Inventories Catalog, Smithsonian Am. Art Museum, Smithsonian Inst. Research Info. Sys.: Ho! Everyone That Thirsteth, https://siris-artinventories.si.edu/ipac20/ipac.jsp?session=P5C5741562R94.5247&profile=ariall&source=~!s

- *Father Serra Cross* (Monterey, California)—This 11-foot granite Celtic cross was donated to the City of Monterey in 1905 and installed on public land in 1908.  The cross features a portrait of Father Junipero Serra and an image of his Carmel Mission.[19]

- *Wayside Cross* (New Canaan, Connecticut)—This large Celtic cross sits at the intersection of Main and Park Streets on New Canaan's historic green. Erected in 1923 as a war memorial, it bears the following inscription: "Dedicated to the glory of Almighty God in memory of the New Canaan men and women who, by their unselfish patriotism, have advanced the American ideals of liberty and the brotherhood of man."[20]
  I could go on, but the point is clear enough.  We've been doing this—

erecting and maintain crosses on public land—for a long time now, and cross

monuments and memorials are ubiquitous in and around this country.

*  *  *

So where does all that leave us?  As I've already confessed, I don't pretend

to know—as I'm sitting here—exactly how the questions surrounding the

constitutionality of the Bayview Park cross should be analyzed or resolved.  Here,

though, is what I do know:

---

iartinventories&view=subscriptionsummary&uri=full=3100001~!343970~!415&ri=7&aspect=Browse&menu=search&ipp=20&spp=20&staffonly=&term=Emblem+--+Cross&index=SUBJX&uindex=&aspect=Browse&menu=search&ri=7 (last visited Sept. 3, 2018).

[19] *See* Art Inventories Catalog, Smithsonian Am. Art Museum, Smithsonian Inst. Research Info. Sys.: Serra Landing,  https://siris-artinventories.si.edu/ipac20/ipac.jsp?uri=full=3100001~!341717!0 (last visited Sept. 3, 2018).

[20] *See* Wayside Cross, New Canaan, CTMonuments.net, http://ctmonuments.net/2011/07/wayside-cross-new-canaan/ (last updated July 8, 2011).

1. That the Supreme Court's Establishment Clause jurisprudence is a wreck;

2. That as a lower court, we are nonetheless obliged to do our best to discern and apply it;

3. That in the last decade, the Supreme Court has increasingly emphasized the centrality of history and tradition to proper Establishment Clause analysis, culminating in its statement in *Greece* that "the Establishment Clause must be interpreted 'by reference to historical practices and understandings.'" 134 S. Ct. at 1819 (quoting *Allegheny*, 492 U.S. at 670 (Kennedy, J., concurring in judgment in part and dissenting in part));

4. That there is a robust history—dating back more than a century, to before the time of the adoption of the Fourteenth Amendment, by which the First Amendment would eventually be applied to state and local governments—of cities, states, and even the federal government erecting and maintaining cross monuments on public land; and

5. That our now-35-year-old decision in *Rabun*—which invalidated a cross situated in a state park and, in so doing, summarily dismissed "historical acceptance" as a reliable guide for Establishment Clause cases—is irreconcilable with intervening Supreme Court precedent.

This case presents important questions—both for the future of Pensacola's Bayview Park cross and for the future of Establishment Clause jurisprudence in this Circuit. Those questions demand the full Court's undivided attention. I urge the Court to take this case en banc so that we can take a first step toward an Establishment Clause analysis that is not only more rational, but also more consistent with prevailing Supreme Court precedent.

## III

Our 35-year-old decision in *Rabun* controls this case and requires that we affirm the district court's decision. But in the intervening years it has become

27

(even more) clear that *Rabun* was wrongly decided—with respect to both standing

and the merits.  Because *Rabun* is doubly wrong, it doubly demands en banc

reconsideration.

ROYAL, District Judge, concurring in the judgment:

Part I: INTRODUCTION

Good law—*stare decisis*—sometimes leads good judges to follow bad law and write the wrong order. That happened in this case. Briefly, the district court's order relied on *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.,*[1] a case that was wrongly decided, and even if it was not wrongly decided in 1983, it has been eclipsed by recent Supreme Court cases that reflect a growing interest in history and historical practices. There is no injury, no harm, and no standing to support jurisdiction in this case, but there is an Eleventh Circuit rule that directs us to affirm the district court based on this flawed precedent.

*Rabun County* needs to be reversed, and this Court needs to devise a practical standing analysis. I believe that recent Supreme Court cases show us that way. Furthermore, I believe that the coercion test should apply to passive monuments, memorials, and displays, like the Bayview cross, and in this opinion, I explain why that test should control.

I have organized the opinion and approached the issues in the case, in part, based on the history of religious oppression. Historians know this record well; but,

---

[1] 698 F.2d 1098 (11th Cir. 1983).

regrettably, most judges know little about it, and it is important.[2] So Part II of the opinion offers a brief history of establishment evils and disestablishment remedies, and it is divided into three sections. The first section outlines four religious establishments: the first one from the Roman Empire, The Edict of Thessalonica, and then one from the Medieval Age—the Catholic Church and its rule for centuries over millions of Europeans. The third begins in early modern England: King Henry VIII's Anglican Church with its *Book of Common Prayer, Thirty-Nine Articles*, and its ecclesiastical government and courts. The fourth church establishment is the Congregationalist Church in early New England.

The second history section describes the ideas of early American thinkers and leaders on religious establishments, the importance of religion, and how they understood religious oppression and the solutions they proposed. The phrase "early America" covers the colonial period, the revolutionary period, and the first decades of the young republic. This second section is also important because it describes religious oppression and all its evils. I let these leaders of religion, law, and government speak for themselves so you can hear their anger, disgust, fear, dread, despair, and misery.

The third history section offers examples of colonial and state charters and constitutions that dealt with establishment issues in early America. In part, this

---

[2] I include myself in the ignorant judge category, but some deep study can fill the gap.

section describes the injuries minority believers suffered for their religious beliefs and how colonial governments made religion more oppressive or devised ways to end that oppression.

I do not think we can understand the origins of the Establishment Clause without understanding what the founders identified as oppressive, the arguments they used against oppression, and how they tried to end it. So, as you read the history, pay attention to the word conscience and the array of phrases that use words like "liberty of conscience," "freedom of conscience," "the dictates of conscience," "rights of conscience," and the "free exercise of religion according to the dictates of conscience." But be careful not to apply a 21st century therapeutic culture understanding of the word. "Conscience" is not describing someone's feelings. You cannot substitute the contemporary concept of psyche for the 18th century idea of conscience.

For early American believers, the religious conscience never stood alone and apart from action. In other words, oppression meant making them do something they did not want to do or not letting them do something they believed that God had called them to do according to their consciences. For example, citizens were forced to pay tithes to a church whose theology and practices they hated or at times were prohibited from preaching because they were not approved by the established church. But there are other reasons to listen to the founders.

31

Without letting the founders speak, without hearing their words and reading their papers, I think it is hard for us living in our post-modern, highly secular society to understand the religiosity of early Americans and the often tyrannical adversity that beat down religious minorities like the Baptists and the Quakers. Yet, Alexis de Tocqueville understood and described this religiosity well. In his *Democracy in America*, written in the 1830s after he had spent several years traveling around the country, he said: "It was religion that gave birth to the Anglo-American societies. This must always be borne in mind. Hence religion in the United States is inextricably intertwined with all the national habits and all the feeling to which the fatherland gives rise."[3] And, as he goes on to explain, "Christianity has therefore retained a powerful hold on the American mind, and—this is the point I particularly want to emphasize—it reigns not simply as a philosophy that one adopts upon examination but as a religion in which one believes without discussion."[4] Indeed, "Christianity itself is an established and irresistible fact, which no one seeks to attack or defend."[5]

The study of early American history teaches that Christianity was central to that history. Parenthetically then, a cross is not just a symbol of Christianity; it

---

[3] ALEXIS DE TOCQUEVILLE: DEMOCRACY IN AMERICA 486 (Arthur Goldhammer trans., Library of America 2004).
[4] *Id.* at 486.
[5] *Id.*

symbolizes America's past—a past perhaps forgotten, neglected, ignored, or even despised, but nonetheless undeniable.

Part III of the opinion wrestles with the case law on the standing issues. I agree with Judge Newsom that the Establishment Clause jurisprudence is a "hot mess," but I think of it more like a wilderness with misdirecting sign posts and tortuous paths. The bad signposts and twisted paths are the various Establishment Clause tests: separation, accommodation, history, neutrality, *Lemon*, endorsement, and coercion, all used at one time or another, in one case and then not in another. Next is the bog of concurring and dissenting opinions, and the opinions that concur in the judgment only, that leave you with the sense that you are walking on unsettled earth. Moreover, it is difficult to get out of a wilderness when all you look at is what is immediately in front of you and do not understand the patterns and directions of the past.

