# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

February 19, 2020

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  17-13025-GG
Case Style:  Amanda Kondrat'yev, et al v. City of Pensacola, Florida, et al
District Court Docket No:  3:16-cv-00195-RV-CJK

Enclosed is a copy of this court's decision filed today in this appeal on remand from the
Supreme Court of the United States.

For questions concerning the issuance of the decision of this court, please call the number
referenced in the signature block below. For all other questions, please call Joseph Caruso, GG
at (404) 335-6177.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-6 Issuance of Opinion Remand SC

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-13025
_____

D.C. Docket No. 3:16-cv-00195-RV-CJK


AMANDA KONDRAT'YEV,
ANDREIY KONDRAT'YEV,
ANDRE RYLAND,
DAVID SUHOR,

                                                    Plaintiffs - Appellees,

versus

CITY OF PENSACOLA, FLORIDA,
ASHTON HAYWARD,
Mayor,
BRIAN COOPER,

                                                    Defendants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(February 19, 2020)

**ON REMAND FROM THE
SUPREME COURT OF THE UNITED STATES**

Before NEWSOM and HULL, Circuit Judges, and ROYAL,[*] District Judge.

NEWSOM, Circuit Judge:

This is Pensacola Cross Case 2.0.

In September 2018, relying on our earlier decision in *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc*., 698 F.2d 1098 (11th Cir. 1983), we affirmed a district court's decision ordering the removal of a 34-foot Latin cross from the City of Pensacola's Bayview Park on the ground that the City's maintenance of the cross violated the First Amendment's Establishment Clause.  *Kondrat'yev v. City of Pensacola*, 903 F.3d 1169, 1171–72 (11th Cir. 2018), *cert. granted, judgment vacated*, 139 S. Ct. 2772 (2019).  The City subsequently filed a petition for certiorari in the Supreme Court.  While the City's petition was pending, the Supreme Court decided *American Legion v. American Humanist Association*, holding that a 32-foot Latin cross on public land in Bladensburg, Maryland does *not* violate the Establishment Clause.  139 S. Ct. 2067, 2074, 2077 (2019).  The following week, the Supreme Court granted the City's petition for certiorari in this case, vacated our earlier decision, and remanded for further consideration in light of *American Legion*.  *Kondrat'yev*, 139 S. Ct. 2772.

---

[*] Honorable Charles Ashley Royal, United States District Judge for the Middle District of Georgia, sitting by designation.

Having carefully reviewed the *American Legion* opinion—or more accurately opinion*s* (there are seven of them)—and having considered the parties' supplemental briefing, we now hold (1) that we remain bound by *Rabun* to conclude that plaintiffs have (or at least one of them has) Article III standing to challenge Pensacola's maintenance of the Bayview Park cross, but (2) that *American Legion* abrogates *Rabun* to the extent that the latter disregarded evidence of "historical acceptance" and instead applied *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and, further, that when *American Legion*—rather than *Rabun*—is applied, the cross's presence on city property doesn't violate the Establishment Clause.

## I

## A

The facts underlying our case, of course, remain unchanged.  In 1941, the National Youth Administration erected a wooden cross in the eastern corner of Pensacola's Bayview Park to be the "[f]ocal point" of what would become an annual Easter sunrise program.  The program itself was organized by the Pensacola Junior Chamber of Commerce (a/k/a the "Jaycees") and soon became a tradition, with people gathering for Easter services during World War II to pray, among other things, for "the divine guidance of our leaders" and for faith to "see through the . . . dark days of war."  The services continued following the war, and in 1949

3

the Jaycees built a small stage—or "bandstand"—immediately in front of the cross to serve as a "permanent home" for the annual program.

In 1969, the Jaycees replaced the original wooden cross with the 34-foot concrete version at issue in this case.  The new cross was dedicated at the 29th annual Easter sunrise service.  The Jaycees later donated the cross to the City, which continues to light and maintain it at a current cost of around $233 per year.  Although the cross is only one of more than 170 monuments scattered throughout Pensacola's parks, it is one of only two—and the only religious display—located in Bayview Park.  Over the years, the cross has continued to serve as the location for an annual Easter program, but it has also been used for other purposes, including as a site for remembrance services on Veterans and Memorial Days, at which attendees place flowers near it in honor of loved ones overseas and in memory of those who have died fighting in service of the country.

## B

The Bayview Park cross (in one iteration or another) stood in the same location for more than 75 years, essentially without incident, before the plaintiffs in this case filed suit asserting that the cross's presence on city property violates the First Amendment's Establishment Clause.

The parties filed dueling summary judgment motions.  The district court granted plaintiffs' motion, held that the City's maintenance of the cross violated

4

the Establishment Clause, and ordered the cross removed.  On appeal, this Court affirmed.  In so doing, we concluded that we were bound by our earlier decision in *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc*., 698 F.2d 1098 (11th Cir. 1983), in two respects—*first*, to conclude that the plaintiffs here (or at least one of them) had Article III standing to challenge Pensacola's maintenance of the Bayview Park cross, and *second*, to hold that the cross violated the Establishment Clause.  *Kondrat'yev v. City of Pensacola*, 903 F.3d 1169, 1173–74 (11th Cir. 2018), *cert. granted, judgment vacated*, 139 S. Ct. 2772 (2019).  The City thereafter filed a petition for certiorari in the Supreme Court.

While the City's petition was pending, the Supreme Court decided *American Legion v. American Humanist Association*,  holding—as already noted—that a 32-foot tall Latin cross on public land in Bladensburg, Maryland does not violate the Establishment Clause.  139 S. Ct. 2067, 2074, 2077 (2019).  We'll take a deeper dive later, but for present purposes, it suffices to say that *American Legion* did two important things.

First, as we will explain, it jettisoned *Lemon v. Kurtzman*, 403 U.S. 602 (1971)—at least for cases involving "religious references or imagery in public monuments, symbols, mottos, displays, and ceremonies"—in favor of an "approach that focuses on the particular issue at hand and looks to history for

guidance." *American Legion*, 139 S. Ct. at 2081–82 & n.16, 2087 (plurality); *see also id.* at 2097 (Thomas, J., concurring in the judgment) (agreeing that *Lemon* does not apply to religious-display cases); *id.* at 2101–02 (Gorsuch, J., concurring in the judgment) (same).

Second, informed by "four considerations"—which, again, we'll explore in greater detail—the Supreme Court adopted what it called "a strong presumption of constitutionality" for "established, religiously expressive monuments, symbols, and practices." *Id.* at 2085 (opinion of the Court). The Court described the pertinent considerations as follows: (1) that "identifying the[] original purpose or purposes" of a longstanding monument "may be especially difficult"; (2) that "as time goes by, the purposes associated with an established monument, symbol, or practice often multiply"; (3) that "the message conveyed" by the monument likewise "may change over time"; and (4) that "when time's passage imbues" a religious monument with "familiarity and historical significance, removing it may" appear "hostile" (rather than neutral) toward religion. *Id.* at 2082–85 (alteration adopted) (quotation omitted).