In this part of the opinion, I restate some of Judge Newsom's argument for continuity. I do, however, propose a way out of the wilderness. It is simple, like Ariadne's thread out of the labyrinth. As such, I limit this approach to cases involving passive monuments, memorials, and displays under Establishment Clause scrutiny like the cross in Pensacola and the cross on Black Rock Mountain in Rabun County, Georgia. My approach is simple: just don't deal with it at all because in both *Pensacola* and *Rabun County* no injury, no coercion, no

oppression, and no stigmatization occurred, so Plaintiffs have no standing and no claim.

As part of the legal analysis, I also describe how the laches concept supports the coercion analysis. This cross has stood quietly in the park for seventy-five years with only one complaint[6] until this lawsuit was filed, and thousands of people have enjoyed the park for decades. The laches concept is based in recent Supreme Court cases and leaves questions like crosses to local government without invoking the federal judiciary's power. The laches concept works with the standing analysis to give district courts a workable guide to deal with passive monuments in cases where no harm has occurred. There is no case where there is no harm; history tells us what harm is, and it also tells us that no plaintiff suffered harm in this case and especially not in *Rabun County*.

On the other hand, district court judges should not be placed in the position of deciding an Establishment Clause case based on a "math problem"—count the monuments on public property to see if there are enough.[7] Likewise, they should not be placed in the position of deciding these cases based on a "geography

---

[6] William Caplinger's affidavit is in the record. He made a complaint to the Pensacola Director of Leisure Services. The affidavit said that the cross made him feel uncomfortable. Pl.'s Reply in Support of Motion for Summary Judgment, Doc. 39, Ex. 2. p. 36-7.

[7] *Van Orden* v. *Perry,* 545 U.S. 677, 681, 691–92 (2005) (finding "[t]he 22 acres surrounding the Texas State Capitol contain 17 monuments and 21 historical markers commemorating the 'people, ideals, and events that compose Texan identity,'" and that "[t]he inclusion of the Ten Commandments monument in this group has a dual significance, partaking of both religion and government," which did not violate the Establishment Clause).

question"—see where the monuments are on public property. If I find the crèche in one place, it is okay; but if I find it in another place, it violates the Constitution.[8] There are over 170 memorials in Pensacola parks, but only one other in Bayview Park. So the math answer and the geography answer required the finding that the City of Pensacola violated the Constitution. This kind of constitutional casuistry is folly. But this is where courts end up when separation, not establishment/disestablishment, becomes the touchstone of the analysis. (More on this later.) And I begin with some history.

## Part II: A SHORT HISTORY OF RELIGIOUS ESTABLISHMENTS

In some recent Supreme Court Establishment Clause cases, the Court has used history as a guide for deciding the issues.[9] That history, however, is generally limited to the specific activity, practice, monument, or display in dispute. But the broader history of religious establishments teaches what the founders understood about the oppression that religious establishments imposed and, therefore, their reasons for enacting the First Amendment. There is considerable scholarly work on religious persecution and the strife it provoked in Britain that caused early Americans to flee their homeland to find religious freedom in the New World.

---

[8] *Cty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 599–600, 109 S. Ct. 3086, 3104 (1989), *abrogated by Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811 (2014) ("Thus, by permitting the display of the crèche in this particular physical setting, the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the crèche's religious message.") (internal citations and quotations omitted).
[9] *Salazar v. Buono*, 559 U.S. 700, 716 (2010); *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1819 (2014).

The founding of the Massachusetts Bay Colony in 1630 is a well-known example of this kind of religious migration. In fact, approximately twenty thousand Puritans settled in New England between 1630 and 1640.[10] They were religious refugees. There is also much history describing religious persecution in early America, and it helps to understand this history. So I begin with four examples of religious establishments. Most of the founders were well-educated men, and some of them trained at Cambridge, Oxford, Harvard, Yale, or Princeton. They would have known this history and even lived through some of it.

1.  Four Religious Establishments

First, in 380 A.D., by the Edict of Thessalonica, Roman Emperor Theodosius I established the Nicene Creed form of Christianity as the official religion of the Roman Empire.[11] The Edict affirms and commands a Trinitarian statement of Christianity and was designed, in part, to end the Arian heresy taught by the Arian bishops whose influence was widespread in the Empire. They attacked the Trinitarian understanding of the deity of Christ. More importantly, the Edict imposed punishments.

It proclaims that those who do not subscribe to the Trinitarian theology are

---

[10] R.R. PALMER & JOEL COLTON, A HISTORY OF THE MODERN WORLD 143 (Alford A. Knopf, Inc., 3d ed. 1967) (1950).

[11] CHURCH AND STATE THROUGH THE CENTURIES: A COLLECTION OF HISTORIC DOCUMENTS WITH COMMENTARIES 6-7 (Sidney Z. Ehler & John B. Morrall eds., Biblo & Tannen Publishers, 1967). Emperors Gratian and Valentinian II also endorsed the edict.

Judge[d] to be mad and raving and worthy of incurring the disgrace of heretical teaching, nor are their assemblies to receive the names of churches. They are to be punished not only by Divine retribution but also by our own measures, which we have decided in accordance with Divine inspiration.[12]

Here, in the space of two paragraphs, we find the key elements of religious oppression and establishment tyranny.

The emperor, the sovereign, passed a law imposing religious beliefs for all peoples within the empire. Some were happy with the Edict because they already believed what it required. Others recognized that it condemned them, their beliefs, and what they taught. The law was coercive and oppressive and empire-wide, and it stigmatized all unbelievers by calling them madmen and heretics. It threatened them with harm and prohibited them from teaching and practicing their version of Christianity, or whatever was their religion, in a way that contradicted the established theology. This Edict shows the common pattern of religious oppression.

The second establishment is the Roman Catholic Church that held sway for centuries across most of Europe until the time of the Reformation. The Catholic Church exerted great power over the lives of most Europeans, and in the century before the Protestant Reformation began, many Europeans resented the birth to

---

[12] *Id.* at 7.

death sacraments, the Mass, the religious taxes, the decadent ecclesiastical hierarchy, and the canon law.

But when the Protestant revolt began against Catholic control, Europe erupted into one of the most destructive conflagrations the West has ever known. A good example of this control is well-known. Henry VIII wanted to divorce Catherine of Aragon, and the Pope said no, primarily for political reasons. This shows the Pope's power: the King of England had to ask the Pope for permission to divorce his wife. (She had not produced a male heir.) And because the Pope said no, Henry established the Anglican Church to replace the Catholic Church in England. The Anglican Church is the third establishment.

England's struggle with Catholic enemies like France and Spain from the outside and the problems with the enemies of the new Anglican Church, the Dissenters, on the inside, compounded by the strife between English Catholics and English Protestants, controlled much of British history for two hundred years. Indeed, it spun British society out of control.

For example, in 1543, at King Henry's direction, Parliament passed the Act of Supremacy that declared him to be the supreme head of the Anglican Church and its clergy. As part of the Act, all subjects had to swear allegiance to King Henry as their religious leader and thereby required them to reject the Pope. You no doubt know the story of Sir Thomas More who refused to take the oath and was

beheaded. Henry also seized all the properties of the Catholic Church in England and gave the land to his friends. And in 1536, he suppressed a Catholic rebellion.[13]

For the next 200 years, religious persecution continued in England. Shortly after King Henry died, his daughter Mary, the daughter of Catherine of Aragon, took the throne. She tried to re-Catholicize England and earned the name Bloody Mary because of all the Protestants she put to death. But it was not just Catholic versus Protestant strife and hatred. There was also the problem of the Anglicans versus the Dissenters and the Separatists, which included the Puritans, the Congregationalists, and the Presbyterians, all of whom had some theological ties and most of whom objected to or despised the Anglican Church. The Puritans wanted to purify the Church of England from its Catholic tendencies, and that is how they got their name.

I have given a brief overview of a complex history of England and the Anglican Church, the Catholic Church, and the Dissenters. As Pulitzer Prize winning historian T. Harry Williams explained: "These events of seventeenth-century England form an essential part of American history. They help to explain the causes and course of English colonization."[14] Armed with this summary, it is now easy to understand how old religious oppressions haunted the

---

[13] R.R. PALMER & JOEL COLTON, *supra*, note 10, at 77-78.

[14] T. HARRY WILLIAMS ET AL., A HISTORY OF THE UNITED STATES (TO 1877) 29 (Alford A. Knopf, Inc., 2d ed. rev. 1966) (1959).

New World. So the fourth establishment I describe is the Congregationalist Church in New England.

A group of Puritans founded the Massachusetts Bay Colony in 1630, and they established a Congregationalist style of church government and followed many of John Calvin's teachings. They desired a purer Christian church than the Anglican Church that they had left in England. They strived for purity among their church members, and while they required everyone in the colony to go to their parish churches each Sunday, only the true believers could participate in government.[15] But it was not enough to attend church; everyone had to support the Congregationalist church.

In 1692, the colonial government enacted a tax that required all citizens to support the local Congregationalist church and its minister.[16] As a result, this law forced conscientious dissenters to support the Congregationalist church when they wanted to support their own church, the Baptists for example.[17] And, as it happened with the Anglican Church in England, dissenters arose in Massachusetts, and the Congregationalists applied harsh measures against the "Separates."