As already explained, just a week after issuing its decision, the Supreme Court granted the City's petition for certiorari in this case, vacated our earlier

decision, and remanded for further consideration in light of *American Legion*.  139 S. Ct. 2772.[1]

## II

In relevant part, the First Amendment states that "Congress shall make no law respecting an establishment of religion . . . ."  U.S. Const. amend. I.  Although by its terms the Establishment Clause applies only to Congress, and although available historical evidence indicates that it was originally understood as a federalism-based provision designed to prevent the federal government from interfering with state and local decisions about church-state relations, the Supreme Court has since made clear that, as "incorporated" through the Fourteenth Amendment, the Clause protects individual rights against state and local interference.  *See, e.g.*, *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947).  The question here, therefore, is whether the City's maintenance of the Bayview Park cross constitutes a prohibited "establishment of religion."

## A

Before considering the merits of plaintiffs' Establishment Clause claim, we must first address the question of their standing to sue, which the City disputes. *See, e.g.*, *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1330 (11th Cir. 2007)

---

[1] As this appeal comes to us following a grant of summary judgment, our review is *de novo*.  *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007).

("[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims.") (quotation omitted).

If we were writing on a clean slate, we might well agree with the City's contention that plaintiffs lack standing here.  But we are not—and so we cannot.  As we explained in our initial opinion, we conclude that our standing analysis is controlled by this Court's earlier decision in *Rabun*, which considered facts nearly indistinguishable from those here.  *Kondrat'yev*, 903 F.3d at 1172–74.  And because the Supreme Court's decision in *American Legion* doesn't address standing one way or another, the standing analysis from our original opinion . . . well . . . stands.

We'll briefly recap, then, what we said there: In *Rabun*, with the approval of the Georgia Department of Natural Resources, the Rabun County Chamber of Commerce erected an illuminated 35-foot Latin cross in Black Rock Mountain State Park.  698 F.2d at 1100–01, 1101 n.1.  Like the Bayview Park cross at issue here, the Black Rock Mountain cross replaced a similar monument that had stood for a number of years but had fallen into disrepair, and like the Bayview Park cross, it was dedicated at an annual Easter sunrise service.  *Id*. at 1101.  The ACLU of Georgia and five named individuals sued, claiming that the Establishment Clause forbade the Black Rock Mountain cross's presence on state-owned land.  *Id.* at 1102.

8

The defendants contended that the plaintiffs lacked standing under the Supreme Court's then-recent decision in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982). In *Valley Forge*, a nonprofit organization and four of its employees had sued to prevent the transfer of federal land to a religious institution. *Id*. at 468–69. The Third Circuit held that the plaintiffs had standing based on the "shared individuated right to a government that 'shall make no law respecting the establishment of religion.'" *Americans United for Separation of Church & State, Inc. v. U.S. Dep't of Health, Ed. & Welfare*, 619 F.2d 252, 261, 265 (3d Cir. 1980), *rev'd sub nom. Valley Forge*, 454 U.S. 464. The Supreme Court rejected that theory, finding that such "generalized grievances" are insufficient to confer standing, and further stated that Establishment Clause plaintiffs who can't identify a personal injury "other than the psychological consequence presumably produced by observation of conduct with which one disagrees" lack the injury necessary to support Article III standing. *Valley Forge*, 454 U.S. at 483, 485–86 (quotation omitted). Relying on *Valley Forge*, the defendants in *Rabun* insisted that none of the plaintiffs there had standing to sue. 698 F.2d at 1103. A panel of this Court disagreed, holding, as relevant for present purposes, that the plaintiffs there had the requisite standing. *Id.* at 1108–09, 1111.

While acknowledging that *Valley Forge* had "expressly held that the mere 'psychological consequence presumably produced by observation of conduct with which one disagrees' is not a cognizable injury" for standing purposes, *id*. at 1103 (quoting *Valley Forge*, 454 U.S. at 486), the *Rabun* panel nonetheless concluded that the plaintiffs before it had "demonstrated an individualized injury, other than a mere psychological reaction," *id*. at 1108. Specifically, the panel held that the plaintiffs had sufficiently "allege[d] that they ha[d] been injured in fact because they ha[d] been deprived of their beneficial right of use and enjoyment of a state park." *Id*. at 1103. Two of the plaintiffs, in particular, "demonstrated the effect that the presence of the cross ha[d] on their right to the use of Black Rock Mountain State Park *both* by testifying as to their unwillingness to camp in the park because of the cross *and* by the evidence of the physical and metaphysical impact of the cross." *Id*. at 1108 (emphasis added). More particularly still, the *Rabun* panel concluded, those two plaintiffs were "forced to locate other camping areas *or* to have their right to use Black Rock Mountain State Park conditioned upon the acceptance of unwanted religious symbolism." *Id*. (emphasis added).

As we read *Rabun*, therefore, it is not strictly necessary for an Establishment Clause plaintiff to modify his behavior in order to avoid the alleged violation; rather, it is enough that he claim to have suffered "metaphysical"—or as the *Rabun* panel also called it, "spiritual"—injury and that his use of a public resource has

been "conditioned upon the acceptance of unwanted religious symbolism." *Id*. Under *Rabun*'s expansive formulation, at least one of the plaintiffs in this case has alleged sufficient injury to pass Article III muster. Andre Ryland testified that he uses Bayview Park "many times throughout the year" and is "offended and feel[s] excluded by . . . the Bayview Cross." Although it doesn't appear that Ryland (or any other plaintiff for that matter) has taken any affirmative steps to avoid encountering the cross, his "offen[se]" and "exclu[sion]" would seem to qualify as the sort of "metaphysical" or "spiritual" injury that *Rabun* deems adequate. Because Ryland has standing under *Rabun*, we needn't consider whether the other plaintiffs do. *See, e.g.*, *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981).

So in short, as we said before, this Court's earlier decision in *Rabun* resolves the standing issue here in plaintiffs' favor. And absent en banc reconsideration or Supreme Court reversal, we are obliged by our "prior panel precedent" rule to follow it. *See, e.g.*, *Breslow v. Wells Fargo Bank*, 755 F.3d 1265, 1267 (11th Cir. 2014) ("It is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled en banc, or by the Supreme Court." (alteration adopted) (quotation omitted)). Because the Supreme Court's decision in *American Legion*

11

didn't address standing one way or another, *Rabun* continues to bind us, and we are constrained to affirm the district court's standing determination.[2]

We turn then, to the merits of plaintiffs' Establishment Clause claim.