For example, in 1635 Anne Hutchinson criticized the framework of Puritan piety. After two years of listening to her preaching and complaining, the

---

[15] DIARMAID MACCULLOCH, THE REFORMATION A HISTORY 538 (Penguin Books 2005).

[16] John D. Cushing, *Notes on Disestablishment in Massachusetts, 1780-1833*, Vol. 26, No. 2, THE WILLIAM AND MARY QUARTERLY, 169, 169-90 (Apr. 1969).

[17] *Id.* at 171.

Congregationalists banished her from the colony, and she moved to Rhode Island.[18] The Congregationalists also treated the Quakers harshly. The Quakers moved to Massachusetts to escape persecution in England and began proclaiming a very different Christian message from the Puritan teaching. In response to the perceived threat to their churches and their colony, the Congregationalists publicly flogged some Quakers and cropped their ears. Four of them were hanged because of their missionary activity, including a woman—Mary Dryer. And as late as 1784, John Murray, a Universalist minister, was fined fifty pounds for performing an illegal marriage ceremony. It was illegal because he was not an ordained minister according to Congregationalist requirements.[19] He fled to England to avoid being fined for all the marriages he had performed.

Connecticut was another Congregationalist colony that imposed various forms of oppression. Like Massachusetts, Connecticut required its citizens to support the parish churches. In 1745, in Norwich, Connecticut, thirty dissenters refused to pay the tax. One of them was Isaac Backus, whom I will discuss below. They had "separated" and set up their own church and elected their own pastor. Many were imprisoned in the Norwich Goale, including Isaac Backus's brother for

---

[18] MacCulloch, *supra*, note 15, at 539.
[19] Cushing, *supra*, note 16, at 173-74.

twenty days and his mother for thirteen days.[20] Isaac Backus became one of the most influential religious leaders in 18th century America.

Religious oppression in New England and in Virginia was well-known to the founders, as was the history of persecution in England. The next section describes some of their ideas about oppression and church establishments.

2. Commentators, Founders, and Leaders in Early America and One English Philosopher

Justice Joseph Story (1779-1845)

I begin this second history section with Justice Joseph Story's *Commentaries on the Constitution* because his three-volume work helps introduce church-state relationships in early America. Story served on the Supreme Court from 1812 to 1832 and published his *Commentaries* in 1833. He was a great legal scholar. His commentaries on the Constitution offer a valuable history about the early American understanding of the relationship between government, law, and the Christian religion, including the limitations on that relationship, and about the importance of religion in general in early America.

As Story explains about the colonial period,

every American colony, from its foundation down to the revolution, with the exception of Rhode Island, (if, indeed, that state be an exception,) did openly, by the whole course of its laws and

---

[20] THE GREAT AWAKENING, DOCUMENTS ON THE REVIVAL OF RELIGION, 1740-1745, 105-06 (Richard L. Bushman ed., University of North Carolina Press 1989) (1970).

institutions, support and sustain, in some form, the Christian religion; and almost invariably gave a peculiar sanction to some of its fundamental doctrines. And this is continued to be the case in some of the states down to the present period, without the slightest suspicion, that it was against the principles of public law, or republican liberty.[21]

This is consistent with how Alexis de Tocqueville described America in the 1830s and the importance of Christianity. No doubt Story is speaking generally, but he is describing the prevailing ideas of the day.

Story goes on to explain the sentiments of the times about religion and government.

Probably at the time of the adoption of the constitution, and of the amendment to it, now under consideration, the general, if not the universal, sentiment in America was, that Christianity ought to receive encouragement from the state, so far as was not incompatible with the private rights of conscience, and the freedom of religious worship. An attempt to level all religions, and to make it a matter of state policy to hold all in utter indifference, would have created universal disapprobation, if not universal indignation.[22]

One of the main reasons for the idea that government and religion should work together was because in that era many people believed that good religion was necessary for good morals and that good morals were necessary for a stable and prosperous society.[23]

---

[21] THE FOUNDERS' CONSTITUTION 108 (Philip B. Kurland & Ralph Lerner eds., vol. 5, Indianapolis: Liberty Fund, 2001).
[22] *Id.* at 109.
[23] A good example of this belief comes from John Locke in "An Essay on Toleration" wherein he says: "I must only remark . . . that the belief of a deity is not to be reckoned amongst purely speculative opinions, for it being the foundation of all morality, and that which influences the

But they also understood that a line had to be drawn and a limit imposed on the church/state relationship. People had to be secure in their faith from harms or limits on their freedom of religious conscience and their freedom to worship. It was not simply a matter of a free state of mind; it was also about actions: Believers could not be forced to do what their religion rejected nor prohibited from doing what it required. As Story explains:

> But the duty of supporting religion, and especially the Christian religion, is very different from the right to force the consciences of other men, or to punish them for worshipping God in the manner, which, they believe, their accountability to him requires. It has been truly said, that 'religion, or the duty we owe to our Creator, and the manner of discharging it, can be dictated only by reason and conviction, not by force or violence.'[24]

And those were the problems: the churches' use of force and violence to suppress dissent and impose conformity. The founders addressed these problems in the First Amendment.

Story explains the founders' goals in enacting the First Amendment. It was not to advance other religions

> by prostrating Christianity; but to exclude all rivalry among Christian sects, and to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government. It thus cut off the means of religious persecution, (the vice and pest of former ages,) and of the subversion of the rights of

---

whole life and actions of men, without which a man is to be considered no other than one of the most dangerous sorts of wild beasts, and so incapable of all society." LOCKE: POLITICAL ESSAYS 137 (Mark Goldie ed. Cambridge University Press 2006) (1997).

[24] Kurland & Lerner, *supra*, note 21, at 109.

conscience in matters of religion, which had been trampled upon almost from the days of the Apostles to the present age.[25]

In other words, religious persecution had been a problem for almost two millennia.

He goes on to explain how this history of religious oppression affected the founders in enacting the First Amendment.

> It was under a solemn consciousness of the dangers from ecclesiastical ambition, the bigotry of spiritual pride, and the intolerance of sects, thus exemplified in our domestic, as well as in foreign annals, that it was deemed advisable to exclude from the national government all power to act upon the subject. . . . Thus, the whole power over the subject of religion is left exclusively to the state governments, to be acted upon according to their own sense of justice, and the state constitutions; and the Catholic and the Protestant, the Calvinist and the Arminian, the Jew and the Infidel, may sit down at the common table of the national councils, without any inquisition into their faith, or mode of worship.[26]

Religious toleration, therefore, was for everyone, and the federal government could not establish a national church. This protected religious freedom in the new country. But state governments could be involved in religion, and "separation" only operated at the national level.

Now with this brief introduction from Justice Story's *Commentaries*, I will move on to what some of the important early American leaders had to say about religious establishments. One theme prevails throughout: liberty of religious

---

[25] *Id.*
[26] *Id.* at 109-110.

conscience, meaning not being required to act against it or being denied or hindered in the right to follow it.

Reverend Jonathan Mayhew (1720-1766)

Reverend Mayhew was a Congregationalist minster in Boston who trained at Harvard and Edinburgh. He coined the phrase "No taxation without representation."[27] He and other Massachusetts leaders were alarmed when they learned that the Archbishop of Canterbury, Thomas Secker, had decided to send bishops to the Anglican Church in Massachusetts in the early 1760s. Despite the fact that the Congregationalists held the power in Massachusetts, it was an English colony, and as English citizens, they were required to support the Anglican Church. One of the reasons that the Anglicans had not succeeded in Massachusetts was because their churches had no bishops there. But that is not the point of quoting Mayhew. Listen to how he grieves about an Anglican Church rising to power in New England:

---

[27] Judge Grant Dorfman, *The Founders' Legal Case: "No Taxation Without Representation" Versus Taxation No Tyranny*, 44 HOUS. L. REV. 1377, 1378 (2008)("See Dr. Jonathan Mayhew, A Discourse Concerning Unlimited Submission and Non-resistance to the Higher Power, Sermon before the West Church in Boston (Jan. 30, 1750), as reprinted in Pulpit of the American Revolution 39, 77, 94-95 (Burt Franklin 1970) (1860) (arguing that one is bound by God to pay taxes to the King; that the Lords and Commons are representatives of the people and extensions of the King, so the people are bound by God to pay taxes to them; but when the King or his extension act above the law and infringe on the rights of the people, the people are not bound to the King, and thus no longer must pay him taxes).").