## B

We won't bury the lede.  Having reconsidered this case in light of *American Legion*, we conclude (1) that the Supreme Court's decision abrogates *Rabun*'s analysis and holding with respect to the merits of the Establishment Clause claim there and (2) that when *American Legion* (rather than *Rabun*) is applied, Pensacola's maintenance of the Bayview Park cross does not violate the First Amendment.

### 1

Candidly—and respectfully—divining any sort of clear rule from the seven separate opinions in *American Legion* is a challenge.  (Much more on that later.) But at least as it pertains to the continuing vitality of *Rabun*'s Establishment Clause analysis and holding—and thus our own earlier *Rabun*-based determination

---

[2] To clarify, the mere fact that the Court decided the *American Legion* case on the merits does not *ipso facto* indicate that it concluded that the plaintiffs there had Article III standing.  One would think it might, as standing is a jurisdictional issue that a court is obliged to consider *sua sponte*, but the Supreme Court has rejected the suggestion that such implicit "drive-by jurisdictional rulings" carry any "precedential effect."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998).  In *American Legion*, Justice Gorsuch (joined by Justice Thomas) filed a separate concurrence contending that the plaintiffs there lacked Article III standing because the "'offended observer' theory of standing has no basis in law" and clarifying that the Court's "own failure to consider standing c[ould not] be mistaken as an endorsement of it."  *American Legion*, 139 S. Ct. at 2098, 2100 (Gorsuch, J., concurring in the judgment).

that the Bayview Park cross violated the First Amendment—*American Legion* makes two things clear: (1) *Lemon* and its much-maligned three-part test no longer govern Establishment Clause challenges to religious monuments and displays; and (2) history and tradition play an important role in Establishment Clause analysis. For reasons we will explain, those two (related) aspects of *American Legion* gut *Rabun*'s merits analysis and thus fatally undermine the lone precedent that drove our initial decision.

**a**

We begin with a summary of *Rabun*'s Establishment Clause analysis.  The panel in *Rabun* analyzed the Black Rock Mountain cross under *Lemon*'s three-part test, which both parties there "agree[d]" supplied "the correct legal standard." *Rabun*, 698 F.2d at 1109.  *Lemon*, the panel observed, asks "(1) [w]hether the [challenged] action has a secular purpose; (2) [w]hether the 'principal or primary effect' is one which neither 'advances nor inhibits religion'; and (3) [w]hether the action fosters 'an excessive government entanglement with religion.'"  *Id*. (quoting *Lemon*, 403 U.S. at 612–13).  "[I]f even one of these three principles is violated," the *Rabun* panel continued, "the challenged governmental action will be found to violate the Establishment Clause."  *Id*.  The panel concluded that the defendants there had "failed to establish a secular purpose" for the Black Rock Mountain cross and, therefore, "that the maintenance of the cross in a state park violate[d] the

13

Establishment Clause of the First Amendment." *Id.* at 1111.  In closing, the panel acknowledged that the cross had stood in the park "[f]or many years," but held that "'historical acceptance without more' does not provide a rational basis for ignoring the command of the Establishment Clause that a state 'pursue a course of "neutrality" toward religion.'" *Id.* (quoting *Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 792–93 (1973)).

In our earlier opinion in this case, we followed *Rabun* right down the line—as we were obliged to do.  In particular, given the factual parallels between the Black Rock Mountain and Bayview Park crosses—both 30-some-odd feet tall, both erected by private organizations, both dedicated in conjunction with Easter services, and both located on government property—we held that the latter, like the former, violated the Establishment Clause.  *Kondrat'yev*, 903 F.3d at 1174.

## b

*American Legion* makes clear that *Rabun*'s Establishment Clause analysis—and thus our own initial assessment of Pensacola's Bayview Park cross—is no longer good law, for two related reasons.  We'll examine them in turn.

## i

For present purposes, perhaps *American Legion*'s clearest message is this: *Lemon* is dead.  Well, sort of.  It's dead, that is, at least with respect to cases involving religious displays and monuments—including crosses.  We count six

clear votes for that proposition.  For starters, Justice Alito's plurality opinion

(joined by Chief Justice Roberts and Justices Breyer and Kavanaugh) pointedly

criticized *Lemon* and its many "shortcomings," refused to apply it to the

Bladensburg cross, and ultimately rejected "efforts to evaluate [display] cases"

under it in favor of "a presumption of constitutionality for longstanding

monuments, symbols, and practices."  *American Legion*, 139 S. Ct. at 2080–82,

2081 n.16, 2087 (plurality).  Justice Thomas authored a separate concurrence in

which he explained, as relevant here, that the plurality had "rightly rejected" the

"long-discredited" *Lemon* test as inapplicable to religious-display cases.  *Id.* at

2097 (Thomas, J., concurring in the judgment).  Indeed, he said that he would have

"take[n] the logical next step and overrule[d] the *Lemon* test in all contexts."  *Id.*

Justice Gorsuch (joined by Justice Thomas) also wrote separately; he similarly

described the "now shelved" *Lemon* test as a "misadventure" and agreed that the

plurality had correctly repudiated it.  *Id.* at 2101–02 (Gorsuch, J., concurring in the

judgment).  Six.

Justice Kagan concurred in part.  While "agree[ing] that rigid application of

the *Lemon* test does not solve every Establishment Clause problem," she expressed

her continuing view that the "test's focus on purposes and effects is crucial in

evaluating government action in this sphere" and therefore declined to join the

portions of the plurality opinion expressly disclaiming *Lemon*—even if only, she said, out of "an excess of caution." *Id.* at 2094 (Kagan, J., concurring in part).

Justice Ginsburg (joined by Justice Sotomayor) dissented without mentioning *Lemon* one way or the other, either as applicable to religious-display cases or more generally. *Id.* at 2103–13 (Ginsburg, J., dissenting).

So again, that's six Justices—Chief Justice Roberts and Justices Thomas, Breyer, Alito, Gorsuch, and Kavanaugh—who have clearly rejected the proposition that *Lemon* provides the appropriate standard for religious-display cases like this one. So, for present purposes anyway, *Lemon* is indeed dead.

**ii**

Another thing that *American Legion* makes reasonably clear is that history and tradition play a crucial role in Establishment Clause analysis. Justice Alito's plurality opinion (which, again, Chief Justice Roberts and Justices Breyer and Kavanaugh joined) explained that post-*Lemon* cases "have taken a more modest approach that focuses on the particular issue at hand and looks to history for guidance." *American Legion*, 139 S. Ct. at 2087 (plurality). The plurality opinion also reiterated the more emphatic statement in *Town of Greece v. Galloway*, 572 U.S. 565 (2014), that "the Establishment Clause *must* be interpreted 'by reference to historical practices and understandings.'" *American Legion*, 139 S. Ct. at 2087 (plurality) (emphasis added) (quoting *Town of Greece*, 572 U.S. at 576). And in

the same vein, noting that the Bladensburg cross had been in place for 90-some years, the plurality opinion adopted a formal "presumption of constitutionality for longstanding monuments, symbols, and practices." *Id*. at 2074, 2081–82.