When we consider the real constitution of the church of England; and how aliene her mode of worship is from the simplicity of the gospel, and the apostolic times: When we consider her enormous hierarchy ascending by various gradations from the dirt to the skies and that all of us be taxed for the support of *bishops* and their *underlyings*, can we help crying out Will they never let us rest in peace, except *where all the weary are at rest*? Is it not enough, that they persecuted us out of the old world? Will they pursue us into the new to convert us here? – *compassing sea and land to make* US *proselytes,* while they neglect the heathen and heathenness plantations! What other new world remains as a sanctuary for us from their oppressions, in case of need? Where is the Columbus who explores one for, and pilot us to it, before we are . . . deluged in a flood of episcopacy?[28]

Here Mayhew poignantly expresses the pain of religious oppression and the fear that hovers with it. He fears the coming strife and the end of peace. He also expresses his deeply held religious convictions and the threat posed by a religious establishment to those outside of and opposed to that establishment.

Reverend Isaac Backus (1724-1806)

Isaac Backus was born in Connecticut and was one of early America's greatest proponents of the freedom of conscience and separation of church and state. He was the foremost leader and spokesman for the Baptist churches in New England in the 18th century. He conferred with delegates to the First Continental

---

[28] BERNHARD KNOLLENBERG, ORIGIN OF THE AMERICAN REVOLUTION, 1759-1766, 84-85 (The Free Press, 1965), *Mayhew's Attack on Plain for Colonial Bishops, Mayhew's Observations*, 155-56. The Congregationalists were concerned about having Anglican Bishops imposed on them for several reasons, including setting up ecclesiastical courts and the expense of maintaining the bishops, which in England was exorbitant. At this time the Congregationalists outnumbered the Anglicans about 30 to one. Secker's bishop controversy had the effect of strengthening the unity of the Massachusetts churches and separating them from England. Knollenberg, 82-83, 86.

Congress in 1774 in Philadelphia and served as a delegate to the Massachusetts convention that ratified the Constitution.[29]

In "An Appeal to the Public for Religious Liberty," Backus describes the punishments imposed by the Congregationalists and the suffering endured by their victims, the Baptists. In this essay Backus describes the Baptist view of freedom of conscience and their sufferings for demanding such freedoms.[30]

The Baptists' major conflict with the Congregationalists was pedobaptist worship or baptizing infants, a practice that the Baptists denied had any biblical basis. But, as explained above, the Massachusetts Congregationalists imposed a tax on all citizens to support the Congregationalist church and minister in each parish. For the Baptists, that meant supporting false teaching, which violated their liberty of conscience. It also violated their pocketbooks and limited their support for their own churches. Moreover, the penalties for failing to pay the levy were severe.

For example, William White had his cow taken because he did not pay the pedobaptist minister's rate.[31] In another town some Baptists had several hundred acres confiscated and sold at auction below value to satisfy the tax.[32] Baptists were falsely accused of crimes, imprisoned, whipped, had their goods pillaged, and some were banished from the Massachusetts colony because they denied infant

---

[29] POLITICAL SERMONS OF THE AMERICAN FOUNDING, 1730-1805, 328 (Ellis Sandoz ed., vol. 1, 2d ed. Liberty Fund 1998).
[30] *Id.* at 366.
[31] *Id.* at 368.
[32] *Id.* at 350.

baptism.[33] They were also stigmatized when the government accused them of being covetous for not paying the tax. And as Backus explained, paying the levy required the Baptists to "uphold men from whom we receive no benefit, but rather abuse."[34]

At the beginning of the essay, Backus makes a plea for religious freedom, and he describes what I have mentioned several times about the freedom of conscience not being some state of mind but instead the freedom to carry out one's religious duties according to the dictates of conscience. As he explains,

> [t]he true liberty of man is, to know, obey and enjoy his Creator, and to do all the good unto, and enjoy all the happiness with and in his fellow-creatures that he is capable of; in order to which the law of love was written in his heart, which carries in its nature union and benevolence to being in general, and to each being in particular, according to its nature and excellency, and to its relation and connexion to and with the supreme Being, and ourselves.[35]

Thomas Jefferson (1743-1826)

I begin with how Jefferson described religious persecution in Virginia. It sounds familiar. The Anglican Church was the established church in the Virginia colony, and the Old World church practiced Old World oppression in Virginia.

In his "Notes on the State of Virginia," Jefferson described an act of the Virginia Assembly of 1705 that penalized atheists, those who did not believe in the

---

[33] *Id.* at 345, 354. In 1664 the court at Boston passed an act to banish people who denied infant baptism. *Id.* at 247.
[34] *Id.* at 348.
[35] *Id.* at 331.

Trinity, those who were polytheists, those who denied the truths of Christianity, and those who denied the authority of Scripture. For the first offense, the offender lost the capacity to hold any office in government or be employed in any ecclesiastical, civil, or military jobs. For a second offense, the offender lost the power to sue, to take any gift or legacy, to be a guardian, executor, or administrator, and was subjected to three years imprisonment. Furthermore, a father could forfeit his right to his children. A Virginia court could take them away and "put [them], by the authority of a court, into more orthodox hands."[36] Jefferson condemned this as religious slavery.

He also condemned the way Quakers were treated when they came to Virginia. It sounds like what happened in New England:

> The poor Quakers were flying from persecution in England. They cast their eyes on these new countries as asylums of civil and religious freedom; but they found them free only for the reigning sect.[37] Several acts of the Virginia assembly of 1659, 1662, and 1693, had made it penal in parents to refuse to have their children baptized; had prohibited the unlawful assembling of Quakers; had made it penal for any master of a vessel to bring a Quaker into the state; had ordered those already here, and such as should come thereafter, to be imprisoned till they should abjure the country; provided a milder punishment for their first and second return, but death for their third . . . .[38]

---

[36] Kurland & Lerner, *supra*, note 21, at 79.

[37] The Quakers were a Christian religious group started by George Fox that largely rejected religious formalism and looked for the inner experience of the Spirit of Christ. They came to America to flee persecution.

[38] Kurland & Lerner, *supra*, note 21, at 79.

Jefferson despised this oppression, but he explained that the Anglicans had complete control over the colony for about 100 years. And in 1769, when he became a member of the Virginia legislature, he complained: "Our minds were circumscribed within narrow limits by an habitual belief that it was our duty to be subordinate to the mother country in all matters of government. . . and even to observe a bigoted intolerance for all religions but hers."[39] The English Anglican mindset and practices continued in Virginia. But Jefferson did not rest with this intolerance. He acted to overcome it.

In 1779, as Governor of Virginia, he drafted a bill to establish religious freedom. It summarizes some of his important ideas about freedom of conscience. He wanted to end civil and church abuses directed toward influencing or commanding certain religious beliefs by "temporal punishments or burthens, or by civil incapacitations, [which] tend only to beget habits of hypocrisy and meanness."[40] This is tyranny. He explains

> [t]hat the impious presumption of legislators and rulers, civil as well as ecclesiastical, who, being themselves but fallible and uninspired men, have assumed dominion over the faith of others, setting up their own opinions and modes of thinking, as the only true and infallible, and as such, endeavouring to impose them on others, hath established and maintained false religions over the greatest part of the world, and through all time: That to compel a man to furnish contributions of

---

[39] THOMAS JEFFERSON, WRITINGS 5 (Merrill D. Peterson ed., The Library of America 1984).
[40] Kurland & Lerner, *supra*, note 21, at 77.

money for the propagation of opinions which he disbelieves and abhors, is sinful and tyrannical.[41]

He denounced church oppression and argued that citizens' civil rights should not depend on their religious opinions. His denunciation brings to light another problem in early America caused by established churches in the colonies.

Citizens with dissenting religious views were deprived of the right to hold public office unless they renounced their offensive religious opinions. Jefferson said that this denied them their civil rights. The wide-spread practice of the civil authority imposing religious views or condemning dissenting views destroys religious liberty. And in his bill on religious freedom, Jefferson sums up his attack on religious oppression in this way:

> no man shall be compelled to frequent or support any religious Worship place of Ministry whatsoever, nor shall be enforced. Restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief, but that all men shall be free to profess, and by argument to maintain their opinions in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities.[42]

There was another side to Jefferson's view on religion and government that is not well-known. But first, and for context, this is what is generally known.

When Jefferson became President, unlike George Washington and later Abraham Lincoln, he refused to proclaim a day of prayer because he believed such

---

[41] *Id.* at 77.
[42] *Id.*

a day violated the separation of church and state—the state being the national government. He wrote a letter to Reverend Samuel Miller in 1808 to defend his decision:

> I consider the government of the US. as interdicted by the Constitution from intermeddling with religious institutions, their doctrines, discipline, or exercises. This results not only from the provision that no law shall be made respecting the establishment, or free exercise, of religion, but from that also which reserves to the states the power not delegated to the U. S. Certainly no power to prescribe any religious exercise, or to assume authority in religious discipline, has been delegated to the general government. It must then rest with the states, as far as it can be in any human authority.[43]

Next is what is not well-known. In 1774, the British Parliament passed the Boston Port Act, and in response Jefferson followed the pattern of New England Puritans and set June 1, 1774, as a day of "fasting, humiliation & prayer, to implore heaven to avert from us the evils of civil war, to inspire us with firmness in support of our rights, and to turn the hearts of the King & parliament to moderation & justice."[44] This, of course, was Virginia action, not national government action, but nonetheless, it was religious establishment action.