Even while joining Justice Alito's lead opinion in full, Justice Breyer concurred separately to flesh out his position.  He agreed that it was "appropriate[]" to "look[] to history for guidance" but clarified that, in his view, the Bladensburg cross's constitutionality ultimately turned on "its particular historical context and its long-held place in the community." *Id.* at 2091 (Breyer, J., concurring).  He declined to embrace an all-encompassing "'history and tradition' test that would permit any newly constructed religious memorial on public land." *Id.*  In short, for Justice Breyer, the key seemed to be that the Bladensburg cross had been there for a long time.

Justice Kagan expressed a similar position.  She too agreed that it is important to "look[] to history for guidance" but declined to "sign on to any broader statements about history's role in Establishment Clause analysis." *Id.* at 2094 (Kagan, J., concurring in part).  Like Justice Breyer, Justice Kagan emphasized the "longstanding"-ness of the Bladensburg cross. *See id.*  And indeed, Justice Kagan joined a portion of Justice Alito's lead opinion stating that "retaining established, religiously expressive monuments, symbols, and practices is quite different from erecting or adopting new ones" and, further, that "[t]he

17

passage of time gives rise to a strong presumption of constitutionality"—thereby making a clear majority for both propositions.  *Id.* at 2085 (opinion of the Court).

So again, let's pause briefly to count heads.  At this point, we have five—Justice Alito plus Chief Justice Roberts and Justices Breyer, Kagan, and Kavanaugh—who have agreed, as a general matter, that courts considering Establishment Clause challenges should at the very least "look[] to history for guidance."  And perhaps more importantly for the disposition of our case, we have the same five agreeing that an established religious display or monument is entitled to a formal (and in one iteration "strong") "presumption of constitutionality."

Justice Thomas's and Justice Gorsuch's concurring opinions round out the story.  Although Justice Thomas's opinion was focused on other issues—principally the notion that the Establishment Clause isn't properly incorporated against the states—there can be little doubt that he believes that history plays a central (and probably decisive) role in Establishment Clause analysis.  *See, e.g.*, *id.* at 2094–98 (Thomas, J., concurring in the judgment) (referring to practices "at the founding," "the historical characteristics of an establishment of religion," and "our Nation's history and traditions").  So that, it seems, is six votes for history and settled practice.

And although he was concerned principally with standing, Justice Gorsuch offered a few thoughts about the merits, as well.  He began by noting with approval

that Justice Alito's lead opinion "relie[d] on a more modest, historically sensitive approach" and "recogniz[ed] that 'the Establishment Clause must be interpreted by reference to historical practices and understandings.'" *Id.* at 2101–02 (Gorsuch, J., concurring in the judgment).  Justice Gorsuch summarized the plurality opinion as concluding that "what matters . . . is whether the challenged practice fits 'within the tradition' of this country." *Id.* at 2102.  "I agree with all this," he said, "and don't doubt that the monument before us is constitutional in light of the nation's traditions." *Id.*  Justice Gorsuch expressed some consternation with the plurality opinion's emphasis on a monument's longstanding-ness; the way he saw it, "what matters when it comes to assessing a monument, symbol, or practice isn't its age but its compliance with ageless principles." *Id.*  In any event, it's clear that we can count Justice Gorsuch a seventh vote for the relevance of history to Establishment Clause analysis; if anything, he seems to have thought that the plurality hadn't gone quite far enough.

That leaves only Justices Ginsburg and Sotomayor, whose dissent didn't say anything one way or the other about the propriety of consulting history, tradition, or settled practice in assessing the Bladensburg cross's constitutionality. *See id.* at 2103–13 (Ginsburg, J., dissenting).

So, a final tally: We count seven votes for the proposition that history, tradition, and settled practice must at the very least be consulted—for

19

"guidance"—in deciding an Establishment Clause case, and five votes in favor of granting a formal "presumption of constitutionality" to established religious displays and monuments.

*     *     *

What does all this mean for *Rabun*—and for our own earlier reliance on *Rabun* to invalidate Pensacola's Bayview Park cross?  In short, we think it means that *Rabun*'s Establishment Clause analysis no longer controls and that we must assess the cross's constitutionality afresh under *American Legion*.  As we explained in our initial opinion, the panel in *Rabun* (1) applied *Lemon* and (2) rejected historical practice as a reliable guide for Establishment Clause cases. *Kondrat'yev*, 903 F.3d at 1173–74.  In stark contrast, the Supreme Court in *American Legion* made clear (1) that *Lemon* does not apply in religious-display cases and (2) that history and tradition matter.

When an intervening Supreme Court decision is "clearly on point" and "clearly inconsistent" with preexisting Eleventh Circuit precedent, *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1292 (11th Cir. 2003), "we are bound to follow [the] Supreme Court," *Overlook Gardens Props., L.L.C. v. Orix USA, L.P.*, 927 F.3d 1194, 1201 (11th Cir. 2019).  We have little difficulty in concluding that with respect to the applicability of *Lemon* and the relevance of history, tradition, and settled practice, the Supreme Court's decision in *American*

20

*Legion* is both "clearly on point" and "clearly inconsistent" with *Rabun*.

Accordingly, we conclude that *Rabun* is abrogated—not as to standing, *see supra*

at 8–12, but as to its Establishment Clause analysis and holding—and that we must

follow *American Legion* instead.

When we apply *American Legion* rather than *Rabun*, we conclude that the

Bayview Park cross does not violate the Establishment Clause.  Explaining why

will require a little bit of, well, explaining.

### 2

Applying *American Legion* is (as you've probably already sensed) easier

said than done; the Supreme Court's splintered decision spans more than 80 slip-

opinion pages and comprises seven separate writings.[3]  But several principles do

emerge.  Perhaps the clearest—alongside *Lemon*'s inapplicability to display cases

and history and tradition's significance—is that "established" religious monuments

---

[3] From the syllabus:

ALITO, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II–B, II–C, III, and IV, in which ROBERTS, C. J., and BREYER, KAGAN, and KAVANAUGH, JJ., joined, and an opinion with respect to Parts II–A and II–D, in which ROBERTS, C. J., and BREYER and KAVANAUGH, JJ., joined.  BREYER, J., filed a concurring opinion, in which KAGAN, J., joined.  KAVANAUGH, J., filed a concurring opinion.  KAGAN, J., filed an opinion concurring in part.  THOMAS, J., filed an opinion concurring in the judgment.  GORSUCH, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined.  GINSBURG, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined.

and displays are entitled to a formal "presumption of constitutionality." Justice Alito's four-member plurality opinion, for instance, states that reviewing courts should apply "a presumption of constitutionality for longstanding monuments, symbols, and practices." *American Legion*, 139 S. Ct. at 2081–82 (plurality). Even more significantly, a portion of his opinion joined by Justice Kagan—and thus representing the decision of the full Court—goes on to reiterate that "a strong presumption of constitutionality" attaches to "established" monuments. *Id.* at 2085 (opinion of the Court). Clear enough.