More importantly, in 1776, Jefferson prepared a draft of a bill exempting dissenters from supporting the Anglican Church in Virginia. The text of the bill highlights an important part of English church history that continued in Virginia

---

[43] *Id.* at 98.
[44] Peterson, *supra*, note 39, at 8.

and other colonies. It required Virginians to pay taxes to support the churches.

Here is what the bill said:

> Whereas it is represented by many of the Inhabitants of this Country who dissent from the Church of England as by Law established that they consider the Assessments and Contributions which they have been hitherto obliged to make towards the support and Maintenance of the said Church and its Ministry as grievous and oppressive, and an Infringement of their religious Freedom: Be it Enacted by the General Assembly of the Common Wealth of Virginia and it is hereby Enacted by the Authority of the same that all Dissenters of whatever Denomination from the said Church shall from and after the passing this Act be totally free and exempt from all Levies Taxes and Impositions whatever towards supporting and maintaining the said Church as it now is or may hereafter be established and its Minsters.[45]

As I have shown, taxing citizens to support the established church was common in the colonial period. It was also common to tax those who objected to the practices and beliefs of that church. So Jefferson's proposed bill dealt with a serious issue of that day and long before, and it offered relief to dissenters by excusing them from supporting a church that contradicted their religious consciences.

Here is the important part of Jefferson's bill for my purposes. His bill relieved the Virginia dissenters from having to pay the Anglican church tax, but it still required them to pay the tax for their own churches. Furthermore, his bill required Anglicans in Virginia to pay the tax to support the Anglican churches. This is a classic establishment practice. So the idea that Jefferson was a strict

---

[45]Kurland & Lerner, *supra*, note 21, at 74.

separationist is correct at the national level but not at the state level. And this leads to Jefferson's "wall of separation" metaphor.

In his 1802 letter to the Danbury Baptist Association, Jefferson used the wall of separation metaphor that Justice Black later adopted in *Everson* v. *Board of Education*[46] in 1947. Roger Williams, the dissenter who established the colony of Rhode Island, had used that phrase at least a century before Jefferson.[47] Richard Hooker used the walls of separation metaphor in his book *Of the Laws of Ecclesiastical Polity* at the end of the 16th century.[48] And we can go back before that when John Calvin expressed the substance of the idea in 1536 in his *Institutes of the Christian Religion.* In talking about the difference between the civil and the ecclesiastical power, Calvin said: "The difference therefore is very great; because the Church does not assume to itself what belongs to the magistrate, nor can the magistrate execute that which is executed by the Church. . . ."[49]

Of course, in the context of the Danbury letter, Jefferson used the wall metaphor to apply to "the Church and State."[50] He does not say between the churches and the states. Moreover, according to the letter, the Establishment

---

[46] 330 U.S. 1, 16 (1947).
[47] Williams used the phrase in his 1644 tract entitled "Mr. Cotton's Letter Lately Printed, Examined & Answered." DANIEL L. DREISBACH, THOMAS JEFFERSON AND THE WALL OF SEPARATION BETWEEN CHURCH AND STATE 76 (New York University Press 2002).
[48] DREISBACH, *supra*, note 47, at 73.
[49] Kurland & Lerner, *supra*, note 21, at 44.

[50] *Id.* at 96.

Clause is between the American people and their legislature, not their legislatures. So for good or ill, the *Everson* court used the wall metaphor, but it moved Jefferson's wall by applying it to the states.

Jefferson, on the other hand, understood the Establishment Clause to apply only to the federal government. It is clear from his writing that he did not want Congress to establish a national church like Henry VIII's Anglican Church. Indeed, in a letter to Benjamin Rush in 1800, he said that the goal of the Episcopalians and Congregationalists to establish their denomination as a national church had been aborted by the return of good sense in the country.[51] He is referring to the Constitution and the Bill of Rights that prohibited a national church.

Consistent with that idea, in 1878 the Supreme Court recognized this limitation in *Reynolds v. U.S.* The Court said that the First Amendment "deprived [Congress] of all legislative power over mere opinion, but [ ] left [it] free to reach actions which were in violation of social duties or subversive of good order."[52] In other words, Congress could not control religious opinion, but it could control religious practices when they violated the good order of society. The *Reynolds* Court held that Mormon polygamy violated that social order.

---

[51] Peterson, *supra*, note 39, at 1082.
[52] *Reynolds*, 98 U.S. 145, 164 (1878) (upholding the constitutionality of a Utah criminal statute outlawing polygamy).

In the same paragraph in *Reynolds*, however, the Court makes a curious statement about Jefferson's wall metaphor: "Coming as this does from an acknowledged leader of the advocates of the [First Amendment], [the wall metaphor] may be accepted almost as an authoritative declaration of the scope and effect of the amendment thus secured."[53] I have found nothing in my studies that indicates that Jefferson used the metaphor before he wrote his Danbury Baptist letter or thereafter or that he intended it to be the touchstone of Establishment Clause jurisprudence. According to Jefferson scholar Daniel Dreisbach,

> [t]here is no evidence that Jefferson considered the metaphor the quintessential symbolic expression of his church-state views. There is little evidence to indicate that Jefferson thought the metaphor encapsulated a *universal* principle of religious liberty or the prudential relationships between religion and *all* civil government (local, state, and federal.)[54]

Since *Everson,* the Supreme Court's First Amendment jurisprudence often relies on this phrase, this metaphor, twisted out of its historical context, transferred into a new context with little evidence that Jefferson ever intended to use the wall metaphor in that way. Nonetheless, it has become the standard of Establishment Clause analysis. It is one thing to say, however, it is the standard; it is something different to say that Jefferson was the champion of that standard, and therefore we, the courts, are following Jefferson. And perhaps without thinking much about it,

---

[53] *Id.*
[54] DREISBACH, *supra*, note 47, at 69-70.

the Supreme Court has replaced the key word in the First Amendment—establishment—with a word not in the First Amendment—separation.

I believe that in focusing on separation, the *Everson* Court shifted away from the history that led up to the First Amendment. It shifted away from the historical establishment/disestablishment language to the separation language. But as Judge Cardoza explained: "Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it."[55] Chief Justice Burger likewise warned that "[j]udicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstance of a particular relationship."[56]

And Chief Justice Rehnquist may be the most forceful critic of the wall metaphor. As he said in *Wallace v. Jaffree,* "[i]t is impossible to build sound constitutional doctrine upon a mistaken understanding of constitutional history, but unfortunately the Establishment Clause has been expressly freighted with Jefferson's misleading metaphor for nearly 40 Years."[57] The separation concept has many critics.

In *Everson*, Justice Black used strong separation language that goes beyond what I believe "disestablishment" requires. He described separation not simply as

---

[55]*Berkey v. Third Ave. Ry. Co.,* 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926).
[56] *Lemon v. Kurtzman*, 403 U.S. 602, 614 (1971).
[57]*Wallace v. Jaffree*, 472 U.S. 38, 92 (1985) (Rehnquist, J., dissenting).

limiting the government from setting up a national church or the other types of religious oppression I have shown. He devised a strict list of what the government could not do in the religious sphere. The list goes beyond disestablishment. The problem is that "separation" tends to lead to the sanitization of any evidence of religion in the public sphere. That has led to the *Lemon* test, which is a sanitization test.  And the Pensacola cross is about to get sanitized.

Placing a cross in a public park that many people have enjoyed for decades, that stands mute and motionless, that oppresses no one, that requires nothing of anyone, and that commands nothing does not violate the Establishment Clause. Nor is it religious oppression. The cross can only cast a shadow; it cannot cast any harm. Only someone with a strict separationist view could find a violation, and such a finding would not be based on an actual injury that satisfies the standing requirement. For the strict separationist, the cross has to go because it is there, not because it causes injury. But now I move to the third and final section on the history of religious oppression.

3. Colonial and State Charters, Constitutions, and Proposed Constitutional Amendments

In this section I offer some government documents from early America on religious freedom. These are not simply the ideas and actions of individuals; they are the actions of government. The purpose is to give more background about the

founders' thoughts on religious freedom and how that thinking ended in state action that led to or influenced the First Amendment. Some of these documents offer profound statements supporting religious freedom. Some documents established churches, and some show the kinds of penalties imposed on dissenters and non-conformists that the Establishment Clause was designed to prohibit. Others show that many colonial and state governments acted to support religion for their citizens' benefit.

The first act is the "Maryland Act concerning Religion" of 1649. This act required anyone who blasphemed God, denied the Trinity, or uttered reproachful words "concerning the blessed Virgin Mary the Mother of our Saviour or the holy Apostles or Evangelists" to pay a fine or be whipped or imprisoned, and upon the third offense, be banished from the province.[58] It should remind you of the Edict of Thessalonica because it imposes a Trinitarian system of religious beliefs on Maryland citizens.

Twenty years later, the Carolina Fundamental Constitutions of 1669 established the Anglican Church as the only true church in the Carolina colony. It further authorized the colonial government to maintain churches and employ ministers.[59] The act offers another example of the early American idea about the importance of religion for society. The Carolina government wanted to promote

---

[58]Kurland & Lerner, *supra*, note 21, at 49.