Far *less* clear from *American Legion*—but just as important to our consideration of the Bayview Park cross's constitutionality—is exactly how and when this "strong presumption" arises and how and when it can be rebutted. We turn, then, to those two issues.[4]

---

[4] As our earlier summary indicates, it's unclear exactly how ("established"-ness aside) history and tradition (more generally) should be weighed in Establishment Clause analysis post-*American Legion*. *Compare, e.g.*, *American Legion*, 139 S. Ct. at 2087 (plurality) ("look[ing] to history for guidance" in Establishment Clause cases), *with, e.g.*, *id.* at 2091 (Breyer, J., concurring) (agreeing that it's "appropriate[]" to "look[] to history for guidance," but clarifying that, in his view, the cross's constitutionality ultimately turned on "its particular historical context and its long-held place in the community"), *and, e.g.*, *id.* at 2094 (Kagan, J., concurring in part) (also agreeing that it's important to "look[] to history for guidance," but declining to "sign on to any broader statements about history's role in Establishment Clause analysis"), *and, e.g.*, *id.* at 2094–98 (Thomas, J., concurring in the judgment) (referring to practices "at the founding," the "historical characteristics of an establishment of religion," and "our Nation's history and traditions"), *and, e.g.*, *id.* at 2101 (Gorsuch, J., concurring in the judgment) (agreeing that "the Establishment Clause must be interpreted by reference to historical practices and understandings"). To the extent that history and tradition have a meaningful role to play, they cut decisively in favor of the Bayview Park cross's constitutionality for reasons that have been explained elsewhere and that we needn't repeat here. *See Kondrat'yev*, 903 F.3d at 1180–82

22

**a**

First, how does the presumption of constitutionality arise?  In embracing the

presumption, the Supreme Court highlighted "four considerations," which, it said,

demonstrate "that retaining established, religiously expressive monuments,

symbols, and practices is quite different from erecting or adopting new ones."  *Id*.

To recap, those considerations are as follows: (1) that "identifying the[] original

purpose or purposes" of an established monument "may be especially difficult";

(2) that "as time goes by, the purposes associated with an established monument,

symbol, or practice often multiply"; (3) that "the message conveyed" by the

monument "may change over time"; and (4) that "when time's passage imbues" a

monument with "familiarity and historical significance, removing it may no longer

appear neutral" toward religion.  *Id.* at 2082–85 (alteration adopted) (quotation

omitted).

The trick is that the Supreme Court's opinion sends mixed messages about

whether and to what extent the four "considerations" inform the operation of the

presumption.  In particular, it's not clear whether, by articulating the four

considerations, the Court intended to explain how and why it reached its

conclusion that the presumption should apply—or instead to prescribe a list of

---

(Newsom, J., concurring in the judgment) (chronicling and describing similar crosses on public land, dating back at least as far as 1782).

prerequisites that must obtain before the presumption applies.  If the considerations were just steps in the Court's analysis, then the presumption will arise simply by virtue of a religious display's "established"-ness.  If, on the other hand, the considerations impose mandatory conditions—prerequisites—then the presumption would seemingly arise *only* where all (or the balance?) of the four considerations apply.  Hence the question that confronts us: Does the presumption apply categorically, to all established religious monuments, or only to those particular monuments (even if established) that meet the four considerations?  Our answer: Hard to say.  Happily, we needn't resolve the uncertainty here because, either way, we conclude that the presumption applies to the Bayview Park cross.

In *Freedom From Religion Foundation, Inc. v. County of Lehigh*, the Third Circuit recently opted for the first interpretation, holding that *American Legion*'s presumption of constitutionality applies categorically to all established religious displays and that it isn't necessary for a particular monument to separately satisfy all four considerations to qualify.  933 F.3d 275, 282 (3d Cir. 2019).  That may well be right; there's certainly language in the Supreme Court's opinion(s) that leaves that impression.  Perhaps most notably, the plurality introduced its discussion of the considerations this way:

> For at least four reasons, the *Lemon* test presents particularly daunting problems in cases, including the one now before us, that involve the use, for ceremonial, celebratory, or commemorative purposes, of words or symbols with religious associations.  Together, these

> considerations counsel against efforts to evaluate such cases under
> *Lemon* and toward application of a presumption of constitutionality
> for longstanding monuments, symbols, and practices.

*American Legion*, 139 S. Ct. at 2081–82 (plurality) (footnote omitted).  That

language—"cases . . . that involve" religious symbols, "such cases," etc.—strongly

suggests that the presumption of constitutionality applies, categorically, to *all*

"longstanding monuments, symbols, and practices."  *Id.*  That suggestion is

reinforced by the (full) Court's discussion of the four considerations themselves,

which likewise implies that the presumption applies categorically and that the

considerations are not necessary prerequisites.  The Court observed, for instance—

1. that "these cases" (seemingly as a class) "often" (not invariably) concern
   monuments that were erected long ago and whose original purposes "may
   be" (not are) difficult to discern, *id.* at 2082 (opinion of the Court);

2. that as time passes the purposes associated with an established monument
   "often" (not invariably) multiply and that the existence of multiple purposes
   is "more likely" (not certain) to occur in "such cases" (again, seemingly as a
   class), *id.* at 2082–83;

3. that the message associated with such a monument "may" (not will) evolve
   over time, *id.* at 2084; and

4. removing a longstanding and thus familiar monument "may" (not will)
   appear hostile, rather than neutral, toward religion, *id.* at 2084–85.

The Court (again, the full Court) then capped its discussion by stating that "[t]hese

four considerations show that retaining established, religiously expressive

monuments, symbols, and practices"—again, apparently as a class—"is quite

different from erecting or adopting new ones," and that, accordingly, "[t]he

passage of time gives rise to a strong presumption of constitutionality." *Id.* at 2085.