[59] *Id.* at 51.

Christianity in the colony, and despite establishing Anglicanism, it allowed groups to form their own churches.[60] It, however, also contained the harsh penalties that were common in the mid-seventeenth century by divesting the unchurched of all their rights.

This kind of oppression began to fade in the middle part of the 18th century. Beginning around the time of the revolution, the founders began drafting state constitutions that often included religious freedom protections. These provisions usually described religious freedom as a freedom based in liberty of conscience. One of the most influential statements is in the Virginia Declaration of Rights of 1776.

> 16. That religion, or the duty which we owe to our CREATOR, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and therefore all men are equally entitled to the free exercise of religion, according to the dictates of conscience; and that it is the mutual duty of all to practice Christian forbearance, love, and charity, towards each other.[61]

Beyond the focus on conscience, the act founds the right to religious freedom in the Christian religion itself and explains that the Christian religion requires forbearance, love, and charity to all. A similar provision was offered at the Virginia Convention to ratify the U.S. Constitution.[62] Also in 1776, the Virginia

---

[60] *Id.*
[61] *Id.* at 70.
[62] *Id.* at 89.

Assembly passed a bill that exempted dissenters from paying support to the Anglican Church and specifically revoked every English act or statute that imposed criminal penalties for religious action in the colony.[63] And finally, I turn to New England.

The Massachusetts Constitution of 1780 offers a concise example of the language used in state constitutions at the time that protected religious liberty:

> Art. II It is the right as well as the duty of all men in society, publicly and at stated seasons, to worship the Supreme Being, the great Creator and Preserver of the universe. And no subject shall be hurt, molested, or restrained, in his person, liberty, or estate, for worshiping God in the manner and season most agreeable to the dictates of his own conscience, or for his religious profession or sentiments, provided he doth not disturb the public peace or obstruct others in their religious worship.[64]

The Massachusetts Constitution offers a valuable summary of how it and other constitutions of that era tried to protect religious freedom and to define what that freedom meant. Specifically, it shows the importance of religion by calling it a duty. It also conveys a right to liberty of religious conscience, and in exercising that right, protection from being hurt, molested, restrained, or losing one's property. It also illustrates the thought of the age in which religious freedom was understood as a fundamental right.

---

[63] *Id.* at 75.
[64] *Id.* at 77.

I could add other state constitutions from late eighteenth century America that speak in the same voice, use the same words, and protect the same rights. But I end here and move on to show what this history says about the Establishment Clause and the standing issue when no coercion and no harm have occurred.

Part III: LEGAL ISSUES

When you examine the history of religious oppression that led, in part, to the founding of our country and the enactment of the Establishment Clause, it becomes clear how incongruent the "harm" is in *City of Pensacola* and *Rabun County* with the harms the Establishment Clause was designed to prevent. Standing that authorizes Article III jurisdiction requires harm; and as *Town of Greece, N.Y. v. Galloway*,[65] makes clear, it must be something more than annoyance, discomfort, or some other psychological harm. And standing requirements are important.

Standing requirements ensure that the federal judiciary only consider cases where actual harm has occurred or been threatened, and leave to the political process the "abstract questions of wide public significance which amount to generalized grievances…."[66] And although, as Judge Newsom says in his concurrence, Circuit precedent in *American Civil Liberties Union of Georgia v.*

---

[65] 134 S. Ct. 1811 (2014).
[66] *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 475 (1982) (internal quotations and citations omitted).

*Rabun County Chamber of Commerce*,[67] constrains us to find that plaintiffs suffered sufficient injury to confer standing, that finding contradicts recent Supreme Court rulings—specifically its decision in *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,*[68] and *Town of Greece*. Moreover, this finding is inconsistent with the history of religious oppression in Britain and early America that the Establishment Clause guards against.

The "irreducible constitutional minimum" of standing consists of three elements, and the first one is at issue here: "[T]he plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."[69]   In his concurrence, Judge Newsom makes two points regarding standing that I would like to emphasize. First, he states, "*Rabun* was wrong the day it was decided—utterly irreconcilable with the Supreme Court's then-hot-off-the-presses decision in *Valley Forge*." Later, Judge Newsom stresses how "standing rules matter—and the sweeping standing rule that *Rabun* embodies threatens the structural principles that underlie Article III's case or controversy requirement."

I agree with Judge Newsom that *Rabun County* was wrongly decided. Ultimately, *Rabun County* is irreconcilable with *Valley Forge* because the ruling

---

[67] 698 F.2d 1098 (11th Cir. 1983).
[68] 454 U.S. 464 (1982).
[69] *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992) (internal citations and quotations omitted).

on standing is based on a flawed distinction that conflates active government coercion with a passive religious monument.  It also fails to take any account of history, and history has become important for the Supreme Court since 1983 in Establishment Clause cases. So the *Rabun County* panel read *Valley Forge* and misunderstood it and then misapplied it.

The panel distinguished the plaintiffs' lack of standing in *Valley Forge* from plaintiffs' standing in *Rabun County* based on the plaintiffs' choice between not using the park or using the park and suffering psychological consequences. The panel found possible psychological harm sufficient to confer standing despite the fact that before filing suit, no plaintiff had ever camped in Black Rock State Park, no plaintiff lived in Rabun County, Georgia,[70] and only one plaintiff had even seen the cross, and then, only from flying over it in an airplane. The other plaintiffs learned about the cross from anonymous phone calls and news releases.[71] The panel held that, unlike the non-resident plaintiffs in *Valley Forge*, "the plaintiffs in [*Rabun*] are residents of Georgia who make use of public parks which are maintained by the State of Georgia; these factors thus provide the necessary

---

[70] It is interesting to note that the citizens of Rabun County were so attached to their cross, they eventually resurrected it on private land not far from its previous location and started a non-profit to raise money for its upkeep.

[71] *Rabun*, 698 F.2d at 1107-08.

connection, which was missing in *Valley Forge*, between the plaintiffs and the subject matter of the action."[72]

Furthermore, the *Rabun* panel primarily based its finding of standing on two reasons—neither of which justifies a holding so incompatible with the standing limits mandated by *Valley Forge*.  First, the panel determined that the Supreme Court had recognized a legally protected interest in the use and enjoyment of land in *Sierra Club v. Morton*,[73] *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,[74] and *Duke Power Co. v. Carolina Environmental Study Group., Inc.*.[75] Indeed, the Supreme Court had recognized a legally protected interest in the use and enjoyment of land/natural resources in *Sierra Club*, *SCRAP*, and *Duke Power Co.*[76] However, the harm, or threatened harm, in these cases was environmental destruction—a real, concrete, and perceptible injury that does not

---

[72] *Id.* at 1107.

[73] 405 U.S. 727 (1972).

[74] 412 U.S. 669 (1973).

[75] 438 U.S. 59 (1978). The Rabun Panel also cited a D.C. Circuit Establishment Clause case. However, this case was also pre-*Valley Forge* and has no precedential value.

[76] In *Sierra Club*, the Supreme Court stated the road to be built through Sequoia National Park threatened an injury in fact in that "'would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations.'" 405 U.S. at 734 The Court stated it did "not question that this type of harm may amount to an 'injury in fact' sufficient to lay the basis for standing," but found the plaintiffs in that case failed to allege the injury was sufficiently personal. *Id.* at 734,735. In *SCRAP*, the Supreme Court held that since Plaintiffs "used the forests, streams, mountains, and other resources in the Washington metropolitan area for camping, hiking, fishing, and sightseeing, and that this use was disturbed by the adverse environmental impact …," this was sufficient to establish an injury in fact. 412 U.S. at 685. In *Duke Power*, the Supreme Court held that "the environmental and aesthetic consequences of the thermal pollution of the two lakes in the vicinity of the disputed power plants is the type of harmful effect which has been deemed adequate in prior cases to satisfy the 'injury in fact' standard." 438 U.S. at 73-74 (internal citation omitted).

support the proposition that one's interest in the use and enjoyment of a public park that has a cross on it violates the Constitution.

Second, the *Rabun* panel determined that the injuries complained of in *Rabun County* were more comparable to the plaintiffs' injuries in *School District of Abington Township v. Schempp*,[77] rather than the non-injury in *Valley Forge*. In *Valley Forge*, the Supreme Court reiterated its "earlier holdings that standing may be predicated on noneconomic injury" and cited *Abington* as a case in which the plaintiffs did have such standing.[78] In analogizing the injury in *Abington* to the injury in *Rabun County*, the *Rabun* panel focused on the dilemma the plaintiffs in *Abington* faced—"the schoolchildren were 'subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them,'"—and concluded "[n]o less can be said of the plaintiffs in the instant case."[79]

Although the panel conceded that there might be a difference in degree of injury, it was "unable to find any qualitative differences between the injury suffered by the plaintiffs in [*Rabun*] and that which the Court found in *Abington*."[80] But there is a major difference—a difference based in history. The *Abington* facts fall within the type of religious oppression I have described in this opinion. The Bible reading program that Pennsylvania legislated into its schools

---

[77] 374 U.S. 203 (1963).
[78] 454 U.S. at 486, 487 n.22 (citing *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963)).
[79] 698 F.2d at 1108 (quoting 454 U.S. at 487 n.22).
[80] 698 F.2d at 1108.

smacks of the kind of establishment action that I have described in Part II of this opinion. The law required that the Holy Bible be read every day in the classroom. Although it may be subtle, it is still coercion, and it is not passive. That a student could be excused from the daily reading might mitigate or soften the coercion, but it does not end it because it left the student with only two choices: stay in class and be proselytized by the Bible reading or suffer being ostracized or stigmatized by leaving the room. This is not so far from the Edict of Thessalonica as it might seem.