Now, in fairness, there is also language in *American Legion* that cuts the other way—toward a conclusion that, in order to qualify for the presumption, a particular monument must satisfy all (or at least the balance of the) four considerations. For instance, the Supreme Court purported to "apply[] these principles"—by which it seemed (?) to mean the considerations—to hold that "the Bladensburg Cross does not violate the Establishment Clause." *Id.* at 2089. And in its concluding paragraph, the Court appeared to march through the considerations, pretty methodically, with respect to the Bladensburg cross specifically:

> The cross is undoubtedly a Christian symbol, but that fact should not blind us to everything else that the Bladensburg Cross has come to represent. **[Considerations 1 and 2]** For some, that monument is a symbolic resting place for ancestors who never returned home. For others, it is a place for the community to gather and honor all veterans and their sacrifices for our Nation. For others still, it is a historical landmark. **[Considerations 2 and 3]** For many of these people, destroying or defacing the Cross that has stood undisturbed for nearly a century would not be neutral and would not further the ideals of respect and tolerance embodied in the First Amendment. **[Consideration 4]**

*Id.* at 2090. Having assessed each of the considerations individually, the Court concluded: "For all these reasons, the [Bladensburg] Cross does not offend the Constitution." *Id.*

26

In short, we think there are two plausible readings of *American Legion*—one, which the City advocates and the Third Circuit has adopted, would apply a presumption of constitutionality to any "established" religious monument; the other, which plaintiffs advocate, would apply the presumption only to monuments that separately satisfy the four considerations that the Supreme Court highlighted in its decision.  Fortunately, we conclude that we needn't choose between these two readings, because we are satisfied that the presumption attaches under either one.

On the City's (and Third Circuit's) categorical interpretation, the Bayview Park cross plainly qualifies—the cross is "established" (given its age, whether deemed to be roughly 50 or roughly 75 years old), "religiously expressive" (it's a cross), and a "monument" or "symbol."  *See id.* at 2085.  Enough said.

Although it takes a bit of unpacking, we're also satisfied that the presumption attaches even if *American Legion*'s four considerations are necessary preconditions.  First, here, as is "often" the case with established monuments, "identifying [the cross's] original purpose or purposes [is] especially difficult." *See id.* at 2082.  The record demonstrates (1) that the National Youth Administration erected a wooden cross in Bayview Park as part of an Easter sunrise program organized by the Pensacola Jaycees, (2) that the original wooden cross was later replaced with a concrete version dedicated at the 29th annual Easter

service, and (3) that the Jaycees later donated to the cross to the City—but not much else.  And to complicate matters further, the "difficult[y]" of isolating the Bayview Park cross's "original purpose" is compounded by the fact that there are three entities whose intentions might plausibly matter: the National Youth Administration, the Jaycees, and the City.  Even if we were to assume that the National Youth Administration and the Jaycees had religious motivations for erecting the cross in the first place, what of the City—which is, after all, the only state actor in the mix and thus the only entity capable of violating the First Amendment?  Plaintiffs haven't offered any meaningful evidence regarding the City's own motivations, either for allowing the erection of the original wooden cross, for permitting its replacement with the current concrete cross, or for accepting the Jaycees' donation.  Without better evidence as to the City's "original purpose" concerning the cross, we think "it would be inappropriate for [us] to compel [its] removal or termination based on supposition."  *See id.*

Second, as is likewise characteristic of established monuments, the purposes associated with the Bayview Park cross have multiplied over time.  *See id.*  Whatever the City's original motivation for allowing the cross's erection and subsequent replacement and donation, it's clear that in the ensuing years the cross has come to serve multiple purposes.  For instance, although it has remained the location for an annual Easter sunrise program, it has also been used as a site for

remembrance services on Veterans and Memorial Days, as well as a place for citizens to gather during times of national crisis—*e.g.*, following the death of President Roosevelt, during times of war, etc.  Moreover, the cross, bandstand, and surrounding area have hosted many community gatherings—including boat festivals, fundraising walks, outdoor movie nights, and weddings—and there is no evidence that the City has ever made the space available to the public on anything other than a neutral basis.  (The surest proof of that fact: Just two months before the filing of this lawsuit, the City granted plaintiff David Suhor's request to reserve the cross for his own "satanic purposes," which required a church that had already reserved it to move to another area of the park.)  So, what the Supreme Court said in *American Legion* applies here precisely: "Even if the original purpose of a monument was infused with religion, the passage of time may obscure that sentiment," and "[a]s our society becomes more and more religiously diverse, a community may preserve such monuments, symbols, and practices for the sake of their historical significance or their place in a common cultural heritage."  *Id.* at 2083.

Third, as with other established monuments, the "message conveyed" by the Bayview Park cross seems to have "change[d] over time."  *See id.* at 2084 (quotation omitted).  As the Supreme Court explained in *American Legion*, "[w]ith sufficient time, religiously expressive monuments, symbols, and practices can

become embedded features of a community's landscape and identity . . . [and] [t]he community may come to value them without necessarily embracing their religious roots." *Id.* Here, the cross's message has evolved into a neutral one as it has become embedded in the fabric of the Pensacola community by hosting a variety of gatherings and events, both religious and secular. This sort of "[f]amiliarity itself can become a reason for preservation." *Id.*

Finally, where, as here, "time's passage imbues a religiously expressive monument, symbol, or practice with this kind of familiarity and historical significance, removing it may no longer appear neutral . . . ." *Id.* Removal of the Bayview Park cross at this point—more than 75 years after its original erection and more than 50 years after its replacement with the current concrete version—could well, in the Supreme Court's words, "strike many as aggressively hostile to religion." *See id.* at 2085.

So in short, even assuming (contra the Third Circuit) that a religious monument must satisfy *American Legion*'s four "considerations" before the presumption of constitutionality arises, we conclude that they are satisfied here, and that the presumption therefore applies.

**b**

So, either way you slice it, the presumption attaches. Next question: Can the presumption be rebutted here—and if so, how? Unfortunately, we find even less

guidance in *American Legion* about that.  The parties offer competing theories, which we will consider in turn.

Borrowing from the Third Circuit's analysis in *Lehigh*, the City contends that the only way the presumption can be overcome is by "demonstrating 'discriminatory intent' in the government's decision to maintain the monument, or 'deliberate disrespect' in the monument's design."  Supplemental Br. of Appellants at 8 (alterations adopted) (quotation omitted).  As best we can tell, the quoted phrases appear to have been taken, respectively, from the introduction to the *American Legion* opinion and from a passing comment in the opinion relating to the Bladensburg cross's status as a World War I memorial.  *See American Legion*, 139 S. Ct. at 2074, 2089.  We aren't convinced that the Supreme Court meant to make either (or both) of those isolated and unexplained references "the test" for rebutting the presumption of constitutionality, but with so little to go on, we might as well consider them.  In short, we agree with the City that, to the extent they are the proper measure(s), plaintiffs have failed to demonstrate either "discriminatory intent" or "deliberate disrespect" in the monument's maintenance or design.

First, plaintiffs have provided no evidence of the sort of discriminatory intent that would warrant invalidating a presumptively constitutional monument.  It's hard to imagine how the City could more convincingly demonstrate its commitment to neutrality than by allowing use of the cross for any purpose—

31

including one of the complaining plaintiffs' own satanic rituals.  Second, plaintiffs

offer no evidence of deliberate disrespect in the monument's design.  There is

nothing unique—let alone uniquely disrespectful—about the Bayview Park cross.