The Pennsylvania legislature was the sovereign, the state was the realm of that sovereignty, and the law imposed Bible reading, the fundamental document of the Christian faith, on all the children in the public schools no matter their creed or faith. This is classic establishment action.

So the qualitative differences between the injuries in *Rabun County* and *Abington* are obvious when one understands the history of religious oppression. Plaintiffs' injuries in *Rabun County* amounted to nothing more than disliking a religious monument on public land. Whereas in *Abington*, the children's parents had to choose between allowing a public school to proselytize their children by reading the Bible in class daily or by forcing their children to endure the stigma of being excused from the class. The qualitative differences are multiple: (1) overt direct government action endorsing the Christian religion in class every day versus

68

a passive monument donated by a private organization; (2) public stigma associated with removing children from their classroom versus the personal choice of avoiding a park because it contains a cross that in no way restricts your activities in the park; (3) the compulsory nature of sending one's child to school versus an adult's decision to visit a public park on his or her free time; and (4) the fundamental parental right to choose a child's religious education, or lack thereof, versus an adult's choice to visit a park for recreation. The differences between the harms in these two cases are clear, and there is no history that I found from the time the Protestant Reformation began until the Bill of Rights was passed of protecting the "right" not to see a cross.

The problem with finding that the "harm" in *Rabun County* is qualitatively the same as the harm in *Abington* is that it authorizes standing in a case like this one, where Plaintiffs' only harm is feeling offended and excluded. As such, their only injury is the psychological consequence of seeing a cross they don't like—the kind of injury that the Supreme Court said in *Valley Forge* would not create standing.

The Pensacola cross does not stigmatize, penalize, coerce, or injure anyone, and psychological harm alone does not satisfy the standing requirement. Furthermore, the psychological harm claims in *City of Pensacola* and *Rabun*

*County* are not the same as the religious conscience harm that the Founders wanted to end.

As I have shown, the history of the idea of the religious conscience was central to the history of religious freedom in early America and in Europe. But religious conscience was not understood as separate from religious action. It was not simply some psychological phenomenon or something that you had on your mind. Protestants and Catholics did not fight the Wars of Religion for almost 100 years because some religious image made them feel uncomfortable, unwelcome, or uneasy. Furthermore, in the 16th, 17th, and 18th centuries, men and women were not burned at the stake, beheaded, hung, flogged, banished, jailed, beaten, taxed, had their ears cropped, or were divested of their property or their rights as citizens because of their state of mind. It was because of their actions and because their actions arose out of their religious convictions. To counter dissidents' religious actions, churches and governments imposed penalties, and that is what the Establishment Clause was designed to protect against.

You can listen to this march of horrors, abuse, cruelty, and death and recognize that it was not a walk in the park. And despite the fact that I am careful to avoid trite statements in my orders, all this case is about is a walk in the park. (Perhaps, because it is a walk in a public park with a cross in it, it is walking on

stilts in the park, as Jeremy Bentham might say.)[81] But in *Rabun County* there was not even the walk because none of the plaintiffs had ever been to the Black Rock Mountain State Park. The fact that one of those plaintiffs might one day camp in the park near the cross was enough for the panel to find standing, which means that the *Rabun County* panel based standing on nothing more than a personal contingency.

Some courts have lost sight of why so many fought for so long at such great cost for religious freedom. It was not to protect people from looking at crosses in public parks. That demeans and debases the sacrifices of millions of people. And it is striking that the evils that were fought against for centuries and that the Establishment Clause was designed to end have come to the place in our history to include a cross in the public square.

And if we follow the standing ruling in *Rabun County*, someone who doesn't like a cross in a park can file suit in federal court and have it taken down. "I don't like it" is all that is required. Can one person in a democracy who does not like the cross in the park trump the thousands who enjoyed the park for years with nothing more at stake than personal dislike or annoyance? This amounts to generalized grievances. That is not enough for standing. It has to be more than offensive.

---

[81] "*Natural rights* is simple nonsense: natural and imprescriptible rights, rhetorical nonsense,-- nonsense upon stilts." Jeremy Bentham, Anarchical Fallacies (1796).

There is no evidence of any oppression, compulsion, stigmatization, or penalties imposed in this case or in *Rabun County*. No plaintiff in this case or *Rabun County* was hurt, molested, or restrained, nor did they lose any personal property or pay any tax to build or support the cross. No strife erupted in either park. No plaintiff suffered injury. All the old evils are absent. So what has happened to the standing requirement in Establishment Clause cases?

My review of some Establishment Clause cases leads me to suspect that some judges, by an unwitting sleight of hand, transfer the establishment question back to support the standing requirement. In other words, judges think they see an establishment problem and use that to support standing even though there is no harm. This looks like what happened in *Rabun County*. But when this standing sleight of hand occurs, no matter how unwittingly, or when courts do not require an injury for standing, the standing requirement becomes a phantom, a kind of constitutional moonbeam—something to look at, something to talk about, but it cannot be grasped. For example, in *Rabun* County, the panel found that,

> because the cross is clearly visible from the porch of his summer cabin at the religious camp which he directs as well as from the roadway he must use to reach the camp, plaintiff Karnan has little choice but to continually view the cross and suffer from the spiritual harm to which he testified.[82]

---

[82] 698 F.2d at 1108.

It's not a moonbeam, but it is nothing more than a light beam. The light of the cross "harms" him, and he is not even in the park. And the harm in this context is "spiritual harm"—what is that if it is not abstract harm? Where does that fit in with being burned at the stake or losing your children?  Does a court have to sanitize all of Rabun County from the light of a cross? In *Rabun County*, the panel let a flyover plaintiff and a front porch plaintiff bring the full panoply of the federal judiciary to bear on a cross simply because they didn't like it.

Courts should not embrace unharmed plaintiffs because of an unpleasant psychological state. As the Supreme Court explained in *Valley Forge*, the plaintiffs

> fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequences presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms.[83]

Yet only psychological consequences provide the basis for standing in *City of Pensacola* and *Rabun County.* Plaintiffs' affidavits in the Pensacola case prove this standing failure.

According to his affidavit, Plaintiff Andre Ryland has been to the park numerous times for numerous events, including picnics and meetings at the Senior Center, and he walks along the park trail. He seems to enjoy the park and has not been molested, penalized, or harmed in any way or kept from his activities.

---

[83] 454 U.S. at 485.

According to Plaintiff David Suhor's affidavit, he rides his bike regularly in the park, as often as twice a week, despite the fact that he first encountered the cross in 1993. And while Suhor claims in his affidavit that he "does not wish to encounter Bayview Cross in the future," he recently booked the amphitheater by the cross for his satanic ritual.  That the City permitted a satanic ceremony by a Christian cross demonstrates classic religious freedom. It also shows religious pluralism. The City did not coerce him to do anything, and more importantly, he was not restrained from enjoying his satanic ceremony in the exercise of his religious freedom. Consequently, the City did not disparage or deprecate his beliefs or dictate his behavior in the park, and the cross did not stigmatize or ostracize him. The presence of the cross did not turn him into a religious hypocrite, which Jefferson said was one of the results of religious oppression. Furthermore, he was not subjected to any City-sponsored religious exercises, and if the City does sponsor or encourage religious events at the cross, that is a separate Establishment Clause violation. (You don't need a cross in the park to do that.) But there is a limit to federal court intervention.

As the Supreme Court explained in *Lee v. Weisman*: "We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as

74

nonreligious messages, but offense alone does not in every case show a violation."[84] And offense is all we have in this case and in *Rabun County*.

The Supreme Court further explains that "a relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution."[85] This is what I have called "sanitizing" the public square of all religion. That is what the plaintiffs accomplished in *Rabun County* and what the plaintiffs want in this case.

Of course, just because a monument, memorial, or display is passive does not mean that by following my coercion analysis, a district court can never find an Establishment Clause violation involving a cross. A good example is when someone is directly taxed for the monument like the laws in early America that required dissenters to support churches against their conscience.[86] Likewise, any government that coerces someone, directly or indirectly, to take certain action or refrain from certain action because of the monument, memorial, or display would violate the Constitution. But there is no direct or indirect injury, so there is no redressable injury in this case. The cross does not dictate, control, or require anything. This is clear from Plaintiffs' affidavits.