And as *American Legion* itself explains, that "[t]he cross is undoubtedly a

Christian symbol" shouldn't "blind us to everything else" it represents.  *Id.* at

2090.

For their part, plaintiffs advocate a different test; they say that even if the

presumption of constitutionality applies, it is overcome in this case for two

reasons—(1) the Bayview Park cross's "blatant[] religious purpose" and (2) the

fact that it is not a war memorial.  Supplemental Br. of Appellees at 11–12.  We

disagree.

As to plaintiffs' first contention: As we just explained, *American Legion*

itself demonstrates that an "undoubtedly . . . Christian symbol"—in particular, a

Latin cross—may nevertheless pose no Establishment Clause concerns.  *American*

*Legion*, 139 S. Ct. at 2090.  Moreover, as we've also explained, the Bayview Park

cross's original purpose isn't entirely clear, and it has in any event multiplied and

evolved over time.  In other words, plaintiffs' "blatant[] religious purpose"

criterion for rebutting the presumption adds little, if anything, to the first two

*American Legion* "considerations," which, on plaintiffs' own reading, inform the

presumption's applicability in the first place.

As to plaintiffs' second contention: Although it's true that a single sub-section of the *American Legion* opinion focuses on the Bladensburg cross's status as a World War I memorial, it's also clear that the Supreme Court didn't consider that to be a necessary condition of its holding.  Conspicuously, the Court didn't include war-memorial status among the four considerations that it used to support its conclusion and that plaintiffs emphasize here.  And in any event, although the Bayview Park cross wasn't officially erected as a war memorial, it has certainly been used as one over the years—an evolutionary purpose (and character) that we must give weight when applying *American Legion*.  *See id.* at 2082–83.

In sum, we're not convinced that either of the parties' proposals was intended to be "the test" pursuant to which a plaintiff might seek to rebut the presumption that applies to established religious monuments.  Plaintiffs' proposal, it seems to us, is hard to square with *American Legion* itself.  And *if* the City's proposal applies, we don't think that plaintiffs have satisfied it.  In either event, we find no basis for concluding that the presumption of constitutionality has been overcome in this case.

*        *        *

Having reconsidered the case in light of *American Legion*, we conclude, as the Supreme Court did there, that "the Cross does not offend the Constitution." *See id.* at 2090.

**III**

For the foregoing reasons, we hold (1) that we remain bound by this Court's decision in *Rabun* to conclude that plaintiffs have Article III standing to challenge Pensacola's maintenance of the Bayview Park cross, but (2) that when *American Legion*—rather than *Rabun* (and through it, *Lemon*)—is applied, the cross's presence on city property does not violate the Establishment Clause.

**REVERSED.**

NEWSOM, Circuit Judge, joined by ROYAL, District Judge, concurring:

This, I suppose, is Pensacola Cross Case Concurrence 2.0.

As the majority opinion explains, the Supreme Court's decision in *American Legion v. American Humanist Association*, 139 S. Ct. 2067 (2019), didn't address the issue of the plaintiffs' standing one way or the other. Accordingly, as the majority opinion likewise explains, we have no basis for revisiting the standing analysis contained in our initial opinion—as we do our merits analysis. So under our prior-panel-precedent rule,[1] we are bound by *American Civil Liberties Union of Georgia v. Rabun County Chamber of Commerce, Inc.*, 698 F.2d 1098 (11th Cir.

---

[1] According to the prior-panel-precedent rule,

> a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*. While an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court, the Supreme Court decision must be clearly on point.

*United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (citation and quotation omitted). We haven't been perfectly consistent in our articulation of the rule, and other formulations would seem to allow subsequent panels more wiggle room. *See, e.g.*, *United States v. Madden*, 733 F.3d 1314, 1319 (11th Cir. 2013) ("[O]ur prior precedent is no longer binding once it has been substantially undermined or overruled by . . . Supreme Court jurisprudence." (quotation omitted)); *Footman v. Singletary*, 978 F.2d 1207, 1211 (11th Cir. 1992) ("We may decline to follow a decision of a prior panel if necessary to give full effect to a United States Supreme Court decision."); *Leach v. Pan Am. World Airways*, 842 F.2d 285, 286 (11th Cir. 1988) ("[A]ccording to both Eleventh and Fifth Circuit precedent [a three-judge] panel may not overlook decisions by the Supreme Court which implicitly overrule a binding circuit decision, or undercut its rationale."). As tempting as it may be to invoke one of the flabbier variants in order to "write around" *Rabun*, the majority opinion resists the urge. The way I see it, a healthy respect for the decisions of my colleagues—both past and present—counsels a fairly rigorous application of the prior-panel-precedent rule.

1983), to conclude that the plaintiffs here have standing to contest the City of Pensacola's maintenance of the Bayview Park cross.

But that won't keep me from reiterating my position that *Rabun*'s standing analysis—and in particular its full-on embrace of what Justice Gorsuch recently called the "offended observer" theory, *see American Legion*, 139 S. Ct. at 2098 (Gorsuch, J., concurring in the judgment)—is just plain wrong.  So here goes. [Warning: If a lot of this sounds familiar, it should.  *See Kondrat'yev v. City of Pensacola*, 903 F.3d 1169, 1174–77 (11th Cir. 2018) (Newsom, J., concurring in the judgment), *cert. granted, judgment vacated*, 139 S. Ct. 2772 (2019).  It's not plagiarism when you do it to yourself.]

*    *    *

Plaintiffs Andre Ryland and David Suhor assert that they feel "offended," "affronted," and "excluded" by the Bayview Park cross.  Neither, though, it seems, has been sufficiently affected to take any affirmative steps to avoid the cross.  To the contrary, Ryland has explained that he continues to use Bayview Park "many times throughout the year" and that he "often" encounters the cross when "walk[ing] the trail around the park."  So too, Suhor says that he "visit[ed] Bayview Park regularly" for years before filing suit and that he still "encounter[s] [the cross] on regular bike rides" there.  (Suhor also used the cross for his own purposes in 2016, just before filing suit—for some kind of satanic ritual.

Under the Supreme Court's pathmarking Establishment Clause standing case, *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982), the plaintiffs' allegations here— offense, affront, exclusion—are plainly inadequate.  There, the Court held, in no uncertain terms, that "the psychological consequence presumably produced by observation of [religious] conduct with which one disagrees" is "not an injury sufficient to confer standing under Art[icle] III, even though the disagreement is phrased in constitutional terms."  *Id*. at 485–86.