---

[84] 505 U.S. 577, 597 (1992).

[85] *Weisman*, 505 U.S. at 598.

[86] "Absent special circumstances, however, standing cannot be based on a plaintiff's mere status as a taxpayer." *Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 134, 131 S. Ct. 1436, 1442, 179 L. Ed. 2d 523 (2011).

The second point in Judge Newsom's concurrence that merits emphasis is that standing rules matter. They matter because they keep the federal judiciary from exceeding its constitutionally-mandated role. Finding that Plaintiffs have standing here is contrary to this purpose because the Bayview Cross litigation is precisely the sort of dispute that the courts should leave to the political process and not let clutter the federal courts.

The Supreme Court has warned that without standing limitations "the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."[87] Here, there is no actual, concrete, or particularized injury, and there is no violation of a legally protected interest. A private organization, whose mission was non-religious, erected a cross on public property. The City of Pensacola spends $233 per year maintaining it, or .03% of the City's annual maintenance budget, not the full budget, and the cross has stood for approximately 75 years with only one complaint before this law suit was filed. There is no evidence that representatives of other religious faiths attempted to place

---

[87] *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

monuments in Bayview Park but were denied by the City.[88] So the citizens of Pensacola should decide if the cross should be removed, not the federal courts.

> As Justice Goldberg eloquently stated in his concurrence in *Abington*:
>
> > The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional adjudication is the ability and willingness to distinguish between real threat and mere shadow."[89]

And this case only involves shadows.

In addition, the fact that the Bayview Cross has stood in Bayview Park for 75 years without any significant controversy further shows the lack of injury in this case and the lack of an Establishment Clause violation. According to Plaintiffs' own evidence, the majority of people in Pensacola feel that the cross is a cherished monument in their community.[90] Indeed, Plaintiffs only submitted evidence of one complaint other than those alleged in the lawsuit. Seventy-five years and only one complaint confirms that the Bayview Cross does not cause harm sufficient to violate the Establishment Clause.

---

[88] Presumably such representatives would have standing to challenge the City's actions in that case. In *Spokeo,* the Supreme Court cited *Pleasant Grove City v. Summum,* 555 U.S. 460 (2009) for the proposition that intangible injuries can be concrete enough to be injuries in fact. 136 S. Ct. at 1549. In *Pleasant Grove*, the City denied a religious organization's request to donate and erect a monument in a park where a Ten Commandments monument was already erected. 555 U.S. at 465-66.

[89] 374 U.S. at 308 (Goldberg, J., concurring).

[90] Pl.'s Mot. for Summary Judgment, Doc. 31, Ex. 15. p. 247-52.

Moreover, "the principle that the passage of time can preclude relief has deep roots in our law, and this Court has recognized this prescription in various guises."[91] Although this language comes from a case involving laches, and not the Establishment Clause, the analogy is sound. "It is well established that laches, a doctrine focused on one side's inaction and the other's legitimate reliance, may bar long-dormant claims for equitable relief."[92] I am not suggesting we apply the laches doctrine to preclude relief in this case or that it is a defense; however, the longstanding history of the Bayview Cross gives us further evidence that there is no injury, and therefore, no standing for Article III jurisdiction. In a sense, the laches concept works with the coercion test to answer the standing question, and history is important.

The Supreme Court has recognized the importance of history in determining whether some government action violates the Establishment Clause. In *Marsh v. Chambers,* the Court said that while "no one acquires a vested or protected right in violation of the Constitution by long use," "an unbroken practice ... is not something to be lightly cast aside."[93] In *Lynch v. Donnelly*, although the Court did not base its no-violation finding on history, it noted that the crèche at issue had

---

[91] *City of Sherrill, N.Y. v. Oneida Indian Nation of New York*, 544 U.S. 197, 217 (2005).
[92] *Id.*
[93] 463 U.S. 783, 790 (1983) (quoting *Walz*, 397 U.S. at 678).

been included in the Christmas display for 40 years or more.[94] More recently, in *Van Orden*, Justice Breyer emphasized in his concurrence the importance of the fact that the Ten Commandments display had "stood apparently uncontested for nearly two generations" in finding that it did not violate the Establishment Clause.[95] In *Salazar v. Buono*, the Court noted that the cross at issue "had stood on Sunrise Rock for nearly seven decades," and that "the cross and the cause it commemorated had become entwined in the public consciousness."[96] And most recently, in *Town of Greece*, the Court stated that "the Establishment Clause must be interpreted by reference to historical practices and understandings."[97]

The Bayview Cross is embedded in the fabric of the Pensacola community. It is rooted in Pensacola's history. If the cross is a problem, it is only a local problem, not a constitutional problem. As Justice Thomas stated in his concurrence in *Van Orden*, "[t]his Court's precedent elevates the trivial to the proverbial 'federal case,' by making benign signs and postings subject to challenge."[98] So the 75-year history of the Bayview Cross is another reason its fate should be left to the local government. And now I finish this part of my opinion explaining the Supreme Court's ruling in *Town of Greece*.

---

[94] 465 U.S. 668, 671 (1984).
[95] *Van Orden v. Perry*, 545 U.S. 677, 704 (2005) (Breyer, J. concurring).
[96] 559 U.S. 700, 716 (2010).
[97] *Town of Greece, N.Y. v. Galloway*, 134 S. Ct. 1811, 1819 (2014).
[98] *Van Orden*, 545 U.S. at 694 (Thomas, J. concurring).

*Town of Greece* is important because the plaintiffs' complaints in that case sound like the complaints about the Bayview Cross, and also because the Court used history as a guide and discussed the element of coercion. I focus on the coercion analysis. In that case the town supervisor invited a member of the local clergy to deliver an invocation at the beginning of every town board meeting. The prayers were mostly Christian prayers because most of the churches in the community were Christian.

The plaintiffs in *Town of Greece* went to the town meetings to talk about local issues, not for recreation. One plaintiff complained that the prayers were "offensive," "intolerable," and "an affront to a diverse community."[99] The plaintiffs also contended that the prayers were coercive. More specifically they argued that,

> [t]he setting and conduct of the town board meetings create social pressures that force nonadherents to remain in the room or even feign participation in order to avoid offending the representatives who sponsor the prayer and will vote on matters citizens bring before the board. The sectarian content of the prayer compounds the subtle coercive pressures, they argue, because the nonbeliever who might tolerate ecumenical prayer is forced to do the same for prayer that might be inimical to his or her beliefs.[100]

The Court considered the plaintiffs' coercion argument and observed that the government cannot coerce or compel a citizen "to support or participate in any

---

[99] 134 S. Ct. at 1817.
[100] *Id.* at 1820.

religion or its exercise."[101] But the Court went on to say that "on the record in this

case the Court is not persuaded that the town of Greece, through the act of offering

a brief, solemn, and respectful prayer to open its monthly meetings, compelled its

citizens to engage in a religious observance."[102] That the prayers made the

plaintiffs feel excluded and disrespected and gave them offense does not equate to

coercion.[103] As the Court explained:

> Offense, however, does not equate to coercion. Adults often encounter
> speech they find disagreeable; and an Establishment Clause violation
> is not made out any time a person experiences a sense of affront from
> the expression of contrary religious views in a legislative forum,
> especially where, as here, any member of the public is welcome in
> turn to offer an invocation reflecting his or her own convictions.[104]

In concluding the opinion, the Court said that "neither choice represents an

unconstitutional imposition as to mature adults, who 'presumably' are 'not readily

susceptible to religious indoctrination or peer pressure.'"[105]Plaintiffs did not ask

the court to stop; they wanted non-sectarian prayers, specifically non-Christian.

Although *Town of Greece* did not involve a standing issue, the case supports

the proposition that there has to be more than personal complaints to support

standing. That is all that there is in this case, which leads to the conclusion that

*Rabun County* and *City of Pensacola* were wrongly decided.

---

[101] *Id.* at 1825.
[102] *Id.*
[103] *Id.* at 1826.
[104] *Id.* at 1827.
[105] *Id.*

CONCLUSION

Federal courts are courts of limited jurisdiction, precluded from considering certain cases and certain issues. The jurisdictional standing requirement is a Constitutional limitation just as the amount in controversy requirement in diversity requirement is a Congressional limitation. These limitations stand for the fundamental proposition that there are certain matters a federal court has no business deciding. The legality of a cross in a city park is one such issue. The doctrines of federalism and separation of powers counsel that this case does not belong in federal court.

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 07, 2018

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 17-13025-FF
Case Style: Amanda Kondrat'yev, et al v. City of Pensacola, Florida, et al
District Court Docket No: 3:16-cv-00195-RV-CJK

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellants.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Mohler, FF at (404) 335-6178.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs

In No. 17-13025, released Friday afternoon:  Page 17, line 5:  The word "and" in "that <u>and</u> honest" should be "an."  Can you fix that for me?

Thanks so much!


Kevin C. Newsom
Circuit Judge
United States Court of Appeals for the Eleventh Circuit