Just a year after *Valley Forge*, however, a panel of this Court upheld the standing of two plaintiffs in *Rabun*, who sued to remove a large Latin cross from a state park in Georgia.  698 F.2d at 1101, 1108–09.  The panel acknowledged *Valley Forge*'s holding that "psychological" injury doesn't give rise to Article III standing in an Establishment Clause case.  *Id.* at 1106.  Even so, the panel concluded that the *Rabun* plaintiffs had sufficiently alleged an injury-in-fact *both* (1) by testifying that they were unwilling to camp in the state park so long as the cross stood there *and*, separately, (2) "by the evidence of the physical and metaphysical impact of the cross."  *Id*. at 1108.  Thus, we said, the plaintiffs there suffered injury because they were required *either* (1) to relocate to other camping areas *or*—again, separately—(2) "to have their right to use [the state park] conditioned upon the acceptance of unwanted symbolism," the latter of which the

panel described as a form of "spiritual harm." *Id*. *Rabun* makes clear, therefore, that at least in this Circuit, it is enough for an Establishment Clause plaintiff to allege that he has suffered "metaphysical" or "spiritual" harm as a result of observing religious conduct or imagery with which he disagrees.[2]

Can it really be that, as *Valley Forge* clearly holds, "psychological" harm is *not* sufficient to establish Article III injury in an Establishment Clause case, and yet somehow, as *Rabun* says, "metaphysical" and "spiritual" harm *are*? And can it really be that I—as a judge trained in the law rather than, say, neurology, philosophy, or theology—am charged with distinguishing between "psychological" injury, on the one hand, and "metaphysical" and "spiritual" injury, on the other? Come on. It seems clear to me that *Rabun* was wrong the day it was decided— utterly irreconcilable with the Supreme Court's then-hot-off-the-presses decision in *Valley Forge*.

And to make matters worse, *Rabun* has only gotten more wrong as time has passed. Since 1983, the Supreme Court has consistently tightened standing requirements—emphasizing, for instance, that the "irreducible constitutional

---

[2] In *Glassroth v. Moore*, we held that two plaintiffs who "altered their behavior" to avoid a large Ten Commandments monument in the rotunda of the Alabama Supreme Court "ha[d] suffered and . . . continue[d] to suffer injuries in fact sufficient for standing purposes." 335 F.3d 1282, 1292 (11th Cir. 2003). Having done so, we excused ourselves from deciding whether another plaintiff, "who ha[d] not altered his behavior as a result of the monument, ha[d] standing." *Id*. at 1293.

minimum" comprises three distinct elements, *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 (1992); that the "[f]irst and foremost" of those elements is injury-in-

fact, *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998); and

perhaps most significantly for present purposes, that an actionable injury must be

not only "particularized" in the sense that it affects the plaintiff in an individual

way, but also "concrete" in the sense that it "actually exist[s]" and is "real" rather

than "abstract," *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1548 (2016) (quotations

omitted).  Notably, along the way—and again, in cases since *Rabun* was decided—

the Court has expressly rejected "stigma[]," *Allen v. Wright*, 468 U.S. 737, 754–55

(1984), "conscientious objection," *Diamond v. Charles*, 476 U.S. 54, 67 (1986),

and "fear," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 417–18 (2013), as

judicially cognizable injuries.

　　To be clear, the question whether Article III's standing requirement is

satisfied by the sort of squishy "psychological" injury that carried the day in

*Rabun*—and via *Rabun*, in this case—is no mere academic issue.  Rather, it

touches on fundamental constitutional postulates.  "The law of Article III

standing," the Supreme Court has said, "is built on separation-of-powers

principles, [and] serves to prevent the judicial process from being used to usurp the

powers of the political branches."  *Clapper*, 568 U.S. at 408.  In particular, the

Court has emphasized that standing questions "must be answered by reference to

the Art[icle] III notion that federal courts may exercise power only 'in the last resort, and as a necessity.'" *Allen*, 468 U.S. at 752 (quoting *Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345 (1892)).  In the same vein, with respect to concreteness—the aspect of the injury-in-fact requirement principally at issue here—the Court has underscored that when, as in this case, "a court is asked to undertake constitutional adjudication, the most important and delicate of its responsibilities, the requirement of concrete injury . . . serves the function of insuring that such adjudication does not take place unnecessarily." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).  By contrast, "[t]o permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing 'government by injunction.'" *Id*. at 222.

In short, standing rules *matter*—and the sweeping standing rule that *Rabun* embodies threatens the structural principles that underlie Article III's case-or-controversy requirement.

*     *     *

One last thing.  Although the Supreme Court's decision in *American Legion* neither adds nor changes anything with respect to standing, that's not to say that no

one there noticed the difficulties presented when an onlooker claims that

"offen[se]" or "affront[]" clothes him with the authority to sue under the

Establishment Clause.  Justice Gorsuch filed a separate opinion concurring in the

Court's judgment—joined by Justice Thomas—in which he vigorously objected

that the plaintiffs there lacked Article III standing to challenge the constitutionality

of the Bladensburg cross.  In particular, he said, the *Rabun*-style theory of

standing—which he aptly called "offended observer" standing—"has no basis in

law."  *American Legion*, 139 S. Ct. at 2098 (Gorsuch, J., concurring in the

judgment).

     Justice Gorsuch's critique tracks mine pretty closely.  (Or perhaps it's that

mine anticipated his pretty closely.  Whatever—we see it the same way.)  He cites

many of the same cases that I've flagged—*e.g.*, *Schlesinger v. Reservists Comm. to

Stop the War*, 418 U.S. 208 (1974), *Allen v. Wright*, 468 U.S. 737 (1984), and

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)—for the proposition that the

Supreme Court has long rejected allegations of offense, fear, and stigma as

sufficient to establish standing.  *American Legion*, 139 S. Ct. at 2099–2100

(Gorsuch, J., concurring in the judgment).  He makes essentially the same

separation-of-powers point that I've highlighted—in his words, that "[i]f

individuals and groups could invoke the authority of a federal court to forbid what

they dislike for no more reason than they dislike it, we would risk exceeding the

judiciary's limited constitutional mandate and infringing on powers committed to other branches of government." *Id*. at 2099.  Perhaps most notably, he emphasizes—as I have—that the Court "has already expressly rejected 'offended observer' standing under the Establishment Clause itself." *Id*. at 2100 (citing *Valley Forge*, 454 U.S. 464).  There, as he notes—and as I've explained—the Court held, unmistakably, that "the psychological consequence presumably produced by observation of conduct with which one disagrees" is not "sufficient to confer standing under Art[icle] III." *Valley Forge*, 454 U.S. at 485.

Couldn't have said it better myself.

\*     \*     \*

For all these reasons, we should—whether in this case or some other— convene en banc in order to bring our own Establishment Clause standing precedent into line with the Supreme Court's and to clarify that "offen[se]," "affront[]," and "exclu[sion]" fail to satisfy Article III's injury-in-fact requirement